# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PETER BISTRIAN,<br>    Plaintiff, | :<br>:<br>: |
| v. | :<br>:    CIVIL ACTION NO. 08-cv-3010 |
| WARDEN TROY LEVI, et al.<br>    Defendants. | :<br>:    MAR -6 2018<br>: |

## MEMORANDUM OPINION

**Rufe, J.**                                                                 **March 6, 2018**

Plaintiff Peter Bistrian brings this action against prison officials of the Federal Detention

Center ("FDC") in Philadelphia and the United States of America, alleging violations of his First,

Fifth, and Eighth Amendment rights, as well as violations of the Federal Tort Claims Act

("FTCA"). Plaintiff's claims arise out of his placement in the Special Housing Unit ("SHU")

while detained at FDC Philadelphia. The prison officials have moved for summary judgment,

and the United States has moved to dismiss, or in the alternative for summary judgment, for lack

of jurisdiction. For reasons set forth below, the Court will grant in part and deny in part the

motions.

## I.  BACKGROUND

### A.  FACTUAL BACKGROUND[1]

Peter Bistrian was detained at FDC Philadelphia pending his trial and through sentencing

on wire fraud-related charges from August 2005 until March 2008.[2] During his time at FDC

---

[1] The facts are either agreed upon by the parties or set forth in the light most favorable to Plaintiff as the non-moving party.

[2] Plaintiff was released on bail after his arrest for wire-fraud charges. However, in August 2005, he failed to appear at trial and became a fugitive. He was subsequently arrested at the Canadian border as he attempted to flee the United States, and was sent to FDC Philadelphia where he was detained until sentencing. Defs.' Proposed Statement of Undisputed Facts (Doc. No. 197-2) at ¶¶ 90-91.

Philadelphia, he spent four spells, totaling 477 non-consecutive days, in the SHU. The SHU is a 120-bed segregated housing unit where roughly 90 to 120 inmates are confined in six-by-eight foot cells in solitary or near-solitary conditions for 23 or 24 hours a day, with little or no opportunity to interact with others.[3] Inmates may be placed in the SHU for administrative or disciplinary purposes.

Administrative detention can occur for a variety of reasons. When an inmate's continued presence in the general population would pose a serious threat to life, property, self, staff, or other inmates, or to the security or orderly running of the institution, the warden may place the inmate in administrative detention if (among other reasons) an investigation of an inmate is pending for violating prison regulations or the inmate requests admission for protective purposes. Bureau of Prison ("BOP") regulations require the warden to prepare an administrative order "ordinarily within 24 hours, detailing the reason(s)" for placement in the SHU.[4] In addition, a Segregation Review Officer ("SRO") must make ongoing determinations about the appropriateness of the inmate's continued placement in administrative detention.[5]

Unlike administrative detention, disciplinary detention is reserved for inmates who have committed serious violations of BOP rules and are designated as exhibiting violent or seriously disruptive behavior. Inmates in disciplinary segregation have fewer privileges than those in administrative detention. Only a Discipline Hearing Officer ("DHO") may impose disciplinary segregation, and may do so after a hearing finding that the inmate has committed a serious prohibited act. An SRO must also monitor inmates in disciplinary segregation and make determinations about the appropriateness of their continued separation.

---

[3] Pl.'s Proposed Statement of Undisputed Facts at ¶ 99.

[4] Defs.' Proposed Statement of Undisputed Facts at ¶ 54 (quoting 28 C.F.R. § 541.25).

[5] *Id.* at ¶ 60 (quoting 28 C.F.R. § 541.26).

## 1. Plaintiff Enters the SHU for the First Time (November 18, 2005 to January 9, 2006)

On November 18, 2005, Plaintiff was transferred out of the general population and into administrative detention in the SHU because he abused his telephone privileges.[6] Three days later, Plaintiff was provided with a copy of the incident reports of his prior telephone abuses, which gave him written notice of the disciplinary charges being brought against him.[7] A hearing on Plaintiff's telephone abuses was held on November 30, 2005, at which time Plaintiff admitted that he had violated BOP rules by placing several unauthorized telephone calls to his former girlfriend using the account of another inmate.[8] After the hearing, on December 9, 2005, the DHO imposed on Plaintiff the following penalties: 8.5 years of lost telephone privileges, 30 days of disciplinary segregation, and 277 days of lost good conduct time.[9] Plaintiff was not given credit for the three weeks he had spent in the SHU up until that time, but was compelled to serve an additional 30 days.[10] After serving the 30-day disciplinary segregation, Plaintiff was released from the SHU on January 9, 2006.[11] Although the propriety of the 30-day disciplinary segregation is not at issue here, Plaintiff bases part of his claims on this initial stint in the SHU, alleging that Defendants failed to review his placement between November 18, 2005 and December 9, 2005.

---

[6] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 154, 157.

[7] *Id.* at ¶ 154 (citations omitted); Defs.' Proposed Statement of Undisputed Facts at ¶ 60 (citation omitted).

[8] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 160-61.

[9] *Id.* at ¶ 162.

[10] *Id.*

[11] *Id.* at ¶ 165.

3

### 2. Plaintiff Enters the SHU for the Second Time (January 25, 2006 to December 8, 2006)

Shortly after he returned to the general population, Plaintiff was again accused of abusing his phone privileges. He was transferred to the SHU for the second time and spent 308 days there (from January 25, 2006 to December 8, 2006).[12] It was during this second period of confinement that things became precariously worse for Plaintiff.

Plaintiff was informed that he was being placed in administrative segregation "pending SIS investigation" for his phone abuse.[13] In late January or February of 2006, Warden Levi was informed that there was no detention order explaining the basis for the segregation in Plaintiff's SHU file.[14] Although Plaintiff requested copies of his detention order, he did not receive a copy until July 6, 2006, which stated that he was being held in the SHU for "security reasons."[15] Despite the delay in receiving the detention order, Plaintiff received a copy of a "SHU review form," which was completed on a monthly basis.[16] The SHU review forms documented that prison officials routinely reviewed Plaintiff's status in the SHU and provided him with "a written copy of staff's decision and the basis for his continued SHU housing assignment at each 30 day review."[17]

In the spring of 2006, Plaintiff was assigned the job of a SHU orderly, which allowed him to be out of his cell and move around the SHU from 6:00 a.m. to 5:00 p.m. daily to complete the

---

[12] *Id.* at ¶ 172.

[13] *Id.* at ¶ 179. SIS refers to Special Investigative Services.

[14] *Id.* at ¶ 178.

[15] In fact, Plaintiff had previously been given a security threat group assignment for his serious and repeated phone abuse. A security threat group is an assignment given to an inmate "if they were a security concern for the orderly running of the institution." Defs.' Proposed Statement of Undisputed Facts at ¶ 118, n.4 (citations omitted).

[16] *Id.* at ¶ 122.

[17] *Id.* For example, Plaintiff's thirty day SHU reviews took place on February 29, March 30, April 27, May 25, June 22, July 20, August 17, September 14, October 12, November 8, and December 3, 2006. *Id.* at ¶ 123.

4

duties of folding clothes, removing food trays, cleaning the cell area, and picking up trash.[18]

Plaintiff worked as an orderly for roughly one to one and a half months.[19] Shortly after

becoming an orderly, Steve Northington (another SHU detainee) asked Plaintiff to pass notes to

other SHU inmates, including Kaboni Savage.[20] Northington and Savage are part of a violent

Philadelphia drug gang, and were being held in an ongoing prosecution that involved substantial

witness intimidation, death threats to witnesses and law enforcement, and a firebombing that

killed six family members of the Government's chief cooperating witness.[21] Savage is currently

on death row for the killings, and Northington is serving a life sentence without the possibility of

parole. After Northington asked Plaintiff to pass a second note, Plaintiff informed Senior Officer

Bowns and Lieutenant Gibbs of Northington's requests.[22] Plaintiff and Gibbs agreed to the

following arrangement: Plaintiff would accept notes from Northington and bring them to

correctional officers in SIS to copy the notes as part of the FBI's ongoing investigation of the

Northington-Savage drug gang, then Plaintiff would return the original note to the intended

recipient.[23] Plaintiff was told that his phone privileges would be reinstated and that he would be

returned to the general population after the note-passing scheme was completed.[24]

For a few weeks, Plaintiff delivered the notes to SIS officials. Defendants Bergos,

Bowns, Gibbs, Jezior, Levi, McLaughlin, Robinson, and Rodgers knew Plaintiff was passing

notes between members of the Northington-Savage gang, and was showing the notes to SIS, so

---

[18] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 186-92.

