IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | : | |
|---|---|---|
| **PETER BISTRIAN,** | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | No. 2:08-CV-03010-CMR |
| | : | |
| v. | : | |
| | : | |
| **WARDEN TROY LEVI, et al.,** | : | |
| | : | |
| Defendants. | : | |

_____

**PLAINTIFF'S MEMORANDUM IN FURTHER
SUPPORT OF MOTION FOR ADVERSE INFERENCE**

**I.    FACTS**

    **A.    The Corridor Video Is the Definitive Evidence Concerning Search of Aaron Taylor – There Is No Substitute**

Any pat or wand search of an inmate being taken from his cell to a rec pen in the SHU at the FDC in October 2006 was conducted just outside the inmate's cell, after the inmate had been cuffed while still in his cell.  *See*, *e.g*., Griffith, August 20, 2019 at pp. 28-29; Gravette, July 26, 2019 at pp. 27-28.  At this time, the area outside each inmate's cell in the SHU was the subject of a video recording device, such that what took place outside the cell was video recorded.  *Id*.  The testimony in this case is clear and uncontradicted that the video apparatus recorded what took place concerning Aaron Taylor outside his cell on his way to being escorted to the rec pen on October 12, 2006.  *See* Griffith, August 20, 2019 at pp. 45-46; Gravette, July 26, 2019 at p. 27.  This was acknowledged to be the most definitive evidence.  *Id*.

This is all the more true given that the particulars of the search are critical.  Program Statement 5500.11, August 10, 2003, includes the following requirement:  "When using the hand-held metal detector, staff must closely check body cavity areas, i.e., mouth, nose, ear, rectum, and

vagina." Exhibit P-28-011. James Griffith confirmed the applicability of this requirement (August 20, 2019 at pp. 61-63). Whether these steps were taken can only be learned through the video. The importance of the specifics of the search is underscored by Taylor's testimony that he concealed the razor weapon in his drawers.[1]

### B. The Government's Conduct in Not Retaining and Reviewing the Video as Part of Its Investigation and Report Was Inexplicable and Intentional

The viciousness of Taylor's attack, the extent of injuries to Peter Bistrian, the fact that Taylor was known to be so dangerous and was not restrained while Bistrian was cuffed behind his back, and the use of a munitions grenade device demonstrated the urgency of obtaining the video in order to learn how this attack could have occurred. The likelihood of a lawsuit, particularly given Mr. Bistrian's other grievances arising from 440-plus days in solitary confinement and the Northington attack, was great. The need was also underscored by the grave security concerns which the FDC and BOP should have had. Moreover, there was a mandatory policy requiring an investigation, and preservation of the records concerning the investigation. *See* Exhibit P-33.[2] James Knox, who was the Captain at the FDC at the time of the attack, admitted that the matter of how Taylor got a razor weapon in the rec pen would be a necessary part of the required investigation, and that the investigation needed to include review of the video. Knox, August 12, 2019 at pp. 174, 176, 179. The investigation of this kind of attack begins immediately after the attack, while the evidence is fresh, as reflected by the witness statements in the report of an attack. *See* Exhibit P-151.

There is no report or testimony that any investigation was made concerning the matter of

---

[1] The other policy statements concerning required pat and wand searches are contained in Exhibits G-16 and P-17.

[2] Exhibit P-33 includes the following directive: "Collect and preserve all evidence pertaining to any serious incidents involving inmates or staff. Your responsibilities also include maintaining records and documents in reference to major incidents."

how Aaron Taylor came to have a razor weapon in the rec pen on October 12, 2006, and there is no report or testimony as to whether the video was reviewed, or, indeed, as to whether Taylor had been searched. David Knox testified that the video should have been reviewed, and that the person responsible for making the review was James Gibbs. Knox, August 12, 2019 at pp. 174, 176. Mr. Gibbs testified that there was no investigation as to how Aaron Taylor came to have the razor weapon he used to attack Peter Bistrian. Deposition of James Gibbs, September 22, 2014 at 153:7-154:9, entered into evidence on rebuttal on August 20, 2019, at p. 146. There are two realistic possibilities. One, that the video was reviewed and destroyed, because of what is showed, or, more precisely, because of what it did not show. Two, that the video was never reviewed and was intentionally not preserved because the government knew that it would not show a search, or show a search in minimal compliance with written, mandatory policy. A third alternative, namely inadvertence, defies credibility.[3]

### C. The Government Destruction of the Razor Weapon and Munition Device Has Compounded the Spoliation

The spoliation of evidence concerning the Taylor attack does not end with the video. The criminal trial of Aaron Taylor took place in 2010. At the criminal trial, the razor weapon and the used munition device were in evidence. They both disappeared after the trial. No record was kept as to the identity of the munition device, and no record was kept of the razor weapon which would show its length or composition. The Bistrian case had been filed on June 27, 2008, and the U.S. Attorney's Office that handled the criminal trial is the same office which has represented the government in this case. These were both important pieces of evidence. Moreover, they are

---

[3] The extent to which the government would have needed to go to ignore the video is underscored by the testimony of Patrick Griffith that supervisory staff lieutenants viewed the videos in the SHU on a daily basis. Griffith, August 20 at p. 46. Regardless of whether this testimony is true, it binds the government on this issue. If, as Griffith testified, the purpose of the review was to ascertain whether staff were properly performing their duties, how could the video showing whether a search was made of Aaron Taylor before he attacked Peter Bistrian with a razor weapon not have been promptly reviewed, or at least reviewed at the daily review, and preserved?

3

relevant to the search issue. The length and composition of the razor weapon are directly related to the adequacy of any search, and to the issue of whether and how searches were made of Aaron Taylor's cell.[4] The identity of the munition device is critical to the effect on Peter Bistrian of the explosion under his back. As to the latter, Plaintiff hopes that prejudice has been cured by agreement as to the munition device that was likely used, but, as to the razor weapon and video, the prejudice is not curable.

## II. This Court Should Draw the Negative Inference that the Video Would Have Shown that the Required Pat and Wand Search of Aaron Taylor Was Not Made Before He Was Taken to the Rec Pen on October 12, 2006

### A. The Court Has Broad Discretion to Impose Sanctions for Spoliation of Evidence

"'Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 110 (E.D. Pa. 2005), quoting *Mosaid Techs., Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 335 (D.N.J.2004). "Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012), citing *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 334 (3d Cir. 1995).

"A showing of spoliation may give rise to a variety of sanctions: '[1] dismissal of a claim or granting judgment in favor of a prejudiced party; [2] suppression of evidence; [3] an adverse inference, referred to as the spoliation inference; [4] fines; [and][5] attorneys' fees and costs.'" *Paramount*, 234 F.R.D. at 110-11, quoting *Mosaid*, 348 F. Supp. 2d at 335. "Spoliation sanctions serve three functions: 'Spoliation sanctions serve a remedial function by leveling the playing field

---

[4] Patrick Griffith testified that the picture that was made of the razor weapon was of no value to issues concerning possible search because the picture fails to show the dimensions of the weapon. Griffith, August 20 at p. 42.

4

or restoring the prejudiced party to the position it would have been without spoliation. They also serve a punitive function, by punishing the spoliator for its actions, and a deterrent function, by sending a clear message to other potential litigants that this type of behavior will not be tolerated and will be dealt with appropriately if need be.'" *Paramount*, 234 F.R.D. at 111, quoting *Mosaid*, 348 F. Supp. 2d at 335.

Spoliation of video evidence, like spoliation of other forms of evidence, is a proper basis for sanctions. *See*, *e.g.*, *Kounelis v. Sherrer*, 529 F. Supp. 2d 503, 522-23 (D.N.J. 2008) (defendant sanctioned for costs and attorneys' fees that plaintiff incurred relating to discovery regarding a destroyed videotape, including subpoenas, depositions, and an evidentiary hearing on plaintiff's motion for sanctions); *Abdulahi v. Wal-Mart Stores East, L.P.*, 76 F. Supp. 3d 1393 (N.D. Ga. 2014) (awarding attorneys' fees incurred in preparing motion for sanctions as sanction for failure to preserve videotape evidence).

"Sanctions motions addressing claimed spoliation of evidence are serious business. They will always implicate professional and personal reputations, and are time-consuming and costly to litigate. When proven, the spoliation of evidence can materially affect the disposition of the case on the merits and must be remedied." *Bozic v. City of Washington*, 912 F. Supp. 2d 257, 259 n.2 (W.D. Pa. 2012).

      **B.    There Is Ample Precedent Supporting Adverse Inferences for Spoliation Against the Government in Cases Brought Under the FTCA and Other Federal Statutes**

As plaintiff's counsel detailed in the August 20, 2019 argument before the Court, adverse inferences have been drawn against the government for spoliation in cases brought under the Federal Tort Claims Act ("FTCA") and other federal statutes. For example, in *Smith v. United States*, 128 F. Supp. 2d 1227 (E.D. Ark. 2000), the special administrator of a decedent, who had died following surgery at a veterans' hospital, sued the United States under the FTCA, alleging

5

that the hospital negligently failed to follow the standard of care. The District Court held that held that the primary surgeon's failure to dictate operative notes of the surgery amounted to a failure to follow the standard of care, and gave rise to case-dispositive adverse inferences that (1) the surgeon failed to act in accordance with the degree of skill and learning ordinarily possessed and used by members of his profession engaged in the same type of practice or specialty in the locality in which he practiced, and (2) as a proximate result thereof, the patient suffered injuries resulting in his death, which would not otherwise have occurred. Based on those adverse inferences, the Court entered judgment in favor of the plaintiff.

Although the case did not involve the destruction of evidence, the Court found that "an adverse inference may be drawn from the failure of a party to produce certain evidence—in this case an operative note – where that evidence is within the control of the party in whose interest it would naturally be to produce it and, without satisfactory explanation, he fails to do so." *Id.* at 1233. The Court noted that all hospitals, including Veterans' Administration hospitals, require that operative notes be dictated, "and the fact that no such notes are taken, especially following a surgery of this magnitude, may be considered suspicious." *Id.* at 1234. The Court found the surgeon's proffered explanation for his failure to dictate operative notes to be "suspicious and, at least, unsatisfactory" (*id.* at 1234), and "the Court will draw the strongest possible adverse inference and thereby conclude that plaintiff has met his burden of proof in establishing his claim of negligence." *Id.*

In *Sovulj v. United States*, 2008 WL 11449125 (E.D.N.Y. May 14, 2008), the widow of a deceased inmate at FCI-Schuykill in Minersville, Pennsylvania[5] brought an FTCA action alleging that a Bureau of Prisons ("BOP") doctor had negligently failed to detect the presence of a tumor

---

[5] The Court found that Pennsylvania substantive law applied, since the alleged negligence occurred in Pennsylvania, but that federal procedural law applied to adverse inference issues. *See id.* at * 2 n.5.

6

on an x-ray taken of her husband at the prison. The BOP had destroyed the x-ray, and plaintiff moved for an adverse inference that the missing x-ray would have revealed the presence of a tumor in her husband's lungs. A Magistrate Judge found that the BOP had an obligation to preserve the x-ray because it was on notice of plaintiff's claim prior to the x-ray's destruction, and that the BOP acted grossly negligent in breaching this obligation. However, the Magistrate Judge recommended denying plaintiff's request for an adverse inference based on his finding that plaintiff had not demonstrated the relevance of the x-ray. The District Judge granted plaintiff's objection, and held that plaintiff was entitled to an adverse inference permitting the jury to conclude that the missing x-ray would have revealed the presence of a tumor. The District Judge wrote that "[t]he law of adverse inference does not require plaintiff to satisfy an impossible standard; indeed, courts are counseled to 'not require too specific a level of proof ... [because] holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference.'" Id. at * 2, quoting *Kronisch v. U.S.*, 150 F.3d 112, 128 (2d Cir. 1998).

In *Beaven v. United States Dept. of Justice*, 622 F.3d 540 (6th Cir. 2010), BOP employees brought FTCA and Privacy Act claims after a BOP agent left a folder containing detailed private and personal information related to all prison employees in an inmate-accessible work area. The District Court found that the plaintiffs were entitled to a non-rebuttable adverse inference that the contents of the folder had been disclosed, in violation of the Privacy Act, as a spoliation sanction for the government's destruction of the folder and its contents. The Court of Appeals held that the District Court had acted within its discretion in so doing, finding that "[t]he district court's spoliation sanction was necessary to further the remedial purpose of the inference." *Id.* at 555 (internal quotation omitted). The Court of Appeals further stated:

7

> The district court's use of a conclusive, non-rebuttable inference of disclosure fulfilled the purpose of spoliation sanctions for the destruction of relevant evidence. See 2 John Henry Wigmore, Evidence in Trials at Common Law § 291, at 227—29 (Chadbourn rev. 1979) (noting that "there is no reason why the utmost inference logically possible should not be allowable, namely, that the contents of the document (when desired by the opponent) are what he alleges them to be, or (when naturally a part of the possessor's case) are not what he alleges them to be" and that in the case of spoliation, rather than mere nonproduction, "it is open to the larger inference ..., namely, a consciousness of the weakness of the whole case"); id. at 228 ("[T]he rule might correctly be stated as follows: The failure or refusal to produce a relevant document, or the destruction of it, is evidence from which alone its contents may be inferred to be unfavorable to the possessor, *provided the opponent, when the identity of the document is disputed, first introduces some evidence tending to show that the document actually destroyed or withheld is the one* as to whose contents it is desired to draw an inference.").

*Id.* at 555 n.11 (italics in original).

And, in *Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998), the plaintiff brought claims under the FTCA and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that a CIA agent had placed LSD in his drink at a Paris café in 1952, as part of covert drug testing on unsuspecting victims. The District Court entered summary judgment in favor of the defendants, but the Court of Appeals reversed as to the *Bivens* claims[6], finding that plaintiff was entitled to an adverse inference based on the government's destruction of documents relating to the drug testing operations, and that the adverse inference was sufficient to allow the plaintiff to survive summary judgment. The Court of Appeals wrote:

> It is a well-established and long-standing principle of law that a party's intentional destruction of evidence relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction. This adverse inference rule is supported by evidentiary, prophylactic, punitive, and remedial rationales. The evidentiary rationale derives from the common sense notion that a party's destruction of evidence which it has reason to believe may be used

---

[6] The Court of Appeals affirmed the District Court's holding that the plaintiff's FTCA claims were time-barred.

8

> against it in litigation suggests that the evidence was harmful to the party responsible for its destruction. The prophylactic and punitive rationales are based on the equally commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence will deter such destruction, and will properly plac[e] the risk of an erroneous judgment on the party that wrongfully created the risk. Finally, courts have recognized a remedial rationale for the adverse inference—namely, that an adverse inference should serve the function, insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.

*Id.* at 126 (internal citations, quotation, and footnote omitted).

The Court of Appeals further found that "[t]he district court properly rejected defendants' argument that an adverse inference was not warranted because at the time the MKULTRA documents were destroyed in 1973 no litigation, administrative action, or congressional investigation had commenced, and because [defendants'] reasons for destroying the evidence allegedly had nothing to do with the fear of future litigation." *Id.* at 127. "At the very least, the district court could not rule out the possibility that a reasonable jury would find that [defendants] feared the prospect of litigation against them individually, and that this prospect may have played a role in their decision to order the destruction of MKULTRA files." *Id.* And, the Court of Appeals cautioned against requiring too stringent a standard of proof from a party seeking an adverse inference sanction:

> holding the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction.

*Id.*

### C. The Government's Arguments Against an Adverse Inference Sanction Do Not Withstand Scrutiny

At the oral argument on August 20, 2019, counsel for the United States attempted to dismiss the precedents cited above on the basis that they pre-dated the 2015 amendments to Federal Rule of Civil Procedure 37 regarding electronically stored information ("ESI"). Counsel for the United States also argued that there is insufficient evidence that the government acted with the intent required by the 2015 amendments.

The government's arguments fail for at least three reasons. First, as the Court recognized at the oral argument, the video evidence of the SHU hallway was not ESI at the time of the Taylor assault and its immediate aftermath. Second, contrary to the government's assertions, it is far from clear that the 2015 amendments to Rule 37 should apply to this case. Third, *even if* the video could properly be categorized as ESI, and *even if* the 2015 amendments to Rule 37 apply to this case, there is still abundant evidence from which the Court could conclude that the government acted with the requisite intent.

#### 1. Rule 37(e) Does Not Apply Because the Video Was Not "Electronically Stored Evidence"

The arguments made by the government at the August 20, 2019 oral argument were all based on the premise that the video of the SHU hallway on the day of the Taylor attack was ESI and thus subject to Fed. R. Civ. P. 37(e). The Court, however, immediately recognized that this was not true:

> MR. KAUFMAN:  . . . .  Now, there is no question that we are dealing with electronically-stored information here. The Court has heard at length about the storage and about how short that storage length was. So this fits with respect to the video within the heartland of Rule 37.
>
> THE COURT:  Because the video is somehow electronic evidence?
>
> MR. KAUFMAN:  Yes.

10

> THE COURT: It's not ESI. It's just a film that rotates, like many surveillance videos. And it was, in 2006, certainly not part of ESI. It becomes that when there is litigation or when there is an attempt to store it. . . .

August 20, 2019 Trial Transcript, pp. 164-65. As the Court proceeded to explain, there was an immediate investigation into prosecuting Taylor, which included the FBI and the United States Attorney's Office "gathering up all the evidence, including the video." *Id.*, p. 165.

The Court's analysis is supported by the history of the amendments to Rule 37. The Rule first dealt with ESI in the 2006 amendments. The advisory committee notes to the 2006 amendments make it clear that the committee was focused on information stored on computers:

> Subdivision (f) is new. ***It focuses on a distinctive feature of computer operations, the routine alteration and deletion of information that attends ordinary use. Many steps essential to computer operation may alter or destroy information***, for reasons that have nothing to do with how that information might relate to litigation. As a result, ***the ordinary operation of computer systems creates a risk that a party may lose potentially discoverable information without culpable conduct on its part***. Under Rule 37(f), absent exceptional circumstances, sanctions cannot be imposed for loss of electronically stored information resulting from the routine, good-faith operation of an electronic information system.
>
> Rule 37(f) applies only to information lost due to the "routine operation of an electronic information system" -- the ways in which such systems are generally designed, programmed, and implemented to meet the party's technical and business needs. ***The "routine operation" of computer systems includes the alteration and overwriting of information, often without the operator's specific direction or awareness, a feature with no direct counterpart in hard-copy documents***. Such features are essential to the operation of electronic information systems.

Advisory Committee Notes to 2006 Amendments to Fed. R. Civ. P. 37 (emphasis added).

For present purposes, the key sentence in the advisory committee notes is this: "The 'routine operation' of computer systems includes the alteration and overwriting of information, often without the operator's specific direction or awareness, a feature with no direct counterpart in

11

hard-copy documents."  The committee was concerned about alteration and overwriting of information resulting from the routine operation of computer systems, "often without the operator's specific direction or awareness."  Those concerns have nothing to do with evidence such as the video of the SHU hallway, which should have been gathered and kept, just like hard-copy documents – it never should have been put in "storage" or subject to any "routine operation" whereby it would be altered or overwritten.  And certainly, the government could not imbue the video with the special status of ESI either by intentionally destroying it, or by ignoring it and allowing it to be overwritten.  Simply stated, the video was not ESI in the aftermath of the Taylor attack, and the provisions of Rule 37(e) dealing with ESI do not apply.

The 2015 Note to Rule 37(e) includes a statement that "courts may sometimes consider whether there was an independent requirement that the lost information be preserved. Such requirements arise from many sources—statutes, administrative regulations, an order in another case, or a party's own information-retention protocol."  The independent requirements for preservation could hardly have been stronger in this case, and speak directly to the fact that the video was critical not only to anticipated litigation but to the investigation required under BOP Policy for the security of the FDC and protection of inmates and staff.  Accordingly, these independent requirements further underscore that the video was evidence immediately upon the Taylor attack, well before it could have become ESI.

### 2. It Is Doubtful that the 2015 Amendments to Rule 37 Should Apply to this Case

The government argues that the 2015 amendments to Rule 37 should apply to this case, even though the Taylor attack took place more than nine years before the amendments went into effect, and even though plaintiff brought this suit more than seven years before the amendments went into effect.  The government's argument is dubious, at best.

The case most on point is *Thomas v. Butkiewikus*, 2016 WL 1718368 (D. Conn. Apr. 29, 2016), which – like this case – dealt with spoliation of video evidence relevant to attacks on the plaintiff by other inmates. After a thorough review of prison camera surveillance procedures, the Court determined that it would be unjust and impracticable to apply the 2015 amendments retroactively, because the case had been filed two and a half years prior to the effective date of the amendments, and the assaults and spoliation had occurred even earlier. *Id.* at * 8. Those same concerns apply with far greater force here, given the longer time periods at issue. The *Thomas* court granted the plaintiff's request for a mandatory adverse inference instruction related to the spoliation of surveillance footage outside the cell and of the recreation yard on the day of one of the attacks, and granted a permissive adverse inference instruction for the spoliation of surveillance footage outside the cell and of the recreation yard on the day of another attack. *Id.* at * 17.

Several other courts have, like the *Thomas* court, declined to apply the 2015 amendments to Rule 37 retroactively, whether because the relevant events and/or spoliation occurred before the effective date of the amendments, or because they found that retroactive application would be unjust and/or impracticable for other reasons. *See*, *e.g*., *Rhoda v. Rhoda*, 2017 WL 4712419, at * 3 (S.D.N.Y. Oct. 3, 2017); *DiStefano v. Law Offices of Barbara H. Katsos, PC*, 2017 WL 1968278, at * 4 (E.D.N.Y. May 11, 2017); Learning Care Group, Inc. v. Armetta, 315 F.R.D. 433, 440 (D. Conn. 2016); *McIntosh v. United States*, 2016 WL 1274585, at * 31 (S.D.N.Y. Mar. 31, 2016); *Thurmond v. Bowman*, 2016 WL 1295957, at * 8 n.6 (W.D.N.Y. Mar. 31, 2016), *report and recommendation adopted*, 199 F. Supp. 3d 686 (W.D.N.Y. 2016); *Trowery v. O'Shea*, 2015 WL 9587608, at * 5 n.11 (D.N.J. Dec. 30, 2015).

### 3. In Any Event, There Is Abundant Evidence from Which the Court Could Conclude that the Government Intentionally Destroyed the Video

Finally, plaintiff is still entitled to an adverse inference even if the video is properly considered to be ESI, and even if the Court deems retroactive application of the 2015 amendments to Rule 37 to be both "just" and "practicable." Although the 2015 amendments to Rule 37 provide that an adverse inference sanction for spoliation of ESI requires "a finding that the party acted with the intent to deprive another party of the information's use in the litigation" (Fed. R. Civ. P. 37(e)(2)), courts applying that standard have recognized that the requisite intent may be inferred from circumstantial evidence and common sense.

*Moody v. CSX Transp., Inc*., 271 F. Supp. 3d 410 (W.D.N.Y. 2017), is instructive. In that case, the court decided to apply the 2015 amendments to FRCP 37 retroactively and, thus, plaintiff was required to prove that the defendant acted with the intent of depriving the plaintiff of the evidence (in that case, data contained on a train data recorder akin to an airplane "black box"). The Court found that the requisite intent existed by examining the totality of the defendants' conduct, and cited other post-2015 cases reaching similar results:

> Moody argues that the Court may infer an intent to deprive from defendants' actions in this matter. (See Docket # 68–1 at 22). The Court agrees. In *Ala. Aircraft Indus., Inc. v. Boeing Co*., 319 F.R.D. 730 (N.D. Ala. 2017), the court held that a party may be found to have acted with an intent to deprive within the meaning of Rule 37(e)(2) where "(1) evidence once existed that could fairly be supposed to have been material to the proof or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly explained as not involving bad faith by the reason proffered by the spoliator." *Id.* at 746 (quoting *Managed Care Solutions, Inc. v. Essent Healthcare, Inc*., 736 F.Supp.2d 1317, 1323 (S.D. Fla. 2010)). Defendants' conduct in this case supports such an inference. As explained more fully supra, no question exists that the lost evidence was highly relevant—if not the most important objective

14

> evidence—to the determination of liability. While knowing they had a duty to preserve the event recorder data, defendants allowed the original data on the event recorder to be overwritten, and destroyed or recycled Lewandowski's laptop without ever confirming that the data had been preserved in another repository. Finally, their failure to make any effort over the course of four years to confirm that the data was properly preserved in the Vault undercuts the reasonableness and credibility of their asserted belief that the material was still accessible. On this record, the Court finds that defendants acted with the intent to deprive Moody of the use of the event recorder data. *See id.* at 746 ("this...unexplained, blatantly irresponsible behavior leads the court to conclude that [defendant] acted with the intent to deprive [plaintiff] of the use of this information"). *See also Brown Jordan Int'l, Inc. v. Carmicle*, 2016 WL 815827, *1, 33–37 (S.D. Fla. 2016) (finding intent to deprive where spoliating party did not credibly explain failure to preserve), *aff'd*, 846 F.3d 1167 (11th Cir. 2017); *Internmatch, Inc. v. Nxtbigthing, LLC*, 2016 WL 491483, *1, 4 n.6, 11 (N.D. Cal. 2016) (finding defendants had acted with intent to deprive where "the alleged chronology of events [was] highly improbable, [and] [d]efendants' story [was] filled with inconsistencies.").

*Id.* at 431-32.

The *Moody* Court further determined that it could infer the requisite intent from the circumstantial evidence, even if it found the defendants' explanations for the unavailability of the evidence to be credible:

> Moreover, even accepting as credible defendants' explanation for the loss of the event recorder data, this Court still concludes that defendants' actions presented sufficient circumstantial evidence from which to infer that they intended to deprive Moody of the relevant data. *See Ottoson v. SMBC Leasing & Fin., Inc.*, 2017 WL 2992726, *9 (S.D.N.Y. 2017) (intentional failure to take steps necessary to preserve relevant evidence "satisfies the requisite level of intent required by Federal Rule of Civil Procedure 37(e)"). Here, even if Lewandowski's initial error in uploading the event recorder data to the Vault is excused, defendants' repeated failure over a period of years to confirm that the data had been properly preserved despite its ongoing and affirmative Rule 11 and Rule 26 obligations, particularly before discarding Lewandowski's laptop, is so stunningly derelict as to evince intentionality. *See*, *e.g.*, *Henkel Corp. v. Polyglass USA, Inc.*, 194 F.R.D. at 457 (plaintiff's conduct in disregard of its discovery obligations, while suggesting but not conclusively establishing bad

> faith, demonstrated that it was "highly culpable for the destruction of the relevant evidence") (citing *Shaffer v. RWP Grp., Inc*., 169 F.R.D. 19, 26 (E.D.N.Y. 1996) (finding party "highly culpable" for its "conscious and reckless disregard" of discovery obligations)). Thus, because I find that defendants' acted with intent to deprive, Rule 37(e)(2) permits the imposition of severe sanctions.

*Id.* at 432. The Moody Court concluded that "an adverse inference instruction is justified. 'The prophylactic and punitive rationales [for an adverse inference instruction] are based on the...commonsensical proposition that the drawing of an adverse inference against parties who destroy evidence will deter such destruction, and will properly place the risk of an erroneous judgment on the party that wrongfully created the risk.'" *Id.*, quoting *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

As set forth in the Fact section, *supra*, the evidence of bad faith and intentionality in not promptly obtaining and preserving the video, and in allowing it to be destroyed is undeniable.

### III.  CONCLUSION

For the reasons set forth herein, Plaintiff moves for an order that the failure by the Government to retain the video showing whether there was a search of Aaron Taylor prior to his being taken to the rec pen on October 12, 2006 requires an inference that the video showed the absence of the required search.

Respectfully submitted,

/s/ Richard L. Bazelon
Richard L. Bazelon, Esquire
Michael F. R. Harris, Esquire
Bazelon Less & Feldman, P.C.
One South Broad Street, Suite 1500
Philadelphia, PA  19107
(215) 568-1155

*Attorneys for Plaintiff*

Dated: August 22, 2019

16

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 22, 2019, I served a copy of the foregoing electronically to the counsel for all of the named defendants, including the United States.

    /s/ Richard L. Bazelon