## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PETER BISTRIAN,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 08-3010** |
| | : | |
| **WARDEN TROY LEVI,** *et al.*, | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

**Rufe, J.**                                                                    **March 24, 2020**

This civil rights case brought by Plaintiff Peter Bistrian has been before this Court for over a decade now. Bistrian asserted claims for a number of constitutional violations against individual officers in the Bureau of Prisons ("BOP") facility where he was held as a pretrial detainee pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*[1] and against the United States under the Federal Tort Claims Act. Some of the *Bivens* claims were dismissed and others were resolved on summary judgment, and at each of those stages, the individual officers took an interlocutory appeal to the Third Circuit. Meanwhile, the FTCA claims were dismissed in 2010 under the law as it stood then. After an intervening change in the law, however, as well as Plaintiff's discovery of some potentially mandatory policies while deposing BOP witnesses, Plaintiff was granted leave to file a Third Amended Complaint in 2015 and the FTCA claim against the United States was reinstated. The *Bivens* and FTCA claims were bifurcated and proceeded to trial in the summer of 2019: First, the *Bivens* claims against the individual officers were tried to a jury. The FTCA claims were then tried to this Court. For the reasons discussed below, the FTCA trial has not concluded.

---

[1] 403 U.S. 388 (1971).

In any long-running case like this one, it is perhaps inevitable that the evidence ultimately presented at trial will be deficient in one way or another. Memories fade, tangible things deteriorate, and electronic data disappear into the ether. Unfortunately, an extraordinary number of such evidentiary irregularities have plagued this litigation—specifically, the litigation of the FTCA claims against the United States that were the subject of the second trial—leading to accusations of spoliation, a motion for sanctions, and the reopening of discovery after both parties had rested. Those issues are addressed in this Opinion.

## I. MOTION FOR ADVERSE INFERENCE

### A. Background

While awaiting trial on charges of wire fraud, Bistrian was detained at the Federal Detention Center ("FDC") in Philadelphia. He was placed in the Secure Housing Unit ("SHU") for allegedly violating his phone privileges. While in the SHU, Bistrian was the victim of two assaults at the hands of other inmates. The second of those assaults was the subject of his failure-to-protect claim against the United States at this trial.

That second assault occurred when Bistrian and his fellow SHU inmate Aaron Taylor were placed in the same "rec pen" for their daily hour of recreation time. At the end of the recreation period, during which inmates were unrestrained in the rec pen, each inmate had to be handcuffed before the rec pen could be unlocked to return the inmates to their cells. After Bistrian was handcuffed, but while Taylor was still unrestrained, Taylor attacked Bistrian with a weapon fashioned from one of the disposable razors regularly given to inmates to shave with. Much attention was paid at trial to the safeguards at the FDC meant to prevent inmates from retaining razors and to ensure inmates did not smuggle contraband to the rec pen.

The FDC has a vast network of surveillance cameras that capture most everything that takes place within the facility. All agree that the cameras in the hallway of the SHU—that is, the corridor between two facing rows of cells in the SHU—would have captured footage of staff retrieving Taylor from his cell and escorting him to the rec pen. That footage would also have shown whether staff properly searched Taylor before escorting him to the rec pen. The footage is no longer available.

At trial, Bistrian moved for an adverse inference based on spoliation of evidence by the government. Bistrian argued that the government intentionally failed to preserve (1) surveillance video footage that would have shown whether Taylor was searched before being taken to the rec pen and (2) the razor weapon with which Taylor attacked Bistrian.[2] Bistrian sought an inference that Taylor either was not searched at all or that any search did not meet mandatory safety requirements. Bistrian also seeks an adverse inference based on the destruction of the munitions device used by correctional officers to break up the assault on him.

### B. Legal Standard

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."[3] When a district court finds that spoliation has occurred, it has the authority to fashion an appropriate sanction to remedy the damage to other parties.[4] The adverse inference has a long history in the common law as one such sanction, as the Third Circuit has explained.[5] It serves to remedy destruction of evidence, based on "the common sense observation that when a party

---

[2] Trial Tr., Aug. 20, at 149–83.

[3] *Paramount Pictures Corp. v. Davis*, 234 F.R.D. 102, 110 (E.D. Pa. 2005) (quoting *Mosaid Techs., Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332, 335 (D.N.J. 2004)).

[4] *Mosaid*, 348 F. Supp. 2d at 335.

[5] *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 78 (3d Cir. 1994).

destroys evidence that is relevant to a claim or defense in a case, the party did so out of the well-founded fear that the contents would harm him."[6] "The admissibility of spoliation evidence and the propriety of the spoliation inference is well established in most jurisdictions."[7]

Until recently, district courts in the Third Circuit relied on both the Federal Rules of Civil Procedure and the inherent authority of the court in imposing sanctions for spoliation of any kind of evidence. In 2015, however, Federal Rule of Civil Procedure 37 was amended to provide a uniform standard governing spoliation sanctions for the loss of electronically stored information. The Supreme Court promulgated amended Rule 37(e) in recognition of "the serious problems resulting from the continued exponential growth in the volume of [electronically stored] information."[8] Where the amended rule applies, it provides the exclusive remedy for spoliation of electronically stored information ("ESI"), foreclosing reliance on the court's inherent authority.[9] Because the Federal Rules of Civil Procedure do not address sanctions for spoliation of tangible items and other non-electronic information, however, the analysis established in the Third Circuit's spoliation precedent still governs motions based on spoliation of non-electronic information.[10] Accordingly, the legal standards governing spoliation of ESI and spoliation of other information are set out separately.

---

[6] *Mosaid*, 348 F. Supp. 2d at 336; *see also Schmid*, 13 F.3d at 78 (citing *Nation-wide Check Corp. v. Forest Hills Distributors, Inc.*, 692 F.2d 214, 218 (1st Cir. 1982) (Breyer, J.)).

[7] *Schmid*, 13 F.3d at 78 (citing *Nation-wide Check Corp.*, 692 F.2d at 218.

[8] Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

[9] *Id.*

[10] *Cf. Best Payphones, Inc. v. City of New York*, No. 01-3934, 2016 WL 792396, at *3 (E.D.N.Y. Feb. 26, 2016) (explaining that Second Circuit case law continues to govern spoliation motions based on non-electronic information, while Rule 37 governs motions based on electronic information).

## i.  Spoliation of ESI: Rule 37(e)

Rule 37(e) sets out the standard for determining whether spoliation of ESI has occurred. Amended Rule 37(e) provides that spoliation occurs where ESI "that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery." The advisory committee's notes to the 2015 amendment further explain the elements of spoliation of ESI. First, the spoliating party was under a duty to preserve when the loss occurred.[11] Second, the lost ESI was within the scope of the duty to preserve.[12] Third, "the information was lost because the party failed to take reasonable steps to preserve" it.[13] Fourth and finally, because ESI "often exists in multiple locations," spoliation occurs only where the information is truly lost and not recoverable elsewhere.[14]

The parties dispute whether the 2015 amendment to Rule 37(e) applies retroactively to the alleged spoliation in this case, which was filed in 2008. In the order promulgating the proposed amendment to Rule 37, Chief Justice Roberts noted that the amendments "shall take effect on December 1, 2015, and shall govern in all proceedings in civil cases thereafter commenced and, insofar as just and practicable, all proceedings then pending."[15] This was

---

[11] Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

[12] *Id.* ("The new rule applies only if *the lost information* should have been preserved in the anticipation or conduct of litigation . . . ." (emphasis added)).

[13] *Id.*

[14] *Id.* Prior to the 2015 amendment, courts applied the Third Circuit's general spoliation test to both ESI and other information. *See infra*. Since 2015, some district courts within the Third Circuit have continued to apply that test to determine whether spoliation occurred, while applying Rule 37(e) to determine what sanction is appropriate. Although the Third Circuit has not specifically clarified this issue, it appears that Rule 37(e) exclusively governs the spoliation inquiry, while both Rule 37(e) and the Third Circuit's own three-factor test govern the sanctions inquiry. *See GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 2019). After all, Amended Rule 37(e) is intended to provide a uniform standard, and was adopted specifically in response to the different culpability requirements developed by the various Courts of Appeals. *See CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 495 (S.D.N.Y. Jan. 12, 2016).

[15] 2015 U.S. Order 0017.

consistent with the default statutory rule governing amendments to the Federal Rules of Civil Procedure, which creates "a presumption that a new rule governs pending proceedings *unless* its application would be unjust or impracticable."[16]

Two cases in this Circuit have considered whether to apply the 2015 amendment retroactively. Both concluded that retroactive application was appropriate.[17] It is true that those cases were filed much later than this one and that the conduct relevant to this motion occurred as much as nine years before the new rule was promulgated.[18] The Court nevertheless agrees with the United States that it is just and practicable to apply the amendments retroactively, especially since the "change does not appear to have substantively altered the moving party's burden, in this Circuit, of showing that ESI was destroyed in 'bad faith' when requesting an adverse inference."[19] Accordingly, the Court will apply the test of Rule 37(e) to determine whether spoliation of ESI has occurred.[20]

Once a court concludes that spoliation has occurred, it must determine what sanction to impose.[21] Rule 37(e) provides a general framework for determining the appropriate sanction for spoliation of ESI. If a party "acted with the intent to deprive another party of the information's use in the litigation," the district court may draw an adverse inference or even impose case-

---

[16] *CAT3*, 164 F. Supp. 3d at 496 (citing 28 U.S.C. § 2074(a)).

[17] *Accurso v. Infra-Red Servs., Inc.*, 169 F. Supp. 3d 612, 618 n.6 (E.D. Pa. 2016) (Pratter, J.); *Lexpath Techs. Holdings, Inc. v. Welch et al.*, No. 13-5379, 2016 WL 4544344, at *4 (D.N.J. Aug. 30, 2016).

[18] Bistrian's Mem. Supp. Mot. for Adverse Inference [Doc. No. 407] at 12–13.

[19] *Accurso*, 169 F. Supp. 3d at 618 n.6. That is, in this Circuit, the 2015 amendment merely moved the bad faith showing from the spoliation inquiry to the sanctions inquiry.

[20] In the interest of thoroughness, the Court notes the following with regard to the other three elements of the Third Circuit's test: The first element, control, is undisputed here. The second element, relevance, is addressed in the course of the Court's analysis under Rule 37(e). The fourth element, the duty to preserve, is also part of the Rule 37(e) analysis. Moreover, both the concepts of control and relevance are logically inherent in the duty-to-preserve concept.

[21] *See Bull v. United Parcel Service, Inc.*, 665 F.3d 68, 73 n.5 (3d Cir. 2012).

dispositive sanctions.[22] In the absence of bad faith, a court may impose a range of lesser sanctions if the loss of the information prejudiced another party.[23] In addition, the Third Circuit has set out three factors for courts to consider in contemplating spoliation sanctions, which—it recently clarified—are still applicable to motions governed by the 2015 amendment to Rule 37(e):

> (1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future.[24]

### ii. Spoliation of tangible items and other non-electronic information

Outside the realm of ESI, "[s]poliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party."[25] "[A] finding of bad faith is pivotal to a spoliation determination."[26] Thus, whereas some lesser sanctions may be warranted under Rule 37(e) for the unintentional but prejudicial loss of ESI, conduct that is "no worse than negligent" is not spoliation where non-electronic evidence is concerned.[27]

If spoliation has occurred, sanctions may be imposed under the court's inherent authority. As noted above, in determining what sanction is appropriate, courts in the Third Circuit consider

---

[22] Fed. R. Civ. P. 37(e)(2).

[23] Fed. R. Civ. P. 37(e)(1).

[24] *GN Netcom, Inc. v. Plantronics, Inc.*, 930 F.3d 76, 82 (3d Cir. 2019) (quoting *Schmid*, 13 F.3d at 79).

[25] *Bull*, 665 F.3d at 73. In the context of *Bull*, it is clear that the "actual suppression or withholding" language refers to a party's intent to deprive an adversary of information in litigation—that is, bad faith. *Id.* at 79.

[26] *Id.* at 79.

[27] *Bozic v. City of Washington*, 912 F. Supp. 2d 527, 270 (W.D. Pa. 2012) (collecting cases).

both the spoliating party's degree of fault and the adverse party's degree of prejudice, as well as whether any lesser sanction would adequately remedy the loss of evidence. Possible sanctions for spoliation include suppression of evidence, an adverse inference, and attorney's fees, as well as case-dispositive sanctions in extreme cases.[28]

## C. Discussion

### i. The Hallway Video

The parties dispute whether Rule 37(e), as amended in 2015, applies to the hallway video. Bistrian argues that the video footage does not qualify as ESI.[29] The United States, however, explains that the surveillance cameras were digital, so the footage was ESI.[30] While there is no definitive evidence as to whether the FDC's surveillance footage was digital or analog in 2006, it appears almost certain that it was digital, so Rule 37(e) applies.[31]

#### a. Whether the United States Had a Duty to Preserve the Hallway Video

Rule 37(e) applies to "electronically stored information that should have been preserved in the anticipation or conduct of litigation."[32] The Rule therefore does not apply to information

---

[28] *Mosaid*, 348 F. Supp. 2d at 335.

[29] Bistrian's Mem. Supp. Mot. for Adverse Inference [Doc. No. 407] at 10–12.

[30] United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 7–8; *see ML Healthcare Servs., LLC v. Publix Super Markets, Inc.*, 881 F.3d 1293, 1307 (11th Cir. 2018) (treating surveillance video as ESI and applying Rule 37(e)); *Pelino v. Gilmore*, No. 18-1232, 2019 WL 6683865, at *2–3 (W.D. Pa. Dec. 6, 2019) (same); *Sosa v. Carnival Corp.*, No. 18-20957, 2018 WL 6335178, at *2 (S.D. Fla. Dec. 4, 2018) (same).

[31] James Gibbs explained at his deposition that footage from the surveillance cameras in the SHU was digitally recorded into a central DVR. United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at Ex. A (Gibbs Dep., Sept. 22, 2014, at 156–59). The Court understands this to mean that the individual cameras recorded digitally but had no storage capacity, so the digital footage was created in the camera and stored in the DVR. Officer Jezior confirmed this, explaining that a DVR recorded the video "feed" that staff observed on the "monitors" and that the DVR stored that footage for at least 20 days. United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at Ex. 19 (Jezior Dep., June 29, 2010, at 78–80). Timothy Gravette, Bistrian's expert, testified that in 2006 the video would have been "formed digitally" and "secured . . . digitally." Gravette Testimony, Trial Tr. July 26, 2019, at 79. On the other hand, Gibbs also noted that the camera system was "very old and outdated" in 2006, and a very old system as of 2006 is less likely to have been digital. But in light of the direct testimony from several witnesses strongly suggesting a digital system, the Court finds the hallway video was ESI.

[32] Fed. R. Civ. P. 37(e).

that was lost or destroyed before a duty to preserve it arose.[33] Thus, the first question is whether the United States was under a duty to preserve the hallway video before it was automatically overwritten about a month after the Taylor attack.[34]

Rule 37(e) does not redefine the duty to preserve; rather, it incorporates the common-law "duty to preserve relevant information when litigation is reasonably foreseeable."[35] The advisory committee notes to the 2015 amendments also allow for courts to "consider whether there was an independent requirement that the lost information be preserved" arising from "statutes, administrative regulations, an order in another case, or a party's own information-retention protocols," among other possible sources, even before a party reasonably should have anticipated the litigation.[36] Such an independent duty to preserve does not necessarily prove that a party also had a duty to preserve for purposes of the litigation, but it may be relevant.[37]

### 1. Common-Law Duty to Preserve in Anticipation of Litigation

A party "is under a duty to preserve what it knows, or reasonably should know, will likely be requested in reasonably foreseeable litigation."[38] This common-law standard is an objective one, asking not whether a party actually anticipated litigation, but "whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation."[39] The "reasonably foreseeable" test "is a flexible fact-specific standard that allows a district court

---

[33] Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

[34] *See* United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 9. In 2006, security footage at the FDC was overwritten within three to four weeks. Knox Testimony, Trial Tr. Aug. 13, 2019, at 67. For purposes of this Motion, the difference between three weeks and four weeks is immaterial.

[35] Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

[36] *Id.*

[37] *Id.*

[38] *Mosaid*, 348 F. Supp. 2d at 336.

[39] *Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011).

to exercise the discretion necessary to confront the myriad factual situations inherent in the spoliation inquiry."[40] It requires something more than the "distant possibility" of litigation, but it does not require that litigation be "imminent, or probable without significant contingencies."[41]

The duty to preserve arises no later than when a lawsuit is filed but may be triggered earlier than the filing of the complaint depending on the particular circumstances.[42] There is no single bright line that definitively marks when litigation reasonably should be anticipated. Instead, courts consider a variety of factors, including the type and seriousness of the injury; how often similar kinds of incidents lead to litigation; the "course of conduct between the parties, including past litigation or threatened litigation"; and what steps both parties took after the incident and before the loss of the evidence, including whether the defendant initiated an investigation into the incident.[43] When a party argues that spoliation occurred before the complaint was filed, the court must conduct a fact-sensitive inquiry to determine at what point the spoliating party reasonably should have anticipated the litigation.

In certain contexts, courts have found that a party reasonably should have anticipated litigation from the time it learned of the events giving rise to the litigation, not merely from the time a lawsuit was filed, threatened, or planned.[44] In the spoliation case law, certain kinds of

---

[40] *Bull*, 665 F.3d at 78 (quoting *Micron Tech.*, 645 F.3d at 1320).

[41] *Micron Tech.*, 645 F.3d at 1320.

[42] *Marten Transport, Ltd. v. Plattform Advertising, Inc.*, No. 14-2464, 2016 WL 492743, at *5 (D. Kan. Feb. 8, 2016); *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).

[43] *Wiedeman v. Canal Ins. Co.*, 2017 WL 2501753, at *3 (N.D. Ga. June 9, 2017) (referring interchangeably to Georgia cases and federal cases per the Eleventh Circuit's holding that Georgia state law "is wholly consistent with federal spoliation principles" (quoting *Wilder v. Rockdale County*, No. 13-2715, 2015 WL 1724596, at *3 n.1 (N.D. Ga. Apr. 15, 2015))); *see also Zyblski v. Douglas Cty. Sch. Dist.*, 154 F. Supp. 3d 1146, 1163 (D. Colo. 2015) (noting that "the likelihood that a certain kind of incident will result in litigation" is one factor in determining whether the duty to preserve was triggered).

[44] *See Winters v. Textron, Inc.*, 187 F.R.D. 518, 520 (M.D. Pa. 1999) ("[K]nowledge of a potential claim is deemed sufficient to impose a duty to preserve evidence."); *see also, e.g.*, *Browder v. City of Albuquerque*, 209 F. Supp. 3d 1236, 1244 (D.N.M. 2016) ("[I]t is likely that litigation was 'reasonably foreseeable' the moment the City became aware that a police officer was involved in a fatal traffic accident."); *Zyblski*, 154 F. Supp. 3d at 1166.

incidents are viewed as being especially likely to lead to litigation. Incidents in which inmates are injured in prison are one such category: A number of courts have found that government defendants reasonably should have anticipated litigation from the time an inmate was seriously injured or died in custody.[45] Even more specifically, courts have held that "in the correctional context, a duty to preserve may attach when an inmate is in a fight or when an inmate files grievances about [such an] incident."[46] Slip-and-fall cases are another example—courts have held that because those incidents so predictably lead to a lawsuit, defendants can often be expected to anticipate litigation soon after the event itself.[47] That is not to say that the mere fact of a slip-and-fall or a prison assault is always enough to put defendants on notice of potential litigation and trigger a duty to preserve. But such an event combined with other circumstances may often be enough that defendants should reasonably anticipate litigation beginning soon after the incident itself.

---

[45] *Storey v. Effingham County*, No. 15-149, 2017 WL 2623775, at *2–3 (S.D. Ga. June 16, 2017) (holding that duty to preserve attached before the fourteen- to thirty-day overwriting window expired where inmate was seriously injured in custody, incidents like the one plaintiff experienced were "not so ordinary or commonplace that ensuing litigation . . . would be a surprise," and plaintiff "hooted and hollered" that he would sue); *Jenkins v. Woody*, No. 15-355, 2017 WL 362475, at *14 (E.D. Va. Jan. 21, 2017) (holding that inmate's death in custody triggered duty to preserve immediately); *Bloom v. Toliver*, No. 12-169, 2015 WL 5344360, at *3 (N.D. Okla. Sept. 14, 2015); *Taylor v. City of New York*, 293 F.R.D. 601, 610–11 (S.D.N.Y. Sept. 4, 2013) (holding that Department of Corrections reasonably should have anticipated litigation within one week of inmate-on-inmate assault). *But see Stanfill v. Talton*, 851 F. Supp. 2d 1346, 1364–65 (M.D. Ga. 2012) (expressing "concern" that relevant video footage was allowed to be overwritten but ruling that the plaintiff had not established that an inmate's death immediately triggered a duty to preserve, because although "the argument can be made that litigation is reasonably foreseeable any time an inmate dies while in custody, that is clearly not always true, and the Court is unwilling to draw that inference under the specific circumstances of this case").

[46] *Barnes v. Harling*, 368 F. Supp. 3d 573, 607 (W.D.N.Y. 2019); *see also id.* (collecting cases). Indeed, the rationale for the Prison Litigation Reform Act was the perception, right or wrong, of inmates as a particularly litigious group. *See Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (explaining that the Prison Litigation Reform Act of 1995 aimed to "reduce the quantity . . . of prisoner suits" to correct what Congress perceived as the problem of litigious inmates flooding the federal courts with frivolous lawsuits); *Rivera v. Allin*, 144 F.3d 719, 727–28 (11th Cir. 1998) ("Congress did not enact the PLRA in a vacuum. It held hearings and rendered findings, concluding that prisoners file more frivolous lawsuits than any other class of persons.").

[47] *Quraishi v. Port Authority of N.Y. and N.J.*, No. 13-2706, 2015 WL 3815011, at *5 (S.D.N.Y. June 18, 2015) (noting that "courts have consistently found defendants put on notice by a serious accident or injury occurring on their premises" and collecting examples).

What kinds of other circumstances? For one thing, the seriousness of the injury is a factor, as more serious injuries naturally are more likely to lead to litigation. So is the parties' prior relationship. A defendant who has already been sued by a litigious acquaintance may more reasonably be expected to anticipate a future lawsuit. Both parties' conduct after the event can also shed light on whether the defendant reasonably should have anticipated the litigation. A plaintiff's statements or conduct might put a defendant on notice that litigation was likely. Similarly, a defendant's decision to open an investigation can indicate that it was reasonable to expect a lawsuit.

Here, Bistrian argues that the United States reasonably should have anticipated this litigation well before the earliest time the video could have been overwritten—indeed, that it reasonably should have anticipated this litigation immediately after the Taylor attack. Bistrian explains that he was a likely plaintiff for five reasons. First, the attack was especially lengthy and brutal, so much so that the usual measures failed to break it up, forcing staff to deploy a munitions device. Second, he was seriously injured and required immediate and substantial medical attention. Third, he had already been attacked once in the custody of the United States. Fourth, it was the correctional staff that had placed him in a vulnerable position by handcuffing him while Taylor was unrestrained.[48] And fifth, according to Officer Gibbs, Bistrian complained to him "weekly" while in the SHU that he planned to sue.[49]

The United States offers two responses. First, it points out that inmate-on-inmate assaults are regrettably common, and that "[i]f all or even most of these assaults led to civil litigation, the courts would be flooded with suits," which they are assertedly not.[50] Second, it argues that

---

[48] Bistrian's Mem. Supp. Mot. for Adverse Inference [Doc. No. 407] at 2.

[49] Bistrian's Reply Mem. Supp. Mot. to Reopen Record [Doc. No. 427] at 18–19.

[50] United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 9.

because Bistrian himself did not expect to sue within the first month after the Taylor attack, the United States could not have anticipated litigation at that point, either.[51] These arguments are not persuasive.

First, the argument from the claimed frequency of these incidents is odd. The United States appears to be arguing that the Court should compare the total number of assaults in the BOP with the Court's own subjective estimate of how overwhelmed the courts are with prisoner lawsuits stemming from inmate violence. If the Court agrees that the federal judiciary is not yet "flooded" with civil rights suits, the United States suggests, then it should conclude that such suits are rare enough that litigation is not reasonably foreseeable after any given assault. This curious methodology is not supported by the case law, to say the least. The Court finds it more appropriate to consider whether the features of this incident and these parties made this litigation reasonably foreseeable.

Even if the Court were to follow the impressionistic approach the government advocates, moreover, it would reach the opposite result. In the Court's experience, the judiciary handles a large volume of prisoner civil rights claims stemming from inmate violence, and based on the raw numbers the United States provides, serious inmate-on-inmate assaults in the BOP do not seem all that common. There were 900 100-level assaults (the most serious kind of inmate assault; the Taylor attack was designated a 100-level assault) in the BOP system in 2006.[52] That year, the BOP operated 102 prisons.[53] On average, therefore, there were fewer than nine such

---

[51] *Id.*

[52] *Id.*

[53] Bureau of Justice Statistics, No. NCJ 222182, Census of State and Federal Correctional Facilities, 2005, at Appendix 1 (Oct. 2008), https://www.bjs.gov/content/pub/pdf/csfcf05.pdf. Figures for 2006 are not available, but the number of BOP facilities has increased sharply since the mid-2000s. The Court therefore refers to the 2005 figure as a conservative estimate, since it seems certain that there were no fewer facilities in 2006 than in 2005.

incidents at each BOP facility that year—one about every six weeks. At that rate, serious inmate assaults seem relatively *in*frequent compared with the Court's subjective impression of the volume of litigation these incidents produce.

As to the second argument—that Bistrian himself did not yet know he would sue—the reasonable foreseeability standard is objective. If a defendant's subjective expectations are not decisive in this analysis, then *a fortiori* a plaintiff's subjective expectations cannot be. Of course, a plaintiff's *conduct* between the relevant events and the filing of a complaint can make litigation more or less foreseeable. The United States, however, argues that it could not be expected to anticipate litigation before Bistrian himself *subjectively expected* to sue. That distorts the common-law standard, which is—like all reasonableness tests—an objective one.[54]

The Court agrees with Bistrian that the United States reasonably should have anticipated litigation soon after the Taylor attack and certainly before the video was overwritten three to four weeks later. This kind of incident—an inmate-on-inmate attack in prison—commonly leads to civil litigation.[55] More importantly, this particular incident was unusual in many respects that would have prompted any reasonable defendant to anticipate this lawsuit, as Bistrian has explained. Additionally, the course of conduct between the parties showed that Bistrian repeatedly and vociferously challenged his treatment in pretrial detention through counsel[56] and told correctional staff regularly that he intended to sue.[57] Further, although Bistrian did not give

---

[54] The notion that Bistrian did not expect to sue until much later is factually dubious, as well, in light of the Officer Gibbs's testimony that Bistrian often told him he planned to sue during the entire time he was in the SHU.

[55] *See Taylor*, 293 F.R.D. at 610 (counting inmate assaults as one of several "types of incidents [that] tend to trigger litigation").

[56] *See* United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424], Ex. 32-1, at 3.

[57] Bistrian's Reply Mem. Supp. Mot. to Reopen Record [Doc. No. 427], Ex. 6 (Gibbs Dep., Sept. 22, 2014, at 25–26) (explaining that Bistrian told him "weekly" that "he was going to file a lawsuit" during the entire period that he was in the SHU).

explicit notice of these particular claims within the video overwriting window, the United States did begin a criminal investigation, including preserving a great deal of other evidence.[58] In sum, all the usual factors that trigger a duty to preserve prior to the filing of a lawsuit are present here.

## 2. Independent Preservation Duties

Because the Court concludes that the United States was under a common-law duty to preserve before the video was overwritten, there is no need to conduct a full analysis of the independent preservation duties at play here. A few things bear mentioning, however.

There were three separate proceedings, in addition to this civil litigation, that might have triggered a duty to preserve the hallway video. First, there was a potential criminal prosecution of Aaron Taylor.[59] Second, there was a potential disciplinary proceeding within the FDC against Taylor. Third, there was a potential investigation into whether staff complied with BOP procedures and, if not, internal disciplinary proceedings against them.[60] The United States argues that there was no policy requiring the preservation of the video for staff disciplinary or training purposes, and Bistrian has indeed been unable to point to any such BOP requirement.[61] The United States does not argue, however, that there was no requirement of preservation with respect to Taylor's criminal case.[62]

---

[58] United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 10.

[59] *See Ungar v. City of New York*, 329 F.R.D. 8, 14 n.2 (E.D.N.Y. 2018) ("Where it is foreseeable that evidence may be relevant to a criminal proceeding, the State's failure to preserve it can support an adverse inference instruction in a civil proceeding arising out of the same events." (first citing *Manganiello v. City of New York*, 612 F.3d 149, 166-167 (2d Cir. 2010); then citing *Creighton v. City of New York*, No. 12-7454, 2017 WL 636415, at *17–18 (S.D.N.Y. Feb. 14, 2017))).

[60] United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 2.

[61] This conclusion does sit somewhat uncomfortably, however, with the very belated discovery of a copy of the 2006 post orders, which the government had represented were irretrievably lost, as discussed below.

[62] *See* United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 10.

The Advisory Committee's notes to the 2015 version of Rule 37(e) explain that an independent duty to preserve arising from a statute, regulation, or other source does not necessarily prove that a party also had a duty to preserve in anticipation of litigation. This makes sense, since the common-law duty to preserve is based on the foreseeability of litigation, while other duties to preserve may be addressed to any number of logically separate concerns. The two duties may be interrelated, however. For example, in this context, the BOP's preservation of evidence for the criminal prosecution of Aaron Taylor could be seen as relevant to its duty to preserve in anticipation of a civil lawsuit. That is because not all prison assaults are prosecuted as crimes. Some are handled in internal disciplinary proceedings instead. When an assault is deemed serious enough to warrant criminal prosecution, as the Taylor assault was, it suggests that it might also be more likely to lead to a civil lawsuit.

Had the United States preserved the hallway video for potential use in the criminal prosecution, it should still have been available by the time Bistrian filed this lawsuit in 2008, at which point its preservation obligations were beyond any question, because Taylor's criminal case was still pending at that point.[63] The United States does not dispute this timeline, nor does it dispute that it should have preserved potentially relevant evidence for the criminal prosecution. Instead, it argues that it was not required to preserve the hallway video because it was not relevant to any element of the assault charges against Taylor[64] and because it had more than enough to convict Taylor without the hallway video.[65]

---

[63] Unfortunately, the video's availability in 2008 would have been no guarantee of its availability at trial, because the United States destroyed other evidence that *was* preserved for Taylor's criminal case long after Bistrian filed this lawsuit, as discussed below.

[64] United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 10.

[65] Trial Tr. Aug. 20, 2019, at 166–68.

It seems unlikely that the government would affirmatively choose not to preserve the hallway video because it had enough to convict Taylor already. Competent investigators ordinarily would not decline to collect potentially probative evidence—let alone allow evidence already in their possession to be discarded, as was done here—just because they feel their case is strong. Whether to use that evidence at trial is another matter. Moreover, it is simply not true that the hallway video was clearly irrelevant to the criminal case against Taylor. Footage that confirmed Taylor's account—that he made the razor weapon himself and hid it in his underwear—might or might not have been relevant to the elements of assault. But as Captain Knox pointed out, the hallway video might also have shown, for example, another inmate passing the weapon to Taylor as he was escorted to the rec pen.[66] The participation of a second inmate would surely have been relevant to the criminal case. The immediate preservation efforts undertaken by the United States for the criminal prosecution and the potential relevance of the hallway video to that prosecution strengthen the Court's conviction that the United States was obligated to preserve the hallway video before it was overwritten.

### b. Whether the Government Knew or Should Have Known that the Hallway Video Was Within the Scope of Its Duty to Preserve

The next question in the spoliation inquiry is whether the destroyed evidence was within the scope of the duty to preserve. The United States argues that it was not obligated to preserve the hallway video because it could not have anticipated how important the video would become to the question of liability as the issues in the case evolved over the ten-year lifespan of this litigation.

---

[66] *See* Knox Testimony, Trial Tr. Aug. 12, 2019, at 168 (explaining that the hallway video would have been reviewed by staff in the normal course of investigation "to make sure that another inmate did not hand a weapon to Taylor" and "[t]o make sure that staff acted appropriately").

The duty to preserve encompasses only relevant evidence. A party that reasonably should anticipate litigation "must not destroy unique, relevant evidence that might be useful to an adversary."[67] A litigant is not required to keep "every document in its possession"—rather, only those items that are relevant, "reasonably calculated to lead to the discovery of admissible evidence," or "reasonably likely to be requested during discovery" need to be preserved.[68]

The government's arguments, however, are premised on what claims and evidence Bistrian actually focused on in the early stages of this litigation and especially in discovery. This makes little sense, because as the United States also emphasizes, the video was overwritten long before Bistrian filed this lawsuit, and even longer before he served discovery requests on the United States. The question is not whether the United States should have anticipated, based on Bistrian's earliest discovery requests (served in 2013) or even based on his Complaint (filed in 2008), that he might seek the hallway video. Instead, the question is whether the United States reasonably should have anticipated within three to four weeks after the Taylor attack that the hallway video was relevant to foreseeable civil claims against the United States or the correctional officers involved.

The answer is yes. Having determined that the United States reasonably should have anticipated litigation before the video was overwritten, the Court has no trouble concluding that a reasonable party would have foreseen the significance of the hallway video. After such a notable and severe attack on an inmate who had already been assaulted once in BOP custody, any reasonable defendant could have foreseen that an ensuing lawsuit would likely include claims of mishandling razors. It is only logical that any claims based on a razor attack would encompass

_____
[67] *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003).

[68] *Id.*

the issues of how the inmate got the razor and how he was able to bring it to the rec pen. On that latter issue, it is undisputed that the hallway video would have been dispositive.[69] The hallway video was well within the scope of the government's duty to preserve.[70]

### c. Whether the United States Took Reasonable Steps to Preserve the Hallway Video

Rule 37(e) applies "only if the information was lost because the party failed to take reasonable steps to preserve" it.[71] The next question in the Rule 37(e) inquiry, therefore, is whether the spoliating party took reasonable steps to preserve the ESI. The advisory committee notes identify three factors that are relevant to whether a party took reasonable steps. First, Rule 37(e) recognizes that perfection is often impossible given the "ever-increasing volume of electronically stored information." Second, the Rule is to be applied with sensitivity to a party's "sophistication with regard to litigation."[72] Third, "the routine, good-faith operation of an electronic information system" is a "relevant factor" in evaluating the reasonableness of a party's preservation efforts, "although the prospect of litigation may call for reasonable steps to preserve information by intervening in that routine operation."[73]

There is no evidence that the hallway video was affirmatively deleted. Instead, it appears that the video was automatically overwritten. Nevertheless, because this litigation and the relevance of the hallway video were foreseeable in October 2006, the duty to take reasonable

---

[69] Griffiths Testimony, Trial Tr. Aug. 20, 2019, at 45–46; Gravette Testimony, Trial Tr. July 26, 2019, at 27–28.

[70] In reaching this conclusion, the Court is careful not to allow hindsight to color the analysis. Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment ("A variety of events may alert a party to the prospect of litigation. Often these events provide only limited information about that prospective litigation, however, so that the scope of information that should be preserved may remain uncertain. It is important not to be blinded to this reality by hindsight arising from familiarity with an action as it is actually filed.").

[71] Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment.

[72] *Id.*

[73] *Id.*

steps to preserve information required the United States—a sophisticated litigant—to intervene to prevent the overwriting of the hallway video.[74]

Preserving the video would not have been unduly burdensome, either. "[A]ggressive preservation efforts can be extremely costly, and parties (including governmental parties) may have limited staff and resources to devote to those efforts."[75] Capturing a small amount of information that is relevant in hindsight might sometimes require an over-inclusive preservation effort that is disproportionate to the need, making the failure to preserve excusable. Here, however, proportionality is not an issue. The video footage at issue is discrete and brief. The feasibility of preserving short, relevant video clips is amply demonstrated by the video that *was* preserved in this case—the video of the attack itself. Indeed, the United States has not argued that preserving the hallway video would have been burdensome. Under these circumstances, the Court concludes that taking no steps to prevent the automatic overwriting was not reasonable.[76]

### d. Whether the Government Acted with Intent to Deprive Plaintiff of the Hallway Video in this Litigation

There is no question that the lost hallway video cannot be replaced or restored through additional discovery. It was overwritten within a month of the Taylor attack.[77] Accordingly, the

---

[74] *Blazer v. Gall*, No. 16-1046, 2019 WL 3494785, at *3–4 (D.S.D. Aug. 1, 2019) (holding that it was not reasonable for jail staff to allow video footage to be automatically overwritten where defendants conceded they made no attempt to prevent the overwriting).

[75] Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment; *see Washington v. Wal-Mart La. LLC*, No. 17-1403, 2018 WL 2292762, at *4 (W.D. La. May 17, 2018).

[76] *See Pettit v. Smith*, 45 F. Supp. 3d 1099, 1106–07 (D. Ariz. 2014) (explaining that state department of corrections was not required to preserve "every video of every escort" and that imposing duty to preserve only those videos that were as "unusual" as the one at issue would not be too "burdensome or disruptive" to the agency).

[77] The Court acknowledges that other critical evidence in this case, such as the 2006 post orders (discussed below), has been unearthed in a supplemental phase of discovery after the United States represented that it was irretrievably lost. But neither party seems to believe that there could be a backup of the surveillance video or that the lost footage could be restored. *See Blazer*, 2019 WL 3494785, at *4 ("While copies of [other evidence] were produced from alternate sources during discovery, no known backups or alternatives exist to replace the surveillance recordings from the [prison]. Thus, this court finds that spoliation has occurred . . . .").

only remaining question is whether the United States acted with intent to deprive Bistrian of the hallway video in this litigation.

Under Rule 37(e), spoliation warrants an adverse inference only if a party acted "with the intent to deprive another party of the information's use in the litigation"—if, in other words, the spoliating party acted in bad faith.[78] Because courts are unable to "examine [a party's] head" to "confirm [whether they] acted in bad faith," courts look to circumstantial evidence to determine intent.[79] The timing of the destruction can be a factor.[80] So can the method of deletion— automatic overwriting is generally less culpable than affirmative deletion, which in turn is less culpable than taking additional steps to erase backup copies.[81] Selective preservation can also reflect intent. Common sense suggests that when a party preserves helpful or neutral information while deleting harmful information, that tends to indicate intentionality.[82] A spoliating party's own policies may be instructive, as well—destroying evidence in violation of an internal policy requiring preservation is more likely to be deliberate.[83]

The loss of this evidence is disturbing. The Taylor attack was vicious, lengthy, and particularly notable for the use of a munitions device to disable and disarm Taylor, belying the notion that the significance of the Taylor attack was not immediately apparent. It came on the

---

[78] As noted, the addition of this standard to Rule 37(e) merely codified the existing law on adverse inferences in this Circuit, which already required a finding of bad faith. Thus, spoliation cases from this Circuit that predate the 2015 amendment are still applicable, as Rule 37(e) merely moves the bad faith element from the spoliation inquiry to the sanctions inquiry.

[79] *DVComm, LLC v. Hotwire Comms., LLC*, No. 14-5543, 2016 WL 6246824, at *8 (E.D. Pa. Feb. 3, 2016) (Kearney, J.); *see Lokai Holdings LLC v. Twin Tiger USA LLC*, No. 15-9363, 2018 WL 1512055, at *16 (S.D.N.Y. Mar. 12, 2018).

[80] *DVComm*, 2016 WL 6246824, at *8; *Blazer*, 2019 WL 3494785, at *5 (holding that failure to prevent overwriting after a specific, "well-defined" request for preservation from an attorney tended to show intent).

[81] *See GN Netcom, Inc. v. Plantronics, Inc.*, No. 12-1318, 2016 WL 3792833, at *7 (D. Del. July 12, 2016).

[82] *Lokai*, 2018 WL 1512055, at *16.

[83] *Blazer*, 2019 WL 3494785, at *5.

heels of seemingly similar attacks by other SHU inmates at the FDC, an indisputably alarming pattern that created a clear incentive to suppress any evidence that lax safety procedures might be to blame. While other video evidence from the day of the Taylor attack was contemporaneously recognized as requiring preservation, the critical, definitive evidence of potential liability—the hallway video that would have shown whether Taylor was properly searched on the way to the rec pen—was overwritten and lost forever.

Most of these considerations, however, drive at the duty to preserve, not at whether the failure to preserve was intentional. The circumstantial evidence of intent here is relatively weak. The hallway video was automatically overwritten, not affirmatively deleted, and there is no indication that most FDC staff were actually subjectively aware that litigation was likely within the short overwriting window.[84] On this record, moreover, the Court cannot conclude that the BOP violated its own internal policies by failing to preserve the video. The only circumstantial evidence of intent is that FDC staff preserved certain footage while allowing the hallway video to be overwritten.[85] But the mere fact that some information was preserved and some was not

---

[84] Of course, it was the government that set up the surveillance video system and chose to have only enough storage space for about a month of retention. Generally speaking, government defendants who choose to retain their footage only for a short time, not plaintiffs, should bear the risk that the loss of footage will hamstring a plaintiff's case.

[85] Both parties have spilled a great deal of ink on the question whether anyone at the FDC watched the hallway footage before it was overwritten. Bistrian argues that BOP policy required regular review of surveillance footage to ensure compliance with safety protocols. It is implausible, Bistrian suggests, that after a notable incident like this one, no one would have included the footage of Taylor being escorted to the rec pen in that review, which he says took place daily. Bistrian therefore reasons that the loss of the hallway video can only be intentional, because the United States allowed it to be overwritten either knowing (after viewing it) or assuming (and thus strategically declining to view it) that it showed Taylor was not properly searched. Bistrian's Mem. Supp. Mot. for Adverse Inference [Doc. No. 407] at 2–3. The United States counters that the review was weekly, not daily; that there is no direct evidence that anyone viewed the hallway footage; and that if staff had viewed it before it was overwritten, the only explanation is that the footage showed a proper and thorough search, since evidence of an improper search would have been preserved for staff discipline. United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 11–12 & n.5.

The Court declines to assume that the video must have shown staff complying with search protocols. That would amount to drawing a favorable inference from the loss of the information. If the video had been watched, that would make it somewhat less likely that its loss was unintentional, as it would demonstrate an awareness of the significance of the video. Ultimately, however, this factor would not change the Court's conclusion on bad faith, as the Court declines to engage in speculation.

does not necessarily amount to suspicious selective preservation.[86] Here, there is a clear alternative explanation of why the rec pen video was preserved: It was essential direct evidence in Taylor's criminal case. While the preservation of the rec pen video cuts against the United States in the duty-to-preserve analysis, since it suggests awareness of the significance of the assault, it is not particularly telling in this analysis. On balance, the Court cannot say that prison officials intentionally destroyed the hallway video to deprive Bistrian of evidence in this litigation.[87]

This finding does not end the inquiry, however. In the absence of bad faith, lesser sanctions may be appropriate upon a finding of "prejudice to another party from loss of the information."[88] "Prejudice to opposing parties requires a showing [that] the spoliation 'materially affect[ed] the substantial rights of the adverse party and is prejudicial to the presentation of his case.'"[89] This requires offering "plausible, concrete suggestions" of what the missing evidence would have shown.[90]

The loss of the hallway video unquestionably prejudiced Bistrian here, materially affecting his substantial rights.[91] The video was critical to the question of liability, which turned

---

[86] *Lokai*, 2018 WL 1512055, at *16.

[87] *See United States v. Nelson*, 481 F. App'x 40, 41–42 (3d Cir. 2012) (holding in a criminal case that bad faith was not shown where video of inmate's cell door showing cell extraction was overwritten within 30 days and was therefore unavailable); *see also id.* ("Nelson did not request preservation of the tapes when given the opportunity.").

[88] Fed. R. Civ. P. 37(e)(1).

[89] *Magnetar Techs. Corp. v. Six Flags Theme Park Inc.*, 886 F. Supp. 2d 466, 481 (D. Del. 2012) (quoting *Micron Tech.*, 645 F.3d at 1328).

[90] *Id.* (quoting *Schmid*, 13 F.3d at 80). Some cases have suggested that prejudice also requires a finding of bad faith. *See GN Netcom*, 2016 WL 3792833, at *6 (citation omitted). This seems contrary to the language of Amended Rule 37(e), which permits curative "measures no greater than necessary" upon a finding of prejudice but permits the harsher sanction of an adverse inference only upon a finding of bad faith. If prejudice required showing bad faith, Rule 37(e)(1) would collapse into Rule 37(e)(2). It also seems contrary to the usual legal meaning of "prejudice." *See Prejudice*, Black's Law Dictionary (9th ed. 2009) ("Damage or detriment to one's legal rights or claims.").

[91] Unlike the duty-to-preserve analysis, prejudice does not require that the Court look only to the foreseeable importance of the lost information. Prejudice, rather, is about the actual, ultimate importance of the lost information to the case the non-spoliating party presented at trial.

on whether Taylor was properly searched before going to the rec pen. Its absence substantially hampered Bistrian in presenting his case. Aaron Taylor himself illustrated this unprompted during his trial testimony. When asked whether staff properly searched him before escorting him to the rec pen the day of the attack, Taylor answered that he thought he had not been wand searched, but that he could not definitely recall, adding: "I guess you would have to pull the tape to see that to be sure."[92] Indeed.

Bistrian has also plausibly and concretely explained what the hallway video would show. All agree that surveillance cameras captured staff taking Taylor out of his cell and escorting him to the rec pen. The lost video would have shown whether correctional officers properly searched Taylor. If a cursory search (or a complete failure to search) allowed Taylor to bring the razor weapon to the rec pen, the video could prove it.[93]

Because Bistrian was prejudiced, the Court will impose "measures no greater than necessary to cure the prejudice."[94] The "range" of measures a district court is authorized to impose under Rule 37(e)(1) is "quite broad."[95] It includes striking certain evidence, permitting "evidence and argument to the jury regarding the loss of information," and instructing the jury as to how to evaluate the loss of information, among other things.[96] It also includes requiring the spoliating party to pay the reasonable attorney's fees incurred by the other side in litigating the

---

[92] Taylor Testimony, Trial Tr. Aug. 12, 2019, at 24. On follow-up questioning, Taylor clarified that he was referring to the hallway video.

[93] *Cf. Fuhs v. McLachlan Drilling Co.*, No. 16-376, 2018 WL 5312760, at *15 (W.D. Pa. Oct. 26, 2018) (finding no prejudice from loss of ESI where non-spoliating party offered mere "conjecture as to what [information] may have been on the devices").

[94] Fed. R. Civ. P. 37(e)(1).

[95] Fed. R. Civ. P. 37(e)(1) advisory committee's note to 2015 amendment.

[96] *Id.*

loss of the ESI.[97] Courts must take care, however, that sanctions imposed under Rule 37(e)(1) not have the effect of sanctions permitted only on a finding of intent to deprive.

Because the Court is unable to find that the United States acted with intent to deprive Bistrian of the hallway video in this litigation, it will not draw an adverse inference. Nor will the Court strike any of the testimony the hallway video might have contradicted, such as Captain Knox's testimony that SHU staff invariably followed search protocols.[98] Instead, the Court will consider the video's destruction as one factor among many in making its ultimate determination, as the finder of fact, as to whether SHU staff properly searched Taylor. The evidence already in the record demonstrates that the video was destroyed, and although the prejudice to Bistrian cannot be fully remedied, the Court finds this lesser sanction appropriate under all the circumstances.

### ii. The Razor Weapon and the Munitions Device

Bistrian also requests an adverse inference based on the destruction of two pieces of physical evidence.[99] Both the razor weapon Taylor used to attack Bistrian and the munitions device SHU staff used to break up the assault were preserved as evidence in anticipation of Taylor's criminal prosecution.[100] Both were destroyed in 2015, seven years after this lawsuit was filed. Bistrian argues that the razor weapon is important evidence on the question of liability and that the munitions device is significant to the question of damages.

As explained above, spoliation of non-electronic evidence occurs where "the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has

---

[97] *Ericksen v. Kaplan Higher Educ., LLC*, No. 14-3106, 2016 WL 695789, at *2 (D. Md. Feb. 22, 2016).

[98] Knox Testimony, Trial Tr. Aug. 12, 2019, at 151–52.

[99] Bistrian's Mem. Supp. Mot. for Adverse Inference [Doc. No. 407] at 3–4.

[100] United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 3.

been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party."[101] A court must find bad faith before it can find that spoliation occurred.[102] It is undisputed that both items were in the possession of the United States after Taylor's criminal trial and that both have been destroyed. Accordingly, the questions to be resolved are whether those items were relevant; whether the United States was under a duty to preserve them; and whether the United States destroyed them in bad faith.

### a. Relevance

Bistrian argues that the razor weapon was relevant evidence because its size and shape would tend to make it more or less likely that Taylor could have concealed it on his person so that a proper search could not detect it. The United States responds that there was plenty of other evidence illustrating the size and shape of the razor weapon such that the weapon itself would essentially have been cumulative. It cannot be seriously disputed, however, that the razor weapon was *relevant*—the government's arguments go more to whether Bistrian was *prejudiced* by the unavailability of the razor weapon, which will be discussed below.

As to the munitions device, Bistrian argues that the exact identity of the device used is relevant to damages so that the explosive power can be determined.[103] Bistrian's briefing at first appeared to suggest that any prejudice might have been cured by stipulation,[104] but backtracked in a later brief, explaining that despite the parties' agreement about what device was likely used, "there is no assurance in this regard, or substitute for examining the actual spent canister."[105] The

---

[101] *Bull*, 665 F.3d at 73.

[102] *Id.* at 79.

[103] Bistrian's Mem. Supp. Mot. for Adverse Inference [Doc. No. 407] at 4.

[104] *Id.*

[105] Bistrian's Reply Mem. Supp. Mot. to Reopen Record [Doc. No. 427] at 5.

United States contends that "there is no apparent consequence to Bistrian's case from not knowing the precise details of the stun munition"[106] because "the parties stipulated to the nature of the stun munition likely used."[107] Again, these arguments go to prejudice—the munitions device was relevant, admissible evidence.

### b. Duty to preserve

When the parties first addressed the unavailability of the razor weapon and the munitions device, the United States represented that they were "lost or disposed of at some unknown point after [Taylor's] criminal trial concluded in December 2010."[108] If that had turned out to be true, the duty-to-preserve analysis might look different. Since then, however, it has emerged that the razor weapon and munitions device were destroyed by the FBI on June 12, 2015—*two days* after Bistrian requested that the exhibits from Taylor's criminal trial be turned over in discovery.[109]

Issues of foreseeability are therefore entirely irrelevant here. Bistrian had explicitly requested the exhibits before the United States destroyed them. Indeed, the United States candidly concedes that "a litigation hold could have been issued" at the time Bistrian's discovery request was received.[110] There is no question that the United States had a duty to preserve both the razor weapon and the munitions device at the time it destroyed them.

---

[106] United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 18.

[107] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 18.

[108] United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 14.

[109] Bistrian's counsel requested on June 10, 2015 that "the transcripts *and exhibits* of [Taylor's] criminal trial be made available to [them], or be produced in electronic format." Bistrian's Reply Mem. Supp. Mot. to Reopen Record [Doc. No. 427], Ex. 2 (emphasis added). The FBI's records show that the razor weapon and munitions device, along with other physical evidence retained for Taylor's criminal case, were destroyed on June 12, 2015. Bistrian's Reply Mem. Supp. Mot. to Reopen Record [Doc. No. 427], Ex. 1.

[110] United States' Sur-Reply Mem. Opp. Mot. to Reopen Record [Doc. No. 430] at 3.

### c. Bad faith

The timing of the destruction of evidence can be relevant to determining whether a party acted in bad faith.[111] The timing here is remarkable. The razor weapon and munitions device were preserved for use in Taylor's criminal trial and were retained thereafter, through Taylor's appeals and through this ongoing civil case, until two days after Bistrian requested them in discovery.

Although the United States had ready access to the FBI's record of destroying these items, it had maintained until recently that disappearance of the razor weapon and munitions device was inexplicable. The United States had also strongly implied that the items were likely destroyed as a matter of course many years ago once Taylor was convicted.[112] The government now contends that the destruction of the razor weapon was a "routine application of the FBI's policy of destroying evidence from trials following exhaustion of direct appeals."[113] But Taylor's conviction became final on June 24, 2013, when the U.S. Supreme Court denied his petition for a writ of certiorari,[114] nearly two years before the FBI "routinely" destroyed it.

In light of the sequence of events here, it is difficult to interpret the destruction of these items as a coincidence. The factors that pointed away from intentionality in the hallway video analysis are absent here. The razor weapon and the munitions device were intentionally destroyed, not lost in an automatic process. By June 12, 2015, four months after Bistrian had

---

[111] See *DVComm*, 2016 WL 6246824, at *8; *Lexpath*, 2016 WL 4544344, at *5 ("The timing of the deletion—a few days after Plaintiff sent its cease and desist letter, which also informed Defendants of the potential claims against them—is especially telling."); *GN Netcom*, 2016 WL 3792833, at *7.

[112] *See* United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 14 ("Accordingly, they were lost or disposed of at some unknown point after the criminal trial concluded in December 2010.").

[113] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 17.

[114] *Taylor v. United States*, 570 U.S. 920 (2013) (denying petition for writ of certiorari).

been granted leave to reinstate his FTCA claims against the government, the United States not only had actual notice of this lawsuit, which had been actively litigated for seven years at that point, but also had actual notice that Bistrian was seeking *these exact items*.

In response, the United States points out that "the standard for discovery and preservation is reasonableness, not perfection."[115] It is not reasonable to destroy evidence immediately after an adversary requests its preservation.

The United States also asserts that neither party viewed the Taylor criminal trial exhibits as particularly important, suggesting that Bistrian did not follow up on the June 10 request. This illustrates, according to the United States, that "counsel on both sides were not focused on locating materials that plaintiff did not appear to be pursuing and that were (erroneously) assumed to be preserved in the criminal file."[116] In other words, because Bistrian has been "ably represented throughout this matter," it was reasonable for the United States to look to the issues Bistrian's counsel emphasized most in discovery as a guidepost for which discovery requests demanded compliance and which could safely be ignored.[117] Any alleged lack of focus on these items by Bistrian's counsel is irrelevant, however. Bistrian's complaint is not that the United States failed to turn them over, but rather that it affirmatively destroyed them. No amount of diligent letter-writing after June 12 could have turned up this evidence. Even if the June 10 letter was not enough to require the United States to produce these items, it was certainly enough to put the United States on notice that they were needed and should not be destroyed. The Court finds that the United States destroyed these items in bad faith.

---

[115] United States' Sur-Reply Mem. Opp. Mot. to Reopen Record [Doc. No. 430] at 3–4.

[116] *Id.* at 4 n.3.

[117] *Id.* at 4.

#### d. Sanctions

Bistrian asks the Court to draw an adverse inference based on the destruction of the razor weapon and the munitions device. As explained, the degree of fault on the part of the United States is high, although perhaps very slightly mitigated by the sheer volume of discovery in this case. As to the munitions device, though, the Court finds that there was no prejudice to Bistrian—the parties stipulated to the device that was likely used and Bistrian has not argued that the exact identity of the device could affect damages. No sanction is needed or appropriate on that issue.

The prejudice from the destruction of the razor weapon is significant, however. The bigger and bulkier the razor weapon was, the less likely it would be that an officer doing a thorough pat search would not feel it. The United States points to other evidence that could shed light on the size and shape of the razor weapon, but that evidence was of very limited value. While there is a photograph of the razor weapon in the record, nothing in the photograph indicates scale, and Officer Griffiths, a witness for the United States, spontaneously noted that he could not gauge the weapon's size from the photograph and therefore could not opine on the likelihood that a proper pat search would detect it hidden on Taylor's person.[118] The United States argues that this was no problem because all agree that the weapon was fashioned from one of the disposable shaving razors given to SHU inmates, and therefore the "approximate size of the weapon" was "the size of the disposable razors distributed in SHU."[119] If, however, Officer Griffiths—the SHU officer in charge of distributing razors to inmates[120]—was unable to gauge the size of the weapon from the photograph, then the razor itself was indispensable.

---

[118] Griffiths Testimony, Trial Tr. Aug. 20, 2019, at 42.

[119] United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 408] at 17–18.

[120] Griffiths Testimony, Trial Tr. Aug. 20, 2019, at 5–8.

As unhelpful as the other evidence was, however, there is at least *some* available information about the razor weapon. The Court therefore finds it inappropriate to close off all proof on the matter by inferring definitively that the razor weapon could not have been concealed during a proper search. A lesser sanction is adequate to cure the prejudice. Accordingly, the Court will permit the parties to supplement the record with the additional documentation of the destruction of the razor weapon, and the Court will consider the destruction of the razor weapon as one factor among many in determining as the finder of fact whether a proper search was made.

## II.    MOTION TO REOPEN THE RECORD

### A.  Background

After both sides had rested at trial, the Court scheduled closing argument. Before hearing those arguments, the Court called a conference with counsel. The Court wished to disclose to the parties and counsel that upon reviewing the trial exhibits in preparation for closing argument, the Court noticed the name "Millhouse" in the razor log used by SHU officers to keep track of which inmates received razors for shaving, which had been introduced into the trial record on the final day of the trial. The Court recognized this name as the name of a defendant in a criminal case which the Court had presided over in 2008. That criminal prosecution stemmed from an incident in which a SHU inmate had concealed a razor blade, an incident which took place close in time to the Taylor attack, as the Court realized upon reviewing the razor log. Concerned that the Court as factfinder now had potentially relevant information of which the parties might not be aware, the Court met with counsel.[121]

It was determined that no materials from the Millhouse case had been produced in discovery, despite at least one discovery order seeming to require that production. Plaintiff's

---

[121] This meeting was held in Chambers and was not recorded.

counsel informed the Court that they had no knowledge of this attack but believed it was highly relevant and needed to be explored. Exercising its broad discretion to manage discovery and remedy possible discovery misconduct, the Court permitted the parties to explore the issue further, postponing closing argument.

The records from the criminal prosecution of Millhouse were recalled from storage and made available to the parties. In the incident that led to that prosecution, Millhouse, a SHU inmate, had received a razor to shave with and apparently removed the blade. He secreted the razor blade out of the SHU when he was transported to a building adjacent to the courthouse, where he attempted to attack someone with the razor blade.

Following up on this issue, Plaintiff's counsel communicated to the government and to the Court that he had learned of yet another apparent razor attack in the rec pen of the SHU. In that incident, two SHU inmates, Humbert and Harper, had attacked a third inmate, Fred Roberts, in the rec pen.[122]

The parties exchanged several rounds of correspondence, which the Court placed on the record.[123] The Court referred the matter to Magistrate Judge Wells to determine, among other things, whether any discovery order in the case required the production of information about these other attacks and whether discovery should be reopened.[124] Judge Wells ruled that the Court's earlier discovery order reasonably encompassed the Millhouse and Humbert/Harper attacks and permitted a supplemental round of discovery into both incidents.[125]

---

[122] According to Bistrian, one of the attackers testified that the weapon in that assault was a razor, and Roberts confirmed this. Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421] at 14. The United States points out that some government witnesses believed that the weapon in that incident was a handcuff slipped off by one of the attackers. United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 21–22.

[123] Doc. No. 411.

[124] *Id.*

[125] Doc. No. 414. Whether to reopen discovery after it has closed is a decision committed to the discretion of the district court. *Mincy v. McConnell*, 523 F. App'x 898, 899–900 (3d Cir. 2013) (citing *Anderson v. Wachovia Mortg.*

After Judge Wells issued her ruling, the Court held a conference on the record at which the parties discussed the status of the supplemental discovery.[126] The Court explained that once the supplemental discovery was complete and the parties had moved for the admission of any additional evidence, the Court would determine whether it was appropriate to reopen the record.[127] The Court also explained that Judge Wells would continue to preside over any disputes that arose regarding the supplemental discovery.[128]

Bistrian now seeks to reopen the trial record to admit evidence from the supplemental discovery. The parties have not requested oral argument.[129]

## B.  Legal Standard

District courts have broad discretion to reopen the record to take new evidence,[130] which may occur on motion of a party or *sua sponte*.[131] "Great flexibility is accorded the District Court in its determination to supplement the record, though it must avoid perpetrating any type of

---

*Corp.*, 621 F.3d 261, 281 (3d Cir. 2010)). Courts sometimes reopen discovery *sua sponte*. *Ramos v. Banner Health*, No. 15-2556, 2019 WL 1429283, at *1 (D. Colo. Mar. 29, 2019) (reopening expert discovery *sua sponte*); *J & J Sports Prods., Inc. v. Bailey*, No. 14-1353, 2016 WL 6648638, at *7 (E.D. Cal. Nov. 9, 2016) (reopening discovery *sua sponte* in the interest of justice); *Puletu v. Fishing Co. of Alaska*, No. 05-1752, 2007 WL 2712965, at *7 (W.D. Wash. Sept. 13, 2007) (same).

[126] Hearing Tr., Sept. 24, 2019.

[127] *Id.* at 12–13.

[128] *Id.* at 22–23.

[129] *See* United States' Sur-Reply Mem. Opp. Mot. to Reopen Record [Doc. No. 430] at 7.

[130] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331 (1971); *see also United States v. Trant*, 924 F.3d 83, 88 (3d Cir. 2019) (explaining in the criminal context that district courts have virtually "unconstrained . . . case-management discretion" to reopen the record in the "fluid" context of a trial, and that "courts should not be distracted at trial by a suggestion that reopening is disfavored").

[131] *Calage v. Univ. of Tenn.*, 544 F.2d 297, 301–02 (6th Cir. 1976); *see also Lussier v. Runyon*, 50 F.3d 1103, 1113 (1st Cir. 1995) ("Typically, a district court's decision to reopen the record for the purpose of receiving additional evidence engenders an exercise of the court's discretion, reviewable for abuse of discretion. This rule pertains even when the district court opts to reopen the record on its own initiative." (citations omitted)); *Briscoe v. Fred's Dollar Store, Inc.*, 24 F.3d 1026, 1028 (8th Cir. 1994) (affirming district court's decision to reopen record and noting that the court had in the past affirmed reopening "after the close of all evidence and the commencement of closing arguments").

injustice in so doing."[132] In deciding whether to reopen the record, district courts must consider "the burden that will be placed on the parties and their witnesses, the undue prejudice that may result from admitting or not admitting the new evidence, and considerations of judicial economy."[133] District courts have especially great latitude to reopen the record when a case is not tried to a jury.[134]

The United States contends that the "primary focus" in considering whether to reopen the record is "whether the party opposing reopening would be prejudiced if reopening is permitted."[135] It asserts that the "principal considerations" in this inquiry are "the timing of the moving party's request to reopen," i.e., whether the opposing party will have an opportunity to rebut the new evidence, and "the effect of granting the motion," that is, whether reopening will substantially disrupt the proceedings or distort the importance of the new evidence.[136] The Third Circuit announced those factors, however, in the context of a criminal case in which the government moved to reopen the record after it had rested and the defendant had moved for a directed verdict.[137] The Third Circuit's cases on reopening in the civil context have always articulated a different standard.[138]

---

[132] *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 229 (3d Cir. 2004).

[133] *Id.*

[134] *Calage*, 544 F.2d at 301 ("In *Walz*[ *v. Fidelity-Phoenix Fire Ins. Co.*, 10 F.2d 22 (6th Cir. 1926),] our court held that it was an abuse of discretion for the judge to reopen proofs for additional testimony after it became apparent that the jury was deadlocked. The judge's action in *Walz* amounted to an intrusion into the fact finding process which was entrusted to the jury; here, in reopening the proofs, the trial judge was performing his own function as the trier of fact, not intruding into the business of others.").

[135] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 27 (quoting *Trant*, 924 F.3d at 88).

[136] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 27 (quoting *Trant*, 924 F.3d at 88).

[137] *Trant*, 924 F.3d at 87.

[138] *See Gibson*, 355 F.3d at 229; *see also Rochez Bros., Inc. v. Rhoades*, 527 F.2d 891, 894 n.6 (3d Cir. 1975).

Allowing the government to reopen the record after a criminal defendant has moved for a directed verdict implicates very different considerations—core Sixth Amendment ones—than reopening the record in a civil case. It makes sense that greater emphasis would be placed on the prejudice to the defendant in the criminal context than in the civil one. Moreover, the Third Circuit's standard for reopening in that case was based on the analogous standard for suppression hearings,[139] which have no direct analogue in civil cases. Nevertheless, some of the language in *United States v. Trant* is broader and could apply to civil cases as well.[140] Because *Trant* is the most recent authority on reopening, the Court will incorporate these factors into its analysis.

In determining whether to admit any new evidence into the record, the Court will consider on an item-by-item basis (1) whether reopening would prejudice the government. "[P]rejudice in this context does not mean the loss of an opportunity for an unearned windfall. Prejudice results when a party experiences an unfair or unreasonable impairment of his defense."[141] A party is not prejudiced, in other words, by the admission of unfavorable evidence it hoped to keep out. Instead, a party is prejudiced if the timing of the reopening will deprive it of a reasonable opportunity to respond to new evidence[142] or if the late and disruptive addition of new evidence will cause that evidence to take on undue importance.[143]

The Court will also consider separately for each item (2) whether Bistrian would be prejudiced if the record were not reopened to permit the new evidence and (3) whether the

---

[139] *Trant*, 924 F.3d at 88.

[140] *See id.* ("When considering *a party's* motion to reopen its case at trial, 'the district court's primary focus should be on whether *the party opposing reopening* would be prejudiced if reopening is permitted.'" (emphasis added) (quoting *United States v. Coward*, 296 F.3d 176, 181 (3d Cir. 2002))).

[141] *Id.* at 91.

[142] The burden on witnesses is part of this inquiry, as a party is prejudiced if late reopening will make it difficult to rebut new evidence by recalling witnesses who already took the stand. Here, however, the United States has not argued that any burden on witnesses is a factor.

[143] *Trant*, 924 F.3d at 88.

evidence is "admissible and has probative value."[144] Additionally, the Court must give adequate consideration to (4) the "reasonableness of [Bistrian's] explanation for failing to introduce the desired evidence before resting."[145]

Other factors, by contrast, apply in the same way across all new evidence Bistrian seeks to introduce. In this situation, (5) concerns of undue delay[146] are trivial. The parties have completed the discovery ordered by Judge Wells. Moreover, in this bench trial, there is little reason to worry that (6) late additions to the record will confuse the factfinder, resulting in distortion of the relative weight and importance of the evidence. These factors weigh in favor of reopening in this context with respect to all potential new evidence.

### C. Discussion

The United States strenuously objects to any reopening beyond the missing pages of the razor log it located in supplemental discovery. It dredges up the parties' discovery correspondence and argues extensively that reopening is not warranted because its discovery responses were adequate. But the Court's concerns here are not with discovery misconduct. Judge Wells ordered further discovery and the parties conducted it. The question now is whether to forge ahead on a manifestly deficient record, letting critical evidence go unexamined. Basic considerations of justice and fairness must have some role to play here—after all, "[a] trial

---

[144] *Id.*

[145] *Id.* The United States argues at length that Bistrian did not inquire into other inmate razor attacks in discovery, but does not specifically argue that his failure to do so should be a factor in determining whether to reopen the record. Rather, that issue is discussed primarily in the government's sanctions analysis. *See* United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 8–11, 18–20. Nevertheless, *Trant* explains that courts should consider whether the movant has a reasonable explanation for not introducing the evidence earlier. *Trant*, 924 F.3d at 88. The Court will therefore consider whether Bistrian pursued these subjects in discovery as one part of the reopening analysis.

[146] The government wisely did not raise objections based on judicial economy, as the already lengthy delay in the midst of this bench trial is mostly attributable to its refusal to resolve concerns about incomplete production in a speedy, informal manner, and to its insistence instead on full briefing and motion practice before critical evidence that was always in the government's possession could be admitted into the record.

should be a solemn exercise in a search for truth, not a game of 'gotcha.'"[147] Weighing these

factors, the Court concludes that limited reopening is required.

### i. The 2006 Post Orders

In the original discovery period, Bistrian asked the government to turn over the "Post

Orders, captain's orders and operations memoranda within the FDC."[148] The government

produced Captain Jeremy Nash as a 30(b)(6) witness on this and other subjects. Captain Nash

testified in late 2015 that post orders were periodically replaced with new ones and retained for

three years after being replaced.[149] The earliest post orders available, according to Captain Nash

and the United States, were the ones effective in 2014.[150] In the course of the additional

discovery ordered by Judge Wells into the Millhouse and Humbert/Harper attacks, however, the

original post orders in effect in 2006 were discovered in the case file for the civil suit brought by

Roberts, Humbert and Harper's victim, which the U.S. Attorney's Office litigated.

Bistrian seeks to introduce two of these newly discovered post orders from 2006, one

addressing the FDC's policy on inmate razor access in the SHU and the other addressing the

FDC's policy on how to conduct a search. The United States concedes that Bistrian long ago

requested these post orders in discovery,[151] so there can be no question that Bistrian's

explanation for failing to introduce this evidence earlier is reasonable—the United States

---

[147] *Trant*, 924 F.3d at 91.

[148] Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421], Ex. H (Nash Dep. Tr., Oct. 6, 2015, at 6). Post orders are BOP documents "revised and issued [periodically] to provide daily instructions" for correctional officers assigned to a particular post. *Bishop v. United States*, 72 Fed. Cl. 766, 768 (2006).

[149] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424], Ex. 8 (Nash Dep. Tr., Oct. 6, 2015, at 14–15). The most charitable interpretation of this timeline is that the 2006 post order was replaced on January 1, 2007, retained for three years, and destroyed on January 1, 2010—while this suit was already pending and the government's litigation hold obligation was absolutely clear.

[150] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 20.

[151] *See id.* at 29–30.

destroyed most copies of this information when it should have been subject to a litigation hold and failed to turn over the last remaining copy. Accordingly, the only questions are whether the post orders are relevant and admissible and the potential prejudice to either party from reopening, or declining to reopen, the record.

### a. Razor Policy

A central liability issue in this case, as explained above, is whether correctional officers violated any mandatory policy concerning the distribution of razors to SHU inmates and, if so, whether that violation caused Taylor's illicit possession of a razor. The United States has maintained that any applicable policies were too general and vague to be mandatory, precluding FTCA liability. The 2014 policy, which all parties had assumed to be materially the same as the policy in effect in 2006, provided:

> Razors will be issued and returned (intact) three times weekly. Razors will be issued and picked up on the same shift. A check will be made utilizing a magnet to ensure the razor blade is intact.[152]

The razor policy in the newly produced 2006 post orders is, it turns out, far more specific than the 2014 post order. It provides:

> Officers will place a razor sign on the door of any inmate being issued a razor. Inmates will have 10 minutes to shave and return the razor. Officers will inspect the razor upon return to insure the blade is still intact.[153]

Bistrian argues that this evidence is critical to, even dispositive of, the question whether FDC policy in 2006 imposed mandatory requirements on correctional officers for the distribution and collection of razors in the SHU.

---

[152] Tr. Ex. D-16 at BOP2015-00372.

[153] Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421], Ex. A (Federal Detention Center Philadelphia SHU Special Instruction, at EDPA2019-2028).

The United States' position is not entirely clear. It states that the post orders are "not themselves objectionable" and admits that Bistrian did timely request them in discovery.[154] But the government goes on to argue that the post orders are not relevant, and that the ten-minute provision is directed at the inmates, not at the officers, so it cannot be a mandatory requirement.[155] It also argues that Captain Knox's testimony in the Roberts case suggests that the ten-minute time limit was not binding on correctional officers.[156]

These arguments both drive at whether the ten-minute time limit was a mandatory policy. That is of great importance, of course, but it is not germane to this motion—rather, it is an ultimate legal issue in this case. The question here is simply whether the post order should become part of the record. The post order in effect in 2006 is admissible and probative of the policies, if any, that governed razor use in the SHU.[157]

Any prejudice to the government from admitting this evidence will, it concedes, be minimal.[158] The issue of what requirements, if any, governed razor use in the SHU was known to

---

[154] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 29–30.

[155] Bistrian also argues that the failure to produce the post orders is further support for his motion for adverse inference. The Court determines that the non-production of the post orders, which outline the requirements for a proper search, does not logically support the inference that Taylor was not properly searched. Therefore, the Court has not considered the post orders in deciding the motion for adverse inference.

[156] In fact, that is not what Captain Knox stated in his deposition in the Roberts case. He said he did not recall *any* 10-minute time limit applicable to razors, whether directed to correctional officers or to inmates. United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424], Ex. 21 (Knox Dep. Tr., June 4, 2010, at 130–31) ("I don't believe it's for a period of 10 minutes and I don't believe that we have put a time limit on them because we normally give them a single edge razor which has continued to get smaller and smaller throughout the years and to shave in 10 minutes is maybe not an appropriate time.").

[157] The government also argues that "Taylor's testimony regarding how he obtained the razor—the BOP unwittingly gave him two and only collected one—would reveal negligence whether he kept the razor for ten minutes or thirty minutes. If the Court is already convinced of Taylor's testimony, there is no reason to submit additional evidence suggesting that the BOP allowed Taylor to keep some other razor for more than the allotted time." United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 30. The Court has not yet heard closing argument, let alone rendered a verdict. Any implication that the Court has prejudged the evidence is inappropriate. The Court will not exclude relevant evidence merely because it could contradict the testimony of one witness. Indeed, that is a reason to admit it, not to exclude it.

[158] *See id.* at 29–30.

be a central issue at the outset of trial, and the government has offered evidence, which is already in the record, to support its position that any policy was not specific enough to be considered mandatory. In other words, while the ten-minute provision is new, the basic issue is no surprise. As mentioned above, moreover, Bistrian sought this information in discovery and failed to introduce it at trial only because the government destroyed the originals and neglected to turn over the last remaining copy. If the government feels it needs another chance to address the content of the 2006 post order, it will have a reasonable opportunity to do so. The 2006 post order, pre-marked as Exhibit P-305, will be admitted.[159]

### b. Search Policy

Another critical issue in this case is whether correctional officers properly searched Aaron Taylor on the way to the rec pen. To answer that question, it is necessary to know what a "proper" search consists of. Accordingly, the parties have disputed whether there were mandatory requirements for correctional officers searching SHU inmates before escorting them to the rec pen, and in particular, whether any mandatory policy prescribed a particular method of conducting a pat search or wand search.

The United States previously produced a 2009 post order containing the requirements for a pat search. In the latest round of discovery ordered by Judge Wells, a 2006 post order was produced containing the same requirements. Thus, this post order could establish that these requirements were in effect at the time of the Taylor attack. The United States does not object to

---

[159] The deposition testimony of Michael Brand, which has been pre-marked as Exhibit P-307, will also be admitted, as it is relevant to when the post order was in effect. *See* Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421], Ex. B.

this post order.[160] Therefore, the entirety of this post order, pre-marked as Exhibit P-306, will be admitted.

### ii. Complete Razor Log

Bistrian has also moved to admit P-303, a supplemented version of the razor log spanning the period from July 1, 2006 through October 29, 2006. A razor log spanning this approximate time period was admitted at trial, but during supplemental discovery missing sections were discovered and produced. The United States consents to the admission of this evidence,[161] so it will be admitted.

Bistrian further moves to admit P-304, a new portion of the razor log not previously admitted, spanning the period from January 1, 2006 through June 30, 2006. The United States allows that the log is "not objectionable" in itself, but notes that it may need to investigate further and potentially submit additional evidence on the issue of whether the ten-minute razor policy was mandatory and whether correctional officers adhered to it. The Court will admit this evidence[162] and give the United States a reasonable opportunity to supplement the record in response if necessary.[163]

### iii. Evidence Surrounding the Millhouse Attack

Next, Bistrian seeks to introduce information from the record of Millhouse's criminal case. Bistrian has moved to admit two categories of evidence from that record.

---

[160] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 29–30.

[161] *Id.* at 27.

[162] The deposition testimony of Eric Harris, which has been pre-marked as Exhibit P-308, will also be admitted, as it is relevant to when the post order was in effect. *See* Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421], Ex. C.

[163] Discovery was reopened in September 2019, more than five months ago as of this Opinion, and the Court will determine how much further investigation is reasonable in light of both parties' diligence during that period.

### a. Millhouse Card File

Bistrian seeks to admit evidence of the Millhouse attack from Millhouse's inmate card file, including information about the razor attack he perpetrated, his prior criminal acts, an escape plan he formulated while detained at the FDC, and his other razor infractions.[164] The United States objects to this evidence on the grounds that it would "force mini-trials on several secondary issues," necessitating more investigation and more witness testimony, further disrupting the proceedings.[165]

The Court agrees with the government. There is obvious *potential* relevance in other razor attacks perpetrated by SHU inmates close in time to the Taylor attack. A pattern of incidents could shed light on the FDC's compliance with its own policies for handling razors, for example. That is why the Millhouse attack warranted investigation in the first place. But determining whether a pattern existed would necessitate a much deeper exploration of particular features of the Millhouse case, the kinds of features that would demonstrate whether these incidents formed a pattern, such as how Millhouse obtained a razor, how he hid it, and how he smuggled it out of the FDC. At this late juncture, taking a prolonged detour from the liability issues in this case to fully litigate other incidents involving third parties—incidents the government might reasonably have thought were long since resolved—would unduly prejudice the government. Likewise, general information about dangerousness and flight risk pertaining to another inmate is peripheral and would open up broad areas of inquiry that were not previously explored and that are not obviously relevant. Evidence regarding Millhouse's razor attack or

---

[164] Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421] at 11–13.

[165] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 28–29.

other razor infractions will not be admitted. Nor will any other information from Millhouse's card file be admitted.

### b. Officer Jezior's Testimony in *Millhouse*

Bistrian also seeks to introduce the testimony of Officer Jezior in *Millhouse*.[166] Specifically, he asserts that two aspects of Officer Jezior's testimony are relevant here. First, Officer Jezior's testimony is relevant to the newly revealed ten-minute time limit on razors, as he testified that an inmate "usually has about ten minutes to shave with [a razor]."[167] Second, Officer Jezior testified that he had witnessed occasions when proper search procedures were not followed, and that some staff at the facility took "shortcuts,"[168] in contrast to the government's position in this case that proper search procedures are invariably followed at the FDC. Although the United States objects generally to reopening the record beyond the complete razor log, it has not articulated a specific objection to this testimony.

In contrast to Bistrian's proffered evidence of the *facts* of the Millhouse attack, this testimony is exclusively concerned with *policy*. Introducing this information will therefore be minimally prejudicial to the government, as both of the policy questions Officer Jezior's testimony addressed (whether there was a mandatory time limit on razors and whether searches were always properly performed) are long-running issues in the case on which both parties have argued and introduced testimony. As with the post orders, moreover, the government will have a reasonable opportunity to respond to the new evidence. Not admitting this relevant evidence would be highly prejudicial to Bistrian, however, in light of the government's position in this

---

[166] Officer Jezior was also one of the individual defendants against whom Bistrian brought *Bivens* claims; he testified in the *Bivens* trial in this case.

[167] Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421], Ex. E (Trial Tr., Sept. 19, 2007, at 120–21).

[168] *Id.* at 117, 131.

case—based on, among other things, Officer Jezior's testimony—that FDC staff invariably followed search and razor policy.

Moreover, although Bistrian was not aware of the *Millhouse* case and therefore did not request that this specific deposition testimony be made available, Bistrian did pursue information about FDC policy (including policy governing razors) and staff compliance with FDC policy extensively in discovery. As this information is relevant both as direct and rebuttal evidence, the Court will not give undue weight to the parties' reasons for the lateness of this evidence.[169] Guided by principles of fairness and completeness, the Court will admit Officer Jezior's testimony in the Millhouse case, which is pre-marked as Exhibit P-310. Of course, as with all the other newly admitted evidence, the government will have a reasonable opportunity for rebuttal.

#### iv.  Evidence Surrounding the Humbert/Harper Attack

Bistrian also moves to admit two categories of evidence from the attack by Humbert and Harper on SHU inmate Roberts.

#### a.  Video and Photographs of Humbert/Harper Attack

Bistrian seeks to introduce information about the Humbert/Harper attack itself, including photos and video of the attack and deposition testimony about the circumstances of the attack. The United States points out, however, that other testimony in *Roberts* called into question whether Humbert and Harper attacked Roberts with a razor or with some other weapon. Because *Roberts* ended in settlement,[170] this issue was never conclusively resolved.[171]

---

[169] *See Trant*, 924 F.3d at 90–91 (affirming reopening even though moving party's only explanation for failure to introduce evidence earlier was that it "simply forgot").

[170] *Roberts v. United States*, No. 08-5426, Order Dismissing Action with Prejudice [Doc. No. 40].

[171] Bistrian would like to bind the government to the position it took in an earlier letter in which it described this incident as a razor attack. *See* Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421] at 13–14. In the days after the scheduled closing arguments, when the Court had directed the parties to investigate the Millhouse episode, the parties exchanged information about the Millhouse and Humbert/Harper attacks in a rapid back-and-forth that

Like the Millhouse incident, the Humbert/Harper attack is potentially relevant here to the extent that it illustrates a pattern of similar incidents at the FDC. The Court agrees with the United States, however, that bringing this evidence into the record would necessitate extensive further investigation and testimony on the tangential issue of whether these third-party attackers used a razor to assault this third-party victim, because if they did not, this episode does not appear to be relevant. This further tangent would unduly prejudice the United States, as this issue has not been explored at all until now. The additional investigation would also burden the parties and any witnesses whose testimony would be needed to explore this issue or rebut evidence of another razor attack. Accordingly, this evidence will not be admitted.

### b. Deposition Testimony of Officer Brand

Bistrian also seeks to admit the deposition testimony of Officer Brand in Roberts' civil suit. Officer Brand testified that if an inmate is wearing a jumpsuit, staff typically would not make a search of the inmate's belt line as required by the post orders because that area would be inaccessible under the jumpsuit.[172] The United States has not specifically objected to this evidence beyond its general objection to reopening the record.

As with the testimony of Officer Jezior from Millhouse's criminal case, admitting this testimony would cause minimal disruption and burden and will not prejudice the United States. The issue of how officers search inmates has been thoroughly explored and this new information merely adds another data point to the evidence already in the record on this subject. Moreover, as with Officer Jezior's testimony, this testimony concerns policy, not the facts of the Humbert/Harper attack, and search policy within the FDC was the subject of extensive

left little time for full investigation. The Court will not punish the United States for its attempt at candor in light of the conflicting information that has emerged since then.

[172] Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421] at 14–15.

discovery. Therefore, it will be admitted and the government will have a reasonable opportunity to respond.

### v. Sally Ports

Finally, Bistrian seeks to introduce deposition testimony from this case regarding the FDC's decision to install sally ports in the SHU rec pens. Bistrian contends that this evidence is made relevant, despite the Court's earlier ruling that the installation of sally ports was discretionary and therefore not actionable under the FTCA, because it is now known that there were two other razor attacks by SHU inmates close in time to the Taylor attack.

The number of razor attacks that preceded the decision to install sally ports is irrelevant. The Court ruled on summary judgment that the decision to install sally ports was a discretionary one.[173] That legal conclusion is not changed by additional evidence. Because it is not potentially relevant to any issue remaining in the case, this evidence will not be admitted.

### III. MOTION FOR FURTHER SANCTIONS

Bistrian contends that all of the newly introduced information in the motion to reopen the record should have been produced by the United States in discovery. He moves for an award of attorneys' fees as a sanction for "the failure to disclose other incidents of razor and other weapon attacks by unrestrained inmates on handcuffed inmates or third parties, the destruction and failure to produce the 2006 post orders," and the alleged presentation of "false and misleading testimony concerning razor [and search] policies and practices" made possible by the loss of or failure to produce evidence that would have contradicted that testimony. Bistrian also bases his motion on the destruction of the hallway video and the Taylor exhibits.[174]

---

[173] Memorandum Opinion [Doc. No. 239] at 37.

[174] Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421] at 21.

The Court will first consider whether spoliation or other sanctionable misconduct occurred and then address what, if any, sanction is appropriate.

## A. Post Orders

The post orders are a potential issue of spoliation because the government destroyed them during the pendency of this litigation (other than the fortuitous *Roberts* copies). Spoliation of non-electronic information occurs when "the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party."[175]

The original 2006 post orders (that is, all copies other than the one retained in the *Roberts* file) were in the government's control until their destruction pursuant to the policy of retaining superseded post orders for three years.[176] The post orders are highly relevant to Bistrian's claims—they describe the FDC's policy for providing razors to inmates and conducting pat searches and are critical to determining whether those policies were mandatory.

As to foreseeability, the 2006 post orders were not destroyed until well after Bistrian filed this lawsuit. The post orders were in effect in 2006 and should have been retained for three years. At the earliest, then, they would have been destroyed on January 1, 2010, when the government's litigation hold obligations were already in effect.[177] Additionally, the *Roberts* copies of the post

---

[175] *Bull*, 665 F.3d at 73.

[176] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424], Ex. 8 (Nash Dep. Tr. at 14–15). The government has not explained how often new post orders are issued (i.e., annually or only as needed), so the Court does not know when the 2006 post order was superseded.

[177] The United States seems to intimate that it did not have any litigation hold obligations during the period from July 2010, when the Court dismissed Bistrian's FTCA claim against the United States, until February 2015, when a change in the law allowed Plaintiff to revive his FTCA claim against the United States. *See* United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 5, 20. The United States does not elaborate on or provide any authority for this suggestion. The notion that the government might have no duty to preserve after claims against it were dismissed but while claims against its individual officers were still pending—claims based on the same events and involving the same evidence, all of which is necessarily the property of the government itself—is wrong.

orders were still in the possession of the U.S. Attorney's Office until 2011, when the *Roberts* case file—from which the post orders have now been retrieved—was archived.

The final issue is whether the 2006 post orders were actually suppressed or withheld in bad faith to deprive Bistrian of evidence in this case. As discussed above, a party that reasonably should anticipate litigation "must not destroy unique, relevant evidence that might be useful to an adversary."[178] A litigant is not required to keep "every document in its possession"—rather, only those items that are relevant, "reasonably calculated to lead to the discovery of admissible evidence," or "reasonably likely to be requested during discovery" need to be preserved.[179]

In the context of the hallway video, the question was whether the video was foreseeably relevant (and thus needed to be preserved) within the three- to four-week overwriting window. Here, the government had two opportunities to ensure the preservation and production of the post orders. First, the United States could have ensured that the original copies of the post orders were retained pursuant to a litigation hold when it came time for their routine destruction in 2010, two years after Bistrian filed this case. Second, despite that failure, the United States could have thought to retrieve the *Roberts* copy of the post orders from that case file when Bistrian requested the post orders in 2014.[180]

The government's failure, not once but twice, to preserve and produce this material is disturbing and falls well short of the reasonable efforts required of all counsel in discovery. The

---

[178] *Zubulake*, 220 F.R.D. at 217.

[179] *Id.*

[180] *See* United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 20–21. The same U.S. Attorney's Office that represented the government in *Roberts* is representing the government in this matter; indeed, the very same Assistant U.S. Attorney who handled *Roberts* has signed filings in this case since January 2017. *See* Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421] at 9. The United States points out that the AUSA would not have known about the request for the post orders, which took place before she began working on this matter. But the overlap in the litigation teams does call into question the reasonableness of the original investigation the government performed when Bistrian requested the post orders.

Court recognizes, however, that in light of the large volume of discovery in this case and the evolution of the central issues over more than ten years and two interlocutory appeals, the failure to intervene in the routine destruction of the post orders was more likely negligent than intentional.[181] The same can be said of the failure to retrieve the copies from the *Roberts* file. This conduct does not satisfy the Third Circuit's demanding standard for finding bad faith, which requires a showing that evidence was knowingly and intentionally withheld for the purpose of preventing its use in this case.[182] Because the record does not support the conclusion that the discovery failures were intentional rather than slipshod, the Court is constrained to find that spoliation did not occur.[183]

### B. Millhouse and Humbert/Harper Attacks

Perhaps the most hotly contested issue in this contentious matter is whether and to what extent Bistrian sought information about other razor attacks before the supplemental discovery period. Whether he explicitly requested this information is relevant but nowhere near dispositive in the separate determination of whether to reopen the record to introduce this information. In

---

[181] Unlike the Taylor exhibits, which were destroyed two days after Bistrian requested them, it appears that the post orders were destroyed several years before Bistrian requested them. The Court does not agree with the United States that Bistrian can be faulted for failing to make an explicit request for the post orders in 2010, several years before discovery commenced. Nevertheless, the timing of the destruction does not support an inference of intentionality.

[182] *See Bull*, 665 F.3d at 79 ("[A spoliation inference] arises, however, only when the spoliation or destruction [of evidence] was intentional, and indicates *fraud and a desire to suppress the truth*, and it does not arise where the destruction was a matter of routine with no fraudulent intent." (quoting 29 Am. Jur. 2d Evidence § 177) (emphasis added)); *see also Nelson*, 481 F. App'x at 42 (explaining that a finding of spoliation is not warranted "where there is no showing that the evidence was destroyed *in order to prevent it from being used by the adverse party*" (emphasis added)).

[183] Because the Court is unable to find bad faith, sanctions also cannot be awarded under 28 U.S.C. § 1927, *see Grider v. Keystone Health Plan Central, Inc.*, 580 F.3d 119, 141–42 (3d Cir. 2009), or pursuant to the Court's inherent authority, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991). Additionally, Bistrian sought the post orders via *Touhy* request during the time when the government was not a party. Although the Court rejects the notion that the government had no preservation obligations during that period, *see supra* note 177, the Court notes that, as an apparent matter of first impression, Rule 26 seems inapplicable to *Touhy* requests. *See* Fed. R. Civ. P. 26(g)(1) ("Every disclosure *under Rule 26(a)(1) or (a)(3)* and every discovery request, response, or objection must be signed by at least one *attorney of record* in the attorney's own name—or by the *party* personally, if unrepresented . . . ." (emphases added)).

determining whether sanctions are appropriate, however, whether Bistrian requested this information is central. The United States maintains that it could not have "anticipate[d] that a plaintiff who had never once sought discovery of other razor episodes would be prompted by the Court to do so."[184] Bistrian contends that he did seek information about other razor episodes.

As evidence of this, Bistrian points to a discovery dispute that was resolved by court order on November 30, 2015.[185] Bistrian had sought information about the government's decision to install sally ports in the rec pen. The United States objected to this on grounds that it was covered by the discretionary function exception. Bistrian moved to compel and the Court ordered the production of documents relating to that decision, including:

1. Documents relating to the need or desirability of secure sally ports for the recreational area in the SHU at the FDC from 2002-2010. . . .

6. Documents that reference unrestrained inmate(s) in Federal Bureau of Prison[s] facilities being in direct contact with restrained inmate(s) from 2002-2010.[186]

Judge Wells's Order reopening discovery found that the November 30, 2015 Order,

[w]hen construed broadly, authorized full discovery of events that led to the construction of a sally port in 2008 at the FDC to prevent contact between restrained and unrestrained prisoners. The two recent prior attacks on inmates Roberts and Millhouse assuredly played a role in the decision to build a port.[187]

---

[184] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at 1.

[185] Bistrian also points to the testimony of Captain Knox. Captain Knox was asked directly at trial whether he know of "any other incident that ever took place at the Federal Detention Center while you were there where an inmate had a razor weapon in the rec pen." He responded: "Off the top of my head, no. I think our procedures were pretty good." Knox Testimony, Trial Tr. Aug. 12, 2019, at 199–200. Bistrian contends this can only be a knowing lie, since as Captain of the FDC, Captain Knox would have known of all these incidents and since just before making that statement he had reviewed the razor log, which contained the names of Millhouse, Humbert, and Harper, which surely would have refreshed his memory. It is unclear, however, why asking this question at trial would support sanctions for the government's failure to disclosure the episodes in discovery. This issue is therefore considered separately below as part of the analysis of allegedly false testimony.

[186] Discovery Order [Doc. No. 160] at 6.

[187] September 20, 2019 Order [Doc. No. 414].

Bistrian argues that both these provisions required disclosure of the Millhouse and Humbert/Harper attacks. As to the second provision, the United States argues that technically it covered only the Humbert/Harper attack and not the Millhouse attack, as Millhouse's victim was not another inmate. As to both provisions, the United States has persuasively demonstrated that the parties reached an understanding about the scope of the Order that did not require the disclosure of either incident, and that in the absence of that informal understanding it would have sought a protective order clarifying the scope.

The Court declines to relitigate in minute detail the many contentious discovery disputes that beset this case. In light of the informal agreement reached between the parties, the Court cannot say that the government intentionally withheld this information.[188] As explained, the standard for bad faith is a demanding one that is not met here.[189]

### C. Witness Testimony

Bistrian also requests sanctions based on allegedly false testimony presented by government witnesses. District courts have inherent authority to assess sanctions where a party has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."[190] Presenting false testimony can be a basis for sanctions.[191] However, "a prerequisite for the exercise of the district

---

[188] *See Bull*, 665 F.3d at 79; *McCann v. Kennedy Univ. Hosp., Inc.*, 2014 WL 282693, at *7 (D.N.J. Jan. 24, 2014).

[189] *See Bozic*, 912 F. Supp. 2d at 270 (explaining that a finding of spoliation is warranted where a party's conduct "rises *well above* inadvertence, negligence, inexplicable foolishness, or part of the normal activities of business or daily living").

[190] *Weisberg v. Riverside Tp. Bd. of Educ.*, 272 F. App'x 170, 173 (3d Cir. 2008) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45–46 (1991)). Bistrian also asserts that the Court has authority to award attorneys' fees based on the Federal Rules of Civil Procedure, but does not identify any particular provision of the Rules that would support such an award for this particular alleged misconduct, *see* Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421] at 19, so the Court will consider only its inherent authority.

[191] *See Mackler Prods., Inc. v. Cohen*, 225 F.3d 136, 140, 145 (2d Cir. 2000).

court's inherent power to sanction is a finding of bad faith conduct."[192] When a witness is designated as an entity's representative pursuant to Rule 30(b)(6), sanctions can also be appropriate if the witness fails to appear or appears but is unprepared to give useful testimony.[193]

As his basis for this request, Bistrian identifies two witnesses whose testimony was allegedly false or misleading. The first is Captain Jeremy Nash, who was offered as the government's 30(b)(6) witness on numerous issues, including post orders. The second is Captain David Knox, who served as Captain of the FDC from 2005 to 2012.[194] Bistrian argues that each witness gave testimony that is contradicted by revelations from the supplemental discovery period.

Captain Nash testified about the razor policies contained in the post orders. He testified that to the best of his knowledge the razor policies in 2006 were the same as those in the later post orders produced by the government, which required only that "razors will be accounted for by staff."[195] As a designated 30(b)(6) witness, Captain Nash had a duty to investigate matters with which he was not already personally familiar. Yet in the absence of the 2006 post orders, the government's designated witness on the subject of the FDC's post orders was content to assume that the destroyed 2006 post orders imposed the same requirements as the available 2014 post orders.[196] This guess favored the government in important ways and turned out to be flatly

---

[192] *Landon v. Hunt*, 938 F.2d 450, 454 (3d Cir. 1991); *see also Orchestrate HR, Inc. v. Trombetta*, 178 F. Supp. 3d 476, 496–97 (N.D. Tex. 2016) (describing threshold for imposing inherent authority sanctions under identical Fifth Circuit standard as "high" and declining to impose sanctions even where 30(b)(6) witness admitted to perjury).

[193] *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 304 (3d Cir. 2000).

[194] Knox Testimony, Trial Tr. Aug. 12, 2019, at 135.

[195] Bistrian's Mem. Supp. Mot. to Reopen Record [Doc. No. 421], Ex. H (Nash Dep. Tr. at 28).

[196] *See id.* ("The razor policy back then, as it is now, in the—in the policy that we have, just says that razors will be accounted for by staff.").

wrong. This testimony compounded the careless behavior that allowed the post orders themselves to be destroyed.

As the government's designee, Nash—assisted by government counsel—should have undertaken a more thorough effort "to collect information, review documents, and interview employees with personal knowledge."[197] Nevertheless, Nash did openly acknowledge that the policy available for him to refer to in his deposition was not the one in effect in 2006.[198] It is also relevant that the information was ultimately corrected (albeit after additional discovery to which the government vehemently objected).[199] The Court cannot conclude that this incorrect statement was made in bad faith or that this deficiency in Nash's testimony on one subject amounted to a complete failure to appear that would justify sanctions.[200]

As for Captain Knox, Bistrian argues that his testimony that he could not recall other razor attacks at the FDC "off the top of [his] head" is not plausible in light of new information about the Millhouse and Humbert/Harper attacks.[201] This is essentially a request for a credibility determination, however, which would be premature at this stage. The Court will assess all issues

---

[197] *Henrik Klinge Retained Trust v. Triumph Apparel Corp.*, No. 09-1812, 2012 WL 259989, at *3 (M.D. Pa. Jan. 27, 2012) (quoting *Wilson v. Lakner*, 228 F.R.D. 524, 528–29 (D. Md. 2005)).

[198] United States' Mem. Opp. Mot. to Reopen Record [Doc. No. 424] at Ex. 8 (Nash Dep. Tr. at 30–32).

[199] *See Morris v. McMaster-Carr Supply Co.*, No. 01-6349, 2002 WL 1290390, at *3 (N.D. Ill. June 10, 2002).

[200] *Cf. Black Horse*, 228 F.3d at 304 ("In reality if a Rule 30(b)(6) witness is unable to give useful information he is no more present for the deposition than would be a deponent who physically appears for the deposition but sleeps through it. . . . [P]roducing an unprepared witness is tantamount to a failure to appear."). It is also unclear whether sanctions under Rule 37(d)(1) for failure to appear would be procedurally appropriate at this late juncture and in the absence of a certification of a good-faith attempt to confer, though—to be clear—these are not dispositive factors in the Court's analysis.

[201] Bistrian also argues that it is not credible that Captain Knox would be unaware of his own post orders at the FDC but does not identify an occasion when Captain Knox made an allegedly false statement on that subject. The allegation seems to be that as a witness for the United States, Captain Knox must have alerted counsel to the content of the post orders in 2006, making the government's earlier position about the razor policy in 2006 suspect. This is entirely speculative.

of competing evidence, including credibility, at the appropriate time—after hearing all the evidence and argument.

**IV. CONCLUSION**

Regrettably, during the protracted course of this litigation, there have been failures by the government in the presentation and timely production of evidence. After additional discovery, however, much of the important evidence Bistrian was denied has been restored. Where evidence could not be restored, the Court has imposed appropriate sanctions, recognizing the many unusual features of this protracted litigation and guided by the Third Circuit's strong emphasis on selecting a sanction no greater than necessary to cure any prejudice.[202] This unfortunate but necessary detour can now be brought to a close. An appropriate Order follows.

---

[202] *See Bull*, 665 F.3d at 73 n.5 (quoting *Schmid*, 13 F.3d at 79).