[19] *Id.* at ¶ 198.

[20] *Id.* at ¶ 199.

[21] *Id.* at ¶¶ 201-02.

[22] *Id.* at ¶¶ 205-06.

[23] *Id.* at ¶ 207.

[24] *Id.* at ¶ 211.

that they could be copied.[25]  On one occasion a few weeks into the note-passing scheme, however, Plaintiff inadvertently delivered a photocopy of an original note that SIS had made to a member of the gang, alerting the gang of his cooperation with prison officials.[26]  Plaintiff told Gibbs of the situation.  Gibbs immediately removed Plaintiff as an orderly for his protection, and Plaintiff returned to the ordinary confinements of the SHU, which included being confined to a cell for 23 to 24 hours each day, with roughly 5 hours of allotted recreation time per week.[27] Despite these safety precautions, Northington and other gang members began threatening Plaintiff.  Plaintiff told Bowns and Gibbs of the threats.[28]  Northington posted a sign on his cell door which read "No Snitches."[29]  Plaintiff had no physical contact with Northington until June 30, 2006.[30]

### a.  June 30, 2006 Northington Attack

On June 30, 2006, Plaintiff was allowed out of his cell to spend one hour in the recreation pen.  However, Northington and two other inmates of the Northington-Savage gang—Jelani Lee and Terry Walker—were also in the recreation area at the time.[31]  Northington, Lee, and Walker

---

[25] *See id.* at ¶¶ 206-08 (explaining that Plaintiff met with Bowns and Gibbs to inform them that Northington wanted Plaintiff to pass notes, and that the three agreed to the arrangement where Plaintiff would pass notes and also cooperate with the officials' investigation), ¶¶ 213-14 (stating that Bergos, Gibbs, Jezior, and Rodgers testified that they knew of the note-passing scheme), ¶¶ 223-25 (explaining that Robinson and Rodgers knew about the note-passing scheme). *See also* Pl.'s Sur-Reply (Doc. No. 229), Ex. B (Bistrian Dep.) at 696-698 (identifying McLaughlin as being aware of the note-passing scheme).

[26] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 217-18.

[27] *Id.* at ¶ 219; Defs.' Proposed Statement of Undisputed Facts at ¶ 146.

[28] Bowns and Gibbs admitted that Plaintiff told them of Northington's threats.  Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 144-45.  Plaintiff also testified that Jezior and Levi knew that he was being threatened.  Pl.'s Sur-Reply (Doc. No. 229), Ex. B (Bistrian Dep.) at 696-98.  Although Jezior and Levi testified that they were never informed of Northington's threats; this contradictory deposition testimony creates a genuine dispute of material fact that precludes summary judgment as to Jezior and Levi.

[29] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 220-21.

[30] Defs.' Proposed Statement of Undisputed Facts at ¶ 149.

[31] Pl.'s Proposed Statement of Undisputed Facts at ¶ 256.

approached Plaintiff and began beating him, knocking him unconscious, dislocating his shoulder, breaking his teeth, and causing other injuries. According to the incident report, Senior Officer Jezior responded to an alarm and, on his arrival outside the recreation area, saw inmates beating Plaintiff. Several staff members arrived on the scene and shouted orders at the assailants to stop the attack. Once a sufficient number of correctional officers had amassed, the officers opened the recreation pen and intervened to move the assailants away from Plaintiff.[32] In the subsequent investigation, Northington explained to officials that he attacked Plaintiff because Plaintiff was cooperating with authorities against him. After the attack, a formal separation order was implemented to ensure Plaintiff would be separated from Northington, Lee, and Walker. Plaintiff remained in the SHU after the attack.[33]

### b. October 12, 2006 Taylor Attack

On October 12, 2006, Plaintiff was attacked for a second time in the recreation pen. Plaintiff was in hand restraints waiting to exit the recreation area when Aaron Taylor, an inmate suffering from mental illness and with a history of violent attacks on fellow inmates,[34] approached him waving a razor-blade weapon, and repeatedly slashed Plaintiff's face, neck, and legs. Still handcuffed, Plaintiff was knocked to the ground and tried to stave off his attacker by kicking at him.[35] Correctional officers shouted orders at Taylor to stop, and fired pepper spray into the pen, to no avail. Defendant Knox then launched an explosive device called a "Tactical

---

[32] Plaintiff alleges that the unspecified SHU Lieutenant did not give the order to open the recreation pen door until 12 to 15 correctional officers were present on the scene. Plaintiff notes that SHU protocol "demands that when two inmates are fighting, correctional officers cannot open the door of the rec cage until the SHU Lieutenant orders them to do so, regardless of what is going on inside the recreation cage, or how long it takes for the Lieutenant to get there." *Id.* at ¶ 258.

[33] *Id.* at ¶ 272.

[34] An investigation after the attack revealed that Taylor "had a history of unprovoked violence toward other inmates." *Id.* at ¶ 285.

[35] *Id.* at ¶¶ 276-78.

7

Blast Stun Munition," which incapacitated Taylor and allowed the officers to enter the recreation pen, secure Taylor, and attend to Plaintiff.[36]  Plaintiff sustained lacerations to the left side of his face and his right forearm.  Plaintiff also suffered back injuries from the explosion of the tactical stun device.  Plaintiff was treated by medical personnel after the assault, but remained in the SHU.

On October 16, 2006, Plaintiff's criminal defense counsel sent a letter to Warden Levi asking for the "basis on which [Plaintiff] is being held" in the SHU.[37]  Warden Levi responded to Plaintiff's counsel, stating:

> Our records indicate inmate Bistrian was placed in the Special Housing Unit (SHU) on January 25, 2006, under administrative detention statue due to his continuous telephone abuse.  Inmate Bistrian has received repetitive infractions for telephone abuse.  While he was housed in the general population, inmate Bistrian persuaded other inmates to place telephone calls on his behalf.  As a result, he was placed in administrative detention as his presence in the general population created security concerns.[38]

Plaintiff's counsel filed a grievance with the FDC on Plaintiff's behalf, and Plaintiff subsequently participated in a hearing with prison officials.  Following the hearing, Plaintiff sent a letter to Warden Levi requesting a transfer to the general population and promising that he would not violate any more BOP policies.[39]  Thereafter, during a SHU review, prison officials determined that Plaintiff should be released from the SHU.  On December 8, 2006, Plaintiff returned to the general population.[40]

---

[36] *Id.* at ¶¶ 280-82.

[37] *Id.* at ¶¶ 358-59.

[38] *Id.* at ¶ 359.

[39] Defs.' Proposed Statement of Undisputed Facts at ¶¶ 178-82.

[40] *Id.* at ¶¶ 183-84.

### 3. Plaintiff Enters the SHU for the Third Time (December 22, 2006 to January 25, 2007)

Plaintiff was removed from the general population and placed into administrative segregation in the SHU for a third time, from December 22, 2006 to January 25, 2007.[41] Defendants allege that Plaintiff was placed in the SHU after the SIS received information on December 21, 2006, which indicated that a contract killing of Plaintiff had been initiated by another inmate.[42] On January 9, 2007, Plaintiff's counsel wrote a letter to Warden Levi asking for the reasoning for Plaintiff's placement in the SHU.[43] On January 22, 2007, Warden Levi responded that the FDC "records indicate[d] inmate Bistrian was placed in SHU on December 22, 2006, under administrative detention status due to an investigation."[44] Three days later, Plaintiff was returned to the general population.[45]

### 4. Plaintiff Enters the SHU for the Fourth Time (September 13, 2007 to December 4, 2007)

Plaintiff was removed from the general population and placed into administrative segregation in the SHU from September 13, 2007 to December 4, 2007.[46] Plaintiff alleges this fourth stint in the SHU was retaliatory in nature, after Plaintiff complained about his treatment at FDC Philadelphia during his sentencing hearing.

On August 23, 2007, Plaintiff participated in the first of two sentencing hearings in his criminal case. At the hearing, Plaintiff's counsel contested the legality of Plaintiff's placement in the SHU. The Government explained that Plaintiff's placement in the SHU was largely due to

---

[41] Pl.'s Proposed Statement of Undisputed Facts at ¶ 360.

[42] Defs.' Proposed Statement of Undisputed Facts at ¶ 186.

[43] *Id.* at ¶ 188.

[44] Pl's Proposed Statement of Undisputed Facts at ¶ 366 (citation omitted).

[45] The propriety of the third period of confinement is not actionable, but is relevant for background.

[46] Defs.' Proposed Statement of Undisputed Facts at ¶ 190.

9

his telephone abuses, and that Plaintiff had just recently violated prison rules again by having another inmate place calls to Plaintiff's sister on his behalf.[47]

Following the hearing, the Government provided Plaintiff's counsel with a recording of two calls made by the other inmate to Plaintiff's sister allegedly on Plaintiff's behalf. On September 11, 2007, Plaintiff's counsel sent an email to counsel for the Government, repeating his challenge to the purported telephone violation charges against Plaintiff, and demanding a copy of the applicable prison regulations.[48] Counsel for the Government forwarded the email to FDC Philadelphia. The next day, Senior Officer Jezior wrote an incident report, documenting that Plaintiff had violated BOP rules by convincing another inmate to place unauthorized calls to Plaintiff's sister.[49] On September 13, 2007, Plaintiff was removed from the general population and transferred to the SHU.[50] The next day, Plaintiff received a hearing on this violation, and the hearing officer imposed on Plaintiff a 60-day loss of phone privileges.[51]

Plaintiff remained in the SHU after the hearing was completed. Plaintiff filed a grievance challenging his continued placement in the SHU, but the grievance was denied. Plaintiff later appealed the decision, but the appeal was also rejected.[52] During this time, Plaintiff alleges that Warden Levi told him that "he would never see the light of day again."[53] Psychology staff also conducted monthly reviews of Plaintiff's condition, but noted only that Plaintiff's adjustment to

---

[47] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 368-71.

[48] *Id.* at ¶¶ 371-72.

[49] *Id.* at ¶¶ 374-76.

[50] Defs.' Proposed Statement of Undisputed Facts at ¶ 190.

[51] *Id.* at ¶¶ 380, 384.

[52] *Id.* at ¶¶ 390-91, 394-95.

[53] *Id.* at ¶ 391 (citation omitted).

10

the SHU had been "unremarkable."[54] Plaintiff returned to the general population on December 4, 2007.[55] On March 14, 2008, Judge DuBois sentenced Plaintiff to 57 months' imprisonment. Two days later, Plaintiff was transferred to the Metropolitan Correctional Center in New York, New York.[56]

## B. PROCEDURAL HISTORY

Plaintiff initially raised nineteen claims against various prison officials at FDC Philadelphia, as well as the United States. After this Court's ruling on Defendants' motions to dismiss, six claims survived against twenty-eight defendants. On interlocutory appeal, the United States Court of Appeals for the Third Circuit pared down the action further as to both the number of claims and defendants.[57] The following claims and defendants remain:

- **Count I: Fifth Amendment Substantive Due Process (Failure to Protect)**
  - Claim: Defendants were deliberately indifferent to the risk posed by placing Plaintiff in the same locked recreation pen as Northington and his gang.
  - Defendants (13): (1-10) The 10 Prison Management Defendants[58]; (11) Sr. Officer Bowns; (12) Lt. Rodgers; and (13) Lt. Robinson.
  - Claim/Defendant: Jezior was deliberately indifferent to Plaintiff's safety during the Northington attack.

- **Count III: Fifth Amendment Substantive Due Process (Punitive Detention)**
  - Claim: Plaintiff's first detention in the SHU, his second until the beginning of the note-copying operation, and his fourth, deprived him of his liberty interest, as an inmate awaiting sentencing, to be free from punishment.

---

[54] *Id.* at ¶ 392 (citation omitted).

[55] Defs.' Proposed Statement of Undisputed Facts at ¶ 198.

[56] *Id.* at ¶ 199.

[57] *Bistrian v. Levi*, 696 F.3d 352 (3d Cir. 2012). The United States did not take part in the appeal.

[58] The 10 Prison Management Defendants are: Warden Levi, Assistant Wardens Brown and Blackman, five members of the Corrections Officers staff (Captain Knox, Lt. Gibbs, Sr. Officer Jezior, Sr. Officer Bergos and Unit Manager White), and two Special Investigative Agents (McLaughlin and Garraway).

11

- Defendants (10): (1-10) The 10 Prison Management Defendants.

- **Count V: Fifth Amendment Procedural Due Process**

  - Claim: Plaintiff's placement and continued detention in the SHU failed to comply with the Fifth Amendment's procedural due process requirements.

  - Defendants (11): (1-10) The 10 Prison Management Defendants; and (11) Lt. Wilson.

- **Count X: First Amendment (Retaliation)**

  - Claim: Plaintiff's placement and continued detention in SHU after his attorney challenged Plaintiff's previous placement was retaliatory for exercising his First Amendment rights.

  - Defendants (10): (1-10) The 10 Prison Management Defendants.

- **Count XV: FTCA Negligence Claim (Failure to Protect as a Confidential Informant)**

  - Claim: The United States of America negligently failed to protect Plaintiff, who was cooperating with authorities, from the Northington attack by locking Plaintiff in the recreation cage with Northington and his fellow gang members.

  - Defendant: The United States of America

- **Count XVI: FTCA Negligence Claim (Failure to Protect from Assault)**

  - Claim: The United States of America negligently failed to protect Plaintiff from the Taylor assault.

  - Defendant: The United States of America

The prison officials move for summary judgment on all remaining claims. In addition, the

United States moves to dismiss the claims asserted against it, or in the alternative for summary

judgment, for lack of jurisdiction.

## II.   STANDARD OF REVIEW

Upon motion of a party, summary judgment is appropriate if "the materials in the record"

show "that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law."[59] Summary judgment may be granted only if the moving party persuades the district court that "there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party."[60] A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law.[61] A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party."[62]

In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor.[63] Further, a court may not weigh the evidence or make credibility determinations.[64] Nevertheless, the party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record.[65] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[66] This requirement upholds the "underlying purpose of summary judgment [which] is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense."[67] Therefore, if, after making all

---

[59] Fed. R. Civ. P. 56(a), (c)(1)(A).

[60] *Miller v. Ind. Hosp.*, 843 F.2d 139, 143 (3d Cir. 1988).

[61] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[62] *Id.*

[63] *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005).

[64] *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998).

[65] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[66] *Anderson*, 477 U.S. at 249-50 (citations omitted).

[67] *Walden v. Saint Gobain Corp.*, 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) (citing *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976)).

reasonable inferences in favor of the non-moving party, the court determines that there is no genuine dispute as to any material fact, summary judgment is appropriate.[68]

## III. DISCUSSION

### A. COUNT I: FIFTH AMENDMENT SUBSTANTIVE DUE PROCESS (FAILURE TO PROTECT)

In Count I, Plaintiff raises a Fifth Amendment substantive due process claim against the 10 Prison Management Defendants, Senior Officer Bowns, Lieutenant Rodgers, and Lieutenant Robinson, alleging Defendants failed to protect him from inmate violence when locking him in the recreation pen with Northington. Plaintiff also alleges that Senior Officer Jezior[69] was deliberately indifferent to his safety during the Northington attack.

"Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society."[70] Therefore, the Eighth Amendment's Cruel and Unusual Punishments Clause imposes on prison officials "a duty . . . to protect prisoners from violence at the hands of other prisoners."[71] The Cruel and Unusual Punishments Clause, however, does not apply until an inmate has been both convicted of and sentenced for his crimes.[72] Thus, an inmate awaiting sentencing must look either to the Fifth Amendment's or the Fourteenth Amendment's Due Process Clause for protection.[73]

In its opinion in this case, the Third Circuit explained that it had "not yet in a precedential opinion recognized that an unsentenced inmate may bring a due process-grounded failure-to-

---

[68] *Celotex*, 477 U.S. at 322; *Wisniewski v. Johns-Manville Corp.*, 812 F.2d 81, 83 (3d Cir. 1987).

[69] Jezior is one of the 10 Prison Management Defendants.

[70] *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks and citation omitted).

[71] *Id.* at 833 (internal quotation marks and citation omitted).

[72] *Id.* at 832-34.

[73] *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *see also Fuentes v. Wagner*, 206 F.3d 335, 341-42 (3d Cir. 2000).

14

protect claim of the sort that a sentenced inmate can bring under the Eighth Amendment. But it is well established that, under the Constitution's guarantees of due process, an unsentenced inmate is entitled, at a minimum, to no less protection than a sentenced inmate is entitled to under the Eighth Amendment."[74] Therefore, the Court of Appeals found that Plaintiff, as an inmate who at all relevant times was either not yet convicted or convicted but not yet sentenced, "had a clearly established constitutional right to have prison officials protect him from inmate violence."[75]

To establish a claim for damages against a prison official for failure to protect an inmate from violence, an inmate must show that: "(1) he was incarcerated under conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent to that substantial risk to his health and safety, and (3) the official's deliberate indifference caused him harm."[76]

First, the evidence shows that Plaintiff was incarcerated under conditions posing a substantial risk of serious harm. He was placed in the SHU with violent members of the Northington-Savage drug gang. Using his position as an orderly, Plaintiff began passing notes between gang members and intermittently showing the notes to the SIS so that they could be copied for the FBI's ongoing investigation of the gang.[77] Those inmates, including Northington, became aware that Plaintiff was sharing their notes with prison officials.[78] Northington openly threatened Plaintiff, calling him a snitch and shouting other hostile threats.[79] Northington also

[74] *Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (citing *Fuentes*, 206 F.3d at 344) (internal quotation marks and alterations omitted).

[75] *Bistrian*, 696 F.3d at 367.

[76] *Id.* (citations omitted).

[77] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 199, 207.

[78] *Id.* at ¶¶ 217-18.

[79] *Id.* at ¶¶ 220-21.

15

hung a "No Snitches" sign on his cell door. Plaintiff reported the threats to certain prison officials.[80] Because of the gang's discovery of Plaintiff's cooperation with prison officials and the danger posed to Plaintiff in continuing to work as an orderly where he would presumably interact with members of the gang, Plaintiff was removed from his position as an orderly and returned to the ordinary restrictions of the SHU.[81] Despite this safety precaution, a few weeks later, Plaintiff was placed in the recreation area with Northington and other gang members. In light of this record, Plaintiff has put forth evidence showing that he was incarcerated under conditions posing a substantial risk of serious harm.

Second, Plaintiff has produced evidence from which a reasonable fact finder could conclude that some prison officials, though not all, were deliberately indifferent to the substantial risk to Plaintiff's safety. Deliberate indifference is measured by an objective standard: "the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety."[82] Viewing the evidence in the light most favorable to Plaintiff as the non-moving party, Plaintiff has identified evidence showing that Defendants Bowns, Gibbs, Jezior, and Levi knew or were aware of the threats Northington made to Plaintiff.[83] Plaintiff has also pointed to evidence showing that Defendants Bergos, Bowns, Gibbs, Jezior, Levi, McLaughlin, Robinson,

---

[80] *Id.* at ¶ 222.

[81] *Id.* at ¶ 227; Defs.' Proposed Statement of Undisputed Facts at ¶ 146.

[82] *Beers-Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001).

[83] Bowns and Gibbs admitted that Plaintiff told them of Northington's threats. Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 144-45. Jezior and Levi testified that they were never informed of Northington's threats; however, Plaintiff testified that he told them of the threats. Pl.'s Sur-Reply (Doc. No. 229) at 3, Ex. B (Bistrian Dep.) at 696-98. This is a disputed material fact that precludes summary judgment as to Jezior and Levi.

and Rodgers knew of the note-passing scheme and were aware of the risk Plaintiff faced once his cooperation with prison officials was discovered.[84]

Third, Plaintiff has pointed to evidence which suggests that a reasonable jury could find that some Defendants' deliberate indifference caused the Northington attack and Plaintiff's resulting injuries. Plaintiff has identified evidence, or disputed issues of material fact, suggesting that the officials cited above knew of the risk Northington posed to Plaintiff's safety, and although they removed Plaintiff as an orderly, they did not take action to prevent Plaintiff from encountering Northington in the recreation area. Instead, these officials placed the two inmates in the same recreation pen. This evidence is sufficient to create a genuine dispute of material fact that these prison officials' deliberate indifference led to the Northington attack.[85]

Although Plaintiff identified evidence that some prison officials knew of the risk to Plaintiff's safety, he has failed to do so with respect to Defendants Brown, Blackman, Garraway,

---

[84] *See* Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 206-08 (explaining that Plaintiff met with Bowns and Gibbs to inform them that Northington wanted Plaintiff to pass notes, and that the three agreed to the arrangement where Plaintiff would pass notes and also cooperate with the officials' investigation), ¶¶ 213-14 (stating that Bergos, Gibbs, Jezior, and Rodgers testified that they knew of the note-passing scheme), ¶¶ 223-25 (explaining that Robinson and Rodgers knew about the note-passing scheme). *See also* Pl.'s Sur-Reply (Doc. No. 229), Ex. B (Bistrian Dep.) at 696-698 (identifying McLaughlin as being aware of the note-passing scheme).

[85] Plaintiff also alleges that Jezior was deliberately indifferent to his safety during the Northington attack. Although deliberate indifference can be demonstrated by a prison official's failure to intervene to stop an attack on an inmate, the evidence must show that the official had "a reasonable opportunity to intervene and simply refused to do so." *Smith v. Mensinger*, 293 F.3d 641, 651 (3d Cir. 2002). Here, the record shows that Jezior immediately responded to the alarm and shouted into the recreation area, ordering the attackers to stop their assault, and that he intervened as soon as he had sufficient support to do so safely. Defs.' Proposed Statement of Undisputed Facts at ¶ 153; Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 258-59. Plaintiff takes issue with the fact that the BOP waited until roughly 12 to 15 officials were present to enter the recreation pen. However, Plaintiff does not indicate how long it took these officials to arrive on the scene, and the evidence suggests that the officials immediately responded to the emergency. Without more, this record is insufficient to create a genuine dispute of material fact regarding Jezior's response to the Northington attack. On appeal, the Third Circuit noted that more facts would be required to establish this failure to protect claim against Jezior for Plaintiff to prevail. *Bistrian*, 696 F.3d at 372 ("It may be that summary judgment for Jezior is on the horizon.") However, Plaintiff has been unable to identify evidence demonstrating that Jezior had a reasonable opportunity to intervene in the Northington attack and simply refused to do so. Moreover, Plaintiff has not pointed to, nor is the Court aware of, any precedent that would require a correctional officer to enter a recreation area alone to quell an attack involving four inmates. The Court concludes that there is no evidence that Jezior was deliberately indifferent in responding to the Northington attack, as opposed to merely failing to prevent it from occurring. This additional claim against Jezior will be dismissed.

17

Knox, and White.[86] Plaintiff can only point to evidence that some of these officials, at times, attended weekly meetings during which inmates housed in the SHU were discussed, and that Brown, Blackman and Knox sometimes attended monthly meetings with SIS.[87] Attendance at these meetings, however, is insufficient to show deliberate indifference on the part of these five officials. Although circumstantial evidence may be used to prove that a prison official had actual knowledge of a substantial risk, "it is not sufficient that the official should have been aware."[88] Attendance at weekly and/or monthly meetings, without more, shows only that these officials possibly should have known of the risk to Plaintiff's safety, assuming that Plaintiff's cooperation was discussed. Plaintiff, however, has not identified any evidence in the record showing that Plaintiff's cooperation, or Northington's threats, were discussed at the meetings. Instead, the record shows that Plaintiff's cooperation was not discussed.[89] Thus, Plaintiff cannot establish deliberate indifference as to Defendants Brown, Blackman, Garraway, Knox, and White, and summary judgment will be granted in favor of these five Defendants on this claim.

*Defendants Are Not Entitled to Qualified Immunity on the Failure to Protect Claim*

Defendants contend that they are entitled to qualified immunity with respect to the failure to protect claim. The doctrine of qualified immunity insulates "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of

---

[86] Plaintiff alleges in his Sur-Reply that Garraway and Knox knew of the note-passing scheme. *See* Pl.'s Sur-Reply at 2. However, Plaintiff does not support this allegation with citations to evidence in the record which indicate that Garraway and Knox knew of Plaintiff's note passing. Plaintiff's unsupported allegations against these two officials, without more, are unpersuasive and do not create a genuine dispute of material fact.

[87] *See* Pl.'s Proposed Statement of Undisputed Facts at ¶ 113 (indicating the unit managers, like White, attended the weekly meetings, though not mentioning White by name as an attendee); *see also id.* at ¶ 210 (stating that the associate wardens Brown and Blackman, and sometimes Knox, attended the monthly SIS meetings).

[88] *Beers-Capitol*, 256 F.3d at 133 (citation omitted).

[89] *See* Pl.'s Proposed Statement of Undisputed Facts at ¶ 210 ("[T]he subject of Plaintiff's cooperation in the KSG [Kaboni Savage Gang] investigation was not mentioned" at the SIS meetings).

18

which a reasonable person would have known."[90] Courts look to whether the facts shown "make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."[91] A right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."[92] "Courts need not evaluate the two prongs sequentially," and the failure of either prong will result in the official being entitled to qualified immunity.[93]

Plaintiff has pointed to evidence showing that certain prison officials acted with deliberate indifference in failing to protect him from harm by placing him in the recreation pen with Northington, and therefore that a violation of his Fifth Amendment substantive due process rights occurred. Furthermore, the Third Circuit has concluded that "Bistrian—as an inmate who at all relevant times was either not yet convicted or convicted but not yet sentenced—had a clearly established constitutional right to have prison officials protect him from inmate violence."[94] Defendants, therefore, are not entitled to qualified immunity on this claim.

## B. COUNT III: FIFTH AMENDMENT SUBSTANTIVE DUE PROCESS (PUNITIVE DETENTION)

In Count III, Plaintiff raises a claim against the 10 Prison Management Defendants, alleging that his detention in administrative segregation deprived him of his clearly established liberty interest to be free from punishment before sentencing, in violation of the Fifth Amendment's Due Process Clause. The Third Circuit limited Plaintiff's punitive detention claim

---

[90] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted).

[91] *Id.* at 232 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

[92] *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (internal quotation marks and citations omitted).

[93] *Karns v. Shanahan*, 879 F.3d 504, 520 (3d Cir. 2018) (citing *Pearson*, 555 U.S. at 236; *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012)).

[94] *Bistrian*, 696 F.3d at 367.

19

so that it might only apply to: (1) his first detention in the SHU; (2) his second detention in the SHU until the beginning of the note-copying operation; and (3) his fourth detention in the SHU.

The Third Circuit held that convicted inmates who are imprisoned pending sentencing are accorded the status of a pretrial detainee, with protected liberty interests that are "firmly grounded in federal constitutional law."[95] These protected liberty interests include the right to be free from punishment.[96] "[A] particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose."[97] "In evaluating a pretrial detainee's claim of unconstitutional punishment, courts must examine the totality of the circumstances within the institution."[98]

## 1. Plaintiff's First Confinement in the SHU Was Not Punitive

Plaintiff contends that his first period of confinement in the SHU (from November 18, 2005 to January 9, 2006) amounts to punitive detention in violation of his Fifth Amendment right to due process. Despite making all reasonable inferences in Plaintiff's favor as the non-moving party, this first SHU confinement was not excessive and did not violate his constitutional rights.

The evidentiary record indicates that on November 18, 2005, Plaintiff was transferred from the general population to the SHU because he abused his telephone privileges. Three days later, he was provided with a copy of the incident reports of his prior telephone abuses.[99]   A

---

[95] *Bistrian*, 696 F.3d at 373 (quoting *Cobb v. Aytch*, 643 F.2d 946, 962 (3d Cir. 1981) (en banc)).

[96] *Bell*, 441 U.S. at 536-37.

[97] *Bistrian*, 696 F.3d at 373 (quoting *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007)).

[98] *Id.* (internal quotation marks and citation omitted).

[99] Defs.' Proposed Statement of Undisputed Facts at ¶ 60; Pl.'s Proposed Statement of Undisputed Facts at ¶ 154.

hearing was held on November 30, 2005, where Plaintiff admitted to placing several unauthorized telephone calls.[100] On December 9, 2005, the DHO imposed penalties for Plaintiff's violations, including 30 days of disciplinary segregation. Plaintiff began serving the 30-day disciplinary segregation immediately and was released from the SHU on January 9, 2006.

Although the propriety of the 30-day disciplinary segregation is not at issue, Plaintiff contends that the initial period of confinement up until the date the DHO imposed the above-mentioned penalties (a three week period from November 18, 2005 to December 9, 2005) was not rationally related to a legitimate non-punitive government purpose, or was excessive in light of that purpose.[101]

However, the record demonstrates that Plaintiff's initial transfer to administrative segregation was rationally related to the legitimate non-punitive government purpose of addressing Plaintiff's suspected misconduct committed in violation of BOP rules. Ensuring that detainees and inmates comply with BOP rules is important to maintaining a secure, safe, and functional detention facility.[102] Telephone violations, however classified, are serious because breaking these rules may allow contraband to enter the FDC, or other crimes to occur within the facility.[103] As the Third Circuit has noted, courts are "unwilling to substitute [their] judgment on

---

[100] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 160-61.

[101] Plaintiff also asserts that he should have received credit for the days he had already been in the SHU in calculating his 30-day disciplinary segregation.

[102] Allowing an inmate to violate BOP rules without consequence will not help prison officials maintain a secure environment.

[103] In *Bell*, the Supreme Court explained:

> The Government also has legitimate interests that stem from its need to manage the facility in which the individual is detained. These legitimate operational concerns may require administrative measures that go beyond those that are, strictly speaking, necessary to ensure that the detainee shows up at trial. For example, the Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees. Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have

21

these difficult and sensitive matters of institutional administration and security for that of the persons who are actually charged with and trained in the running of such facilities."[104] Thus, there is no evidence that the three week administrative segregation was not rationally related to a legitimate, non-punitive purpose.

The record also shows that the duration of Plaintiff's first stint in the SHU was not excessive in light of that purpose. Once Plaintiff was placed in administrative segregation, prison officials proceeded to adjudicate his telephone violations within three weeks. Plaintiff was apprised of the allegations against him, and was afforded the opportunity to be heard at a hearing shortly thereafter. Plaintiff's suggestion that this three week period was excessive, during which his violations were adjudicated, is not supported by the record, and does not create a genuine dispute of material fact. Summary judgment will be granted as to this claim.[105]

---

experienced had he been released while awaiting trial. We need not here attempt to detail the precise extent of the legitimate governmental interests that may justify conditions or restrictions of pretrial detention. It is enough simply to recognize that in addition to ensuring the detainees' presence at trial, the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment.

441 U.S. at 540 (citations omitted).

[104] *Stevenson*, 495 F.3d at 71(quoting *Block v. Rutherford*, 468 U.S. 576, 588 (1984)) (internal quotation marks omitted).

[105] In this case, the Third Circuit stated: "Given Appellants' failure to assert any legitimate, non-punitive need for the segregation, Bistrian has plausibly alleged that it was excessive to keep him in the SHU for nearly a month while awaiting a hearing on seemingly minor telephone infractions." *Bistrian*, 696 F.3d at 374. Discovery in this case has shown, however, that Defendants were appropriately adjudicating Plaintiff's telephone violations during this period. Moreover, Defendants articulated a legitimate, non-punitive need for the segregation during this process.

## 2. Defendants Are Entitled to Qualified Immunity with Respect to Plaintiff's Second Period of Confinement Up Until His Participation in the Note-Passing Scheme

Next, Plaintiff contends that his second period of confinement in the SHU up until he began participating in the note-passing scheme (from January 25, 2006 to around April or May of 2006) amounts to punitive detention in violation of his substantive due process rights.

The facts show Plaintiff violated BOP rules shortly after his first release from the SHU by placing unauthorized telephone calls to his former girlfriend. Plaintiff's telephone abuses occurred within one month after returning to the general population, and thereafter demonstrated to prison officials that he was either unwilling or incapable of following BOP rules while in the general population, undermining the prison officials' attempts to maintain an orderly detention center. Therefore, Plaintiff was removed from the general population and transferred back to the SHU on January 25, 2006.[106]

Plaintiff contends that the approximately three to four month period (from January 25, 2006 to April or May of 2006) when he was confined to the SHU was not rationally related to a legitimate non-punitive government purpose, or was excessive in light of that purpose. Defendants argue that this second period of confinement was rationally related to the legitimate non-punitive government purpose of addressing Plaintiff's continued misconduct and securing the FDC, and that the three-to-four month period was not excessive in light of this purpose. In the alternative, Defendants argue that they are entitled to qualified immunity with respect to this period of confinement. The Court agrees with Defendants on qualified immunity grounds.

---

[106] Pl.'s Proposed Statement of Undisputed Facts at ¶ 172.

Courts consider two prongs to determine whether prison officials are entitled to qualified immunity: (1) whether the facts shown make out a violation of a constitutional right, and (2) whether the right at issue was clearly established.[107] The failure of either prong will result in the official being entitled to qualified immunity.[108] Here, Plaintiff has not shown that he had a clearly established right to be removed from the SHU within the three-to-four month period after his continued violation of BOP rules. The Court of Appeals has stated that "*Bell* provides scant guidance on what constitutes punishment."[109] Although in the earlier appeal of this case, the Third Circuit acknowledged the exhaustive examinations it has undertaken in interpreting *Bell*'s "no-punishing-pretrial detainees" rule,[110] neither the Court of Appeals nor the Supreme Court had clearly established the right that Plaintiff claims was violated in this case.[111] Summary judgment will be granted on this claim.

---

[107] *Karns*, 879 F.3d at 520 (citations omitted).

[108] *Id.* (citation omitted).

[109] *Hubbard v. Taylor*, 538 F.3d 229, 236 (3d Cir. 2008) (internal quotation marks and citations omitted).

[110] *Bistrian*, 696 F.3d at 373 (citing cases).

[111] For example, in *Hubbard*, the Court of Appeals held that the triple celling of pretrial detainees was rationally related to a legitimate government interest of trying to manage the overcrowded conditions at the correctional institution, was not excessive in light of that interest, and was not intended to punish the plaintiffs. *Hubbard v. Taylor*, 538 F.3d at 231-36. Moreover, in *Fuentes*, the Third Circuit found that the placement of a convicted but unsentenced inmate in a restraint chair for eight hours following a disturbance did not violate substantive due process, as there was no evidence suggesting that use of the restraint was done maliciously or to cause harm, and where the inmate was not kept in the restraint chair for longer than had been authorized. *Fuentes v. Wagner*, 206 F.3d at 345-46. Most analogous to this case, however, is *Stevenson*, in which the district court held that a pretrial detainee's placement in the SHU for more than a year after considering the severity of the crimes for which he was charged and after he was involved in a fight while incarcerated was rationally related to the legitimate government purpose of maintaining his safety, as well as the security of the prison, was not excessive in light of that purpose, and was not intended to punish the detainee. *Stevenson v. Carroll*, No. 04-139, 2011 WL 6842955, at *9-11 (D. Del. Dec. 29, 2011), *aff'd*, 474 F. App'x 845 (3d Cir. 2012). Like the court in *Stevenson*, this Court concludes that Plaintiff's three-to-four month administrative segregation was rationally related to the legitimate government purposes of maintaining the security of the detention center, that the segregation was not excessive in light of that purpose, and that there was no intent to punish Plaintiff related to this period of administrative segregation. Thus, this claim will be dismissed.

24

### 3. There is a Genuine Dispute of Material Fact Regarding Whether Plaintiff's Fourth Period of Confinement in the SHU Was Punitive

Finally, Plaintiff asserts that his fourth period of confinement in the SHU was punitive in nature and violated his constitutional rights. As previously noted, "a particular measure amounts to punishment when there is a showing of express intent to punish on the part of detention facility officials, when the restriction or condition is not rationally related to a legitimate non-punitive government purpose, or when the restriction is excessive in light of that purpose."[112]

Plaintiff contends that he has identified evidence suggesting that the 10 Prison Management Defendants expressly intended to punish him by placing him in the SHU for the fourth time after learning of his complaints about his treatment at FDC Philadelphia, which he made to the Court during his criminal sentencing hearing. Although Plaintiff contends that all 10 Prison Management Defendants should be held liable for this claim, he points to evidence in the record which suggests that only Jezior and Levi may have intended to punish him for his protests. Specifically, Plaintiff identifies evidence that Jezior wrote an incident report which stated that Plaintiff violated BOP telephone rules one day after receiving an email from the Government informing him that Plaintiff was complaining about his treatment at FDC Philadelphia to the Court.[113] Plaintiff also testified that Levi told him that he would "never see the light of day again" after his protests to the Court.[114] This evidence creates a genuine dispute of material fact regarding whether Jezior and Levi expressly intended to punish Plaintiff for his protests to the Court by placing him in the SHU for the fourth time. Summary judgment will be

---

[112] *Bistrian*, 696 F.3d at 373 (quoting *Stevenson*, 495 F.3d at 68).

[113] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 374, 377.

[114] *Id.* at ¶ 391.

denied with respect to Jezior and Levi on this claim, but it will be granted with respect to the remaining Prison Management Defendants.[115]

*Defendants Jezior and Levi Are Not Entitled to Qualified Immunity on Plaintiff's Punitive Detention Claim Regarding His Fourth Period of Confinement in the SHU*

Defendants contend they are entitled to qualified immunity with respect to Plaintiff's punitive detention claim. As noted, courts examine two prongs to determine whether prison officials are entitled to qualified immunity: (1) whether the facts shown make out a violation of a constitutional right, and (2) whether the right at issue was clearly established.[116] Here, Plaintiff has pointed to evidence which suggests a violation of his substantive due process right to be free from punishment "prior to an adjudication of guilt."[117] Moreover, this right is clearly established, as reasonable prison officials would understand that expressly intending to punish an inmate for his complaints made to a court is unconstitutional.[118] Therefore, Jezior and Levi are not entitled to qualified immunity on Plaintiff's punitive detention claim with respect to his fourth period of confinement.

---

[115] They are: Bergos, Blackman, Brown, Garraway, Gibbs, Knox, McLaughlin, and White. Plaintiff has not shown though evidence in the record that these Prison Management Defendants were personally involved in, or knew of and acquiesced to, the decision to transfer Plaintiff to the SHU for the fourth time after he complained about his treatment at FDC Philadelphia. *See Baraka v. McGreevey*, 481 F.3d 187, 210 (3d Cir. 2007) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs to be liable, . . . and cannot be held responsible for a constitutional violation which he or she neither participated in nor approved . . . .") (internal quotation marks and citations omitted); *see also Diaz v. Canino*, 502 F. App'x 214, 219 (3d Cir. 2012) (affirming dismissal of a complaint because the defendant did not have the requisite personal involvement in the alleged post-sentence deprivations despite having found the plaintiff "guilty of misconduct and sentenced him to 360 days in [the Restrictive Housing Unit]").

[116] *Karns*, 879 F.3d at 520 (citations omitted).

[117] *Bell*, 441 U.S. at 535 (citations omitted).

[118] *See Bistrian*, 696 F.3d at 376 ("Retaliating against a prisoner for the exercise of his constitutional rights is unconstitutional.") (citing cases).

26

## C.  COUNT V: FIFTH AMENDMENT PROCEDURAL DUE PROCESS

In Count V, Plaintiff raises a claim against the 10 Prison Management Defendants and Lieutenant Wilson, alleging that his placement and continued detention in the SHU during the actionable periods failed to comply with the Fifth Amendment's procedural due process requirements.

"Although pretrial detainees do not have a liberty interest in being confined in the general prison population, they do have a liberty interest in not being detained indefinitely in the SHU without explanation or review of their confinement."[119] Thus, procedural due process requires prison officials to "provide detainees who are transferred into more restrictive housing[,] for administrative purposes only[,] an explanation of the reason for their transfer as well as an opportunity to respond."[120]

### 1.  Plaintiff's Procedural Due Process Claim Fails with Respect to His First Period of Confinement in the SHU

First, Plaintiff contends that his procedural due process rights were violated during his first period of confinement in the SHU. As mentioned, on November 18, 2005, Plaintiff was transferred from the general population to the SHU because he abused his telephone privileges.[121] Three days later, Plaintiff was provided with a copy of the incident reports of his prior telephone abuses, which gave him written notice of the disciplinary charges being brought against him.[122]  In other words, Plaintiff was provided with an explanation of the reason for his placement in the SHU within three days of the transfer.

---

[119] *Stevenson*, 495 F.3d at 69.

[120] *Id.* at 70.

[121] Pl.'s Proposed Statement of Undisputed Facts at ¶ 157.

[122] *Id.* at ¶ 154; Defs.' Proposed Statement of Undisputed Facts at ¶ 60.

27

A hearing on Plaintiff's telephone abuses was held shortly thereafter on November 30, 2005, and Plaintiff admitted that he had violated BOP rules by placing several unauthorized telephone calls to his former girlfriend using the account of another inmate.[123] On December 9, 2005, after the hearing, the DHO imposed on Plaintiff the following penalties: 8.5 years of lost telephone privileges, 30 days of disciplinary segregation, and 277 days of lost good conduct time.[124] Plaintiff began serving the 30-day disciplinary segregation and was subsequently released from the SHU 30 days later, on January 9, 2006.

Plaintiff contends that the 10 Prison Management Defendants and Lieutenant Wilson violated his procedural due process rights because they did not give Plaintiff a detention order within 24 hours of his initial transfer and did not conduct reviews of his placement between November 18, 2005 and December 9, 2005. These contentions, however, are without merit. "[T]he protections due to sentenced inmates . . . provide a floor for what pretrial detainees may expect,"[125] and all that is required is an explanation for placement in the SHU and an opportunity to respond.[126] Plaintiff was provided with both an explanation and an opportunity to respond during his first confinement in the SHU. This claim will be dismissed.

## 2. Plaintiff's Procedural Due Process Claim Fails with Respect to His Second Period of Confinement in the SHU

Second, Plaintiff argues that the 10 Prison Management Defendants and Lieutenant Wilson violated his procedural due process rights during his second spell in the SHU. As discussed, Plaintiff entered the SHU for a second time on January 25, 2006 after prison officials

---

[123] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 160-61.

[124] *Id.* at ¶ 162.

[125] *Bistrian,* 696 F.3d at 375 (citations omitted).

[126] *Id.*

28

discovered that he abused his telephone privileges again.[127] Plaintiff was informed that he was being placed in administrative segregation "pending SIS investigation" for his phone abuse.[128] Although Plaintiff did not immediately receive a copy of his detention order, he did receive copies of monthly SHU review forms, which explained "the basis for his continued SHU housing assignment."[129] Thus, there is no genuine dispute of material fact that Plaintiff was provided with an explanation of why he was initially placed and was being held in the SHU.[130] Plaintiff contends that he was not provided with an opportunity to respond, yet the record shows that Plaintiff could have filed a grievance challenging his placement in the SHU at any time. In fact, Plaintiff had filed grievances on other occasions, yet did not do so during this period. Since Plaintiff also had the opportunity to respond and challenge his administrative segregation, this claim will be dismissed.

### 3. Plaintiff's Procedural Due Process Claim Fails with Respect to His Fourth Period of Confinement in the SHU

Last, Plaintiff contends that the 10 Prison Management Defendants and Lieutenant Wilson violated his procedural due process rights during his fourth period of confinement in the SHU. As previously mentioned, on September 13, 2007, Plaintiff was removed from the general population and placed in the SHU after prison officials documented that Plaintiff had abused his telephone privileges by convincing another inmate to place unauthorized phone calls to

---

[127] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 172, 179.

[128] *Id.* at ¶ 179.

[129] Defs.' Proposed Statement of Undisputed Facts at ¶ 122.

[130] *See Shoats v. Horn*, 213 F.3d 140, 145-46 (3d Cir. 2000) (concluding that the prisoner received procedural due process via periodic reviews and the right to be heard).

29

Plaintiff's sister.[131] The next day, Plaintiff received a hearing on this violation, during which Plaintiff was apprised of the charges against him and was given an opportunity to respond to the charges.[132] After the hearing, Plaintiff filed at least one grievance challenging his continued confinement in the SHU, but this grievance was denied. Plaintiff appealed the decision, but after considering the appeal, prison officials rejected this as well.[133] In light of this record, there is no genuine dispute of material fact that Plaintiff was provided with an explanation for his fourth placement in the SHU and an opportunity to respond. This claim will be dismissed.

*Defendants Are Entitled to Qualified Immunity on the Procedural Due Process Claim*

Defendants argue that they are entitled to qualified immunity on Plaintiff's procedural due process claim. Courts examine two prongs to determine if prison officials are entitled to qualified immunity: (1) where the facts shown make out a violation of a constitutional right, and (2) whether the right at issue was clearly established.[134]

In this case, Plaintiff contends that the Third Circuit's recent decision in *Williams v. Secretary, Pennsylvania Department of Corrections*[135] sets the standard for what process is constitutionally required. In particular, Plaintiff asserts that *Williams* now requires: (1) "[w]ritten notice of the reason for placement in administrative custody"; (2) "[e]ntitlement to a hearing . . . within six days of the initial transfer to administrative custody"; and (3) "[e]very thirty days thereafter, the opportunity to be personally interviewed . . . [to determine] whether the

---

[131] Pl.'s Proposed Statement of Undisputed Facts at ¶¶ 368-71; Defs.' Proposed Statement of Undisputed Facts at ¶ 190.

[132] Pl.'s Proposed Statement of Undisputed Facts at ¶ 380.

[133] *Id.* at ¶¶ 390-91, 394-95.

[134] *Pearson*, 555 U.S. at 231.

[135] 848 F.3d 549 (3d Cir. 2017).

30

inmate should continue to be maintained in administrative custody."[136] Although these requirements were taken from Pennsylvania Department of Correction policies considered in the earlier case of *Shoats v. Horn*,[137] it is important to note that the Court of Appeals in *Shoats* held only that an inmate was entitled to periodic review of his confinement in administrative custody, and did not find that this particular process was constitutionally required. The Third Circuit explained in the earlier appeal of this case that "the protections due to sentenced inmates [as discussed in . . . *Shoats*] provide a floor for what pretrial detainees may expect. Therefore, the law was sufficiently clear prior to *Stevenson* that Plaintiff was entitled to an explanation and an opportunity to challenge his confinement."[138] The comprehensive protections in *Williams* were not clearly established before that decision, as the Court of Appeals stated.[139]

Here, Plaintiff was provided with an explanation and an opportunity to challenge his confinement, either through grievance or a hearing, each time he was placed in the SHU. Therefore, as explained above, there is no constitutional violation and Defendants are entitled to qualified immunity. Even if *Williams* now sets the floor for what process is constitutionally required when inmates are placed in administrative custody or solitary confinement, the process described in this case was not clearly established before 2008, when Plaintiff was housed at FDC Philadelphia and periodically placed in the SHU. Because "existing precedent must have placed the statutory or constitutional question beyond debate,"[140] Defendants are entitled to qualified immunity on the procedural due process claim.

---

[136] Pl's Resp. to Individual Defendants' Mot. for Summ. J. at 13.

[137] 213 F.3d 140 (3d Cir. 2000).

[138] *Bistrian*, 696 F.3d at 375 (*Stevenson*, 495 F.3d at 69).

[139] *See Williams*, 848 F.3d at 570 ("[W]e are not prepared to conclude that *Shoats* was sufficient to clearly establish Plaintiffs' due process interest in avoiding confinement on death row.").

[140] *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

## D. COUNT X: FIRST AMENDMENT (RETALIATION)

In Count X, Plaintiff alleges that the 10 Prison Management Defendants placed him in the SHU for the fourth time in retaliation for protesting his prior SHU confinements at his sentencing hearing, in violation of his rights under the First Amendment.

"Retaliating against a prisoner for the exercise of his constitutional rights is unconstitutional."[141] To establish a retaliation claim, the prisoner must show that: (1) he was engaged in constitutionally protected conduct; (2) he suffered some adverse action at the hands of prison officials; and (3) his constitutionally protected conduct was a substantial or motivating factor in the decision to take that action.[142] "Because motivation is almost never subject to proof by direct evidence, [the prisoner] must rely on circumstantial evidence to prove a retaliatory motive."[143] He can satisfy his burden with evidence of either: (a) "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," or (b) "a pattern of antagonism coupled with timing that suggests a causal link."[144]

First, Plaintiff has shown that his conduct was constitutionally protected. On Plaintiff's behalf, counsel challenged Plaintiff's repeated confinement in the SHU, and such a challenge is constitutionally protected.[145]

---

[141] *Bistrian*, 696 F.3d at 376 (citations omitted).

[142] *Rauser v. Horn*, 241 F.3d 330, 333-34 (3d Cir. 2001).

[143] *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016).

[144] *Id.* (citing *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007)).

[145] *See Watson,* 834 F.3d at 422 (finding that the plaintiff engaged in constitutionally protected activity when he filed a grievance against a corrections officer); *see also Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (concluding that filing a grievance "implicates conduct protected by the First Amendment"). Here, the Court concludes that a prisoner's protests or complaints about his treatment at a detention center made to a Court during a criminal sentencing hearing is sufficiently similar to the filing of grievances and implicates conduct protected by the First Amendment.

32

Second, Plaintiff argues that his detention in the SHU for the fourth time was an adverse action that he suffered because his counsel challenged his earlier administrative segregation and complained of his treatment at FDC Philadelphia during the sentencing hearing. The Third Circuit has explained that this "adverse action" element is a fact question: "whether placement in the SHU was 'sufficient to deter a person of ordinary firmness from exercising his constitutional rights' is an objective inquiry and ultimately a question of fact."[146] In *Allah v. Seiverling*,[147] the Third Circuit held that where "confinement in administrative segregation resulted, *inter alia*, in reduced access to phone calls, reduced access to the commissary, reduced access to recreation, [and] confinement in his cell for all but five hours per week," "[a] fact finder could conclude from those facts that retaliatory continued placement in administrative confinement would deter a person of ordinary firmness from exercising his First Amendment rights."[148] The Court finds that Plaintiff has set forth evidence from which a reasonable fact finder might conclude that his placement in the SHU for a fourth time was an adverse action to prevail on the retaliation claim.

Third, Plaintiff identified evidence demonstrating that his complaints at the sentencing hearing were a substantial or motivating factor as to Defendants Jezior and Levi. As previously noted, Plaintiff can satisfy his burden of showing motivation with either "an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action," or "a pattern of antagonism coupled with timing that suggests a causal link."[149] Here, the record shows that one day after the FDC was notified of Plaintiff's complaints made during the sentencing hearing, Jezior wrote an incident report documenting Plaintiff's telephone

---

[146] *Bistrian*, 696 F.3d at 376 (quoting *Rauser*, 241 F.3d at 333).

[147] 229 F.3d 220 (3d Cir. 2000).

[148] *Id.* at 225 (internal quotation marks and citation omitted).

[149] *Watson*, 834 F.3d at 422 (citation omitted).

33

violations.[150]  In addition, Plaintiff alleges that Levi told him that "he would never see the light of day again."[151]  Although Levi denies ever saying this to Plaintiff, this is a disputed issue of fact that cannot be resolved on summary judgment.  This record supports the inference that Jezior and Levi were motivated to place Plaintiff in the SHU after being notified that Plaintiff was complaining about his treatment at FDC Philadelphia to the Court.

Summary judgment therefore is not appropriate with respect the retaliation claim against Jezior and Levi.  However, summary judgment is warranted as to the remaining Defendants,[152] because Plaintiff has failed to point to any evidence in the record suggesting that these individuals were personally involved in, or knew of and acquiesced to, the decision to place Plaintiff in the SHU for the fourth time for any retaliatory motive or purpose.[153]

*Defendants Jezior and Levi Are Not Entitled to Qualified Immunity on the Retaliation Claim*

Defendants argue that they are entitled to qualified immunity with respect to Plaintiff's retaliation claim.[154]  Here, Plaintiff has pointed to evidence which suggests a violation of his First Amendment right to protest his prior treatment at FDC Philadelphia.  In addition, the right to protest, or to challenge conditions of incarceration, is clearly established under the First

---

[150] Pl.'s Proposed Statement of Undisputed Facts at ¶ 374.  *See Estate of Smith v. Marasco*, 318 F.3d 497, 512-13 (3d Cir. 2003) (explaining that the Third Circuit has held that an inference can be drawn "where two days passed between the protected activity and the alleged retaliation, . . . but not where 19 months had elapsed") (citing *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989), *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997)).

[151] Pl.'s Proposed Statement of Undisputed Facts at ¶ 391.

[152] Summary Judgment will be granted on this claim as to these remaining defendants: Brown, Blackman, Knox, McLaughlin, Garraway, Gibbs, Bergos, and White.

[153] *Baraka*, 481 F.3d at 210.

[154] As discussed, courts consider two prongs to determine whether prison officials are entitled to qualified immunity: (1) whether the facts shown make out a violation of a constitutional right, and (2) whether the right at issue was clearly established.  *Pearson*, 555 U.S. at 231 (citation omitted).

Amendment, and it is unconstitutional to retaliate against an inmate for doing so.[155] Thus, Jezior and Levi are not entitled to qualified immunity with respect to the retaliation claim.

## E.    COUNT XV AND COUNT XVI AGAINST THE UNITED STATES

Count X and Count XVI allege that the United States is liable under the FTCA for the prison officials' negligence in failing to protect Plaintiff from the two assaults. The United States argues that the discretionary function exception to the FTCA bars the two claims.

Pursuant to the FTCA, the United States has waived its sovereign immunity for certain types of suits.[156] However, under the discretionary function exception, the FTCA's waiver of sovereign immunity does not apply to claims based upon a government employee's exercise or performance, or failure to exercise or perform, a discretionary function or duty.[157] The purpose of the discretionary function exception is "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy."[158] Courts conduct a two-part test to determine whether the discretionary function exception applies in a particular case. First, a court must ask whether "the act giving rise to the alleged injury . . . involves an element of judgment or choice."[159] "Second, even if the challenged conduct involves an element of judgment, the court must determine whether that judgment is of the kind that the discretionary function exception was designed to shield."[160] "The focus of th[is] inquiry is not

---

[155] *See Bistrian*, 696 F.3d at 376 ("Retaliating against a prisoner for the exercise of his constitutional rights is unconstitutional.") (citing cases).

[156] *See* 28 U.S.C. § 1346(b)(1).

[157] 28 U.S.C. § 2680(a).

[158] *Merando v. United States*, 517 F.3d 160, 164 (3d Cir. 2008) (quotation omitted).

[159] *Id.* (internal quotation marks and citation omitted).

[160] *Id.* at 165 (internal quotation marks and citation omitted).

on the agent's subjective intent in exercising the discretion conferred by the statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."[161]

Count XV and Count XVI allege that the United States is liable under the FTCA for the prison officials' negligence in failing to protect Plaintiff from the Northington attack "as a confidential informant" and from the Taylor assault. Plaintiff relies on 18 U.S.C. § 4042, which imposes a general duty on the BOP to provide for the care and safekeeping of inmates. However, the Third Circuit has held that 18 U.S.C. § 4042 involves an element of judgment or choice by leaving the implementation of the duty to protect prisoners (including in the context of inmate-on-inmate violence) to the discretion of the BOP.[162] It also established that "the judgment involved in this case—*i.e.*, how to best protect one inmate from the threat of attack by another—'is the kind that the discretionary function exception was designed to shield.'"[163] Thus, the discretionary function exception applies, and alleged violations of § 4042 are not actionable under the FTCA.

With respect to Count XV, Plaintiff also asserts that an excerpt from the SIS manual imposes a non-discretionary duty on prison officials to protect confidential informants from inmate violence.[164] However, the manual involves elements of judgment or choice by affording prison officials with discretion to determine how to protect informants from inmate violence, just

---

[161] *United States v. Gaubert*, 499 U.S. 315, 325 (1991).

[162] *Donaldson v. United States*, 281 F. App'x 75, 77 (3d Cir. 2008).

[163] *Id.* (quoting *Mitchell v. United States*, 225 F.3d 361, 363 (3d Cir. 2000)).

[164] Plaintiff relies on the SIS Manual, which states: "Confidential Information is a primary means of gathering intelligence. The sensitivity inherent in this investigative tool mandates that staff protect the identity of the source. The failure to do so could pose a serious threat not only to the personal safety of the informant, but to the security of the institution to liability should the inmate be injured as a result of staff failure to protect the informant. If the identity of the confidential source is compromised, immediate action shall be taken to protect the individual."

to this claim on this basis. In conclusion, summary judgment will be granted on Count XV, but will be denied on Count XVI with respect to the razor collection policy Plaintiff has identified.

## IV.    CONCLUSION

For the reasons set forth above, the motion for summary judgment filed by the prison officials will be granted in part and denied in part, and the motion to dismiss, or in the alternative for summary judgment, filed by the United States will be granted in part and denied in part. An Order follows.

For clarity, the following claims against the following Defendants remain:

- **Count I: Fifth Amendment Substantive Due Process (Failure to Protect)**

  - Claim: Defendants were deliberately indifferent to the risk posed by placing Plaintiff in the same locked recreation pen as Northington and his gang.

  - Defendants (8): Senior Officer Bergos, Senior Officer Bowns, Lt. Gibbs, Senior Officer Jezior, Warden Levi, Special Investigative Agent McLaughlin, Lt. Robinson, and Lt. Rodgers

- **Count III: Fifth Amendment Substantive Due Process (Punitive Detention)**

  - Claim: Plaintiff's fourth detention in the SHU deprived him of his liberty interest, as an inmate awaiting sentencing, to be free from punishment.

  - Defendants (2): Warden Levi, Senior Officer Jezior.

- **Count X: First Amendment (Retaliation)**

  - Claim: Plaintiff's placement and continued detention in SHU after his attorney challenged Plaintiff's previous placement was retaliatory for exercising his First Amendment rights.

  - Defendants (2): Warden Levi, Senior Officer Jezior.

- **Count XVI: FTCA Negligence Claim (Failure to Protect from Assault)**

  - Claim: The United States of America negligently failed to protect Plaintiff from the Taylor assault by failing to collect a razor issued to Taylor.

  - Defendant: The United States of America