# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **PETER BISTRIAN,** | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO. 08-3010** |
| | : | |
| **WARDEN TROY LEVI,** *et al.*, | : | |
| **Defendants.** | : | |

## ADJUDICATION

**Rufe, J.**                                                                              **August 21, 2020**

Nearly fourteen years ago, Plaintiff Peter Bistrian, a pretrial detainee in the Secure Housing Unit at the Federal Detention Center in Philadelphia, was brutally attacked by a fellow inmate armed with a contraband razor. His attacker, Aaron Taylor, had been placed in the SHU for assaulting two other inmates with a razor weapon just a few months earlier. While in the SHU, Taylor continued to receive razors for shaving. He kept one of them and fashioned it into a weapon, which he smuggled into the recreation area. At the end of the recreation period, Taylor waited until Plaintiff was handcuffed to be escorted back to his cell and could not defend himself. Then Taylor attacked him, slashing him repeatedly with the razor weapon.[1] When correctional officers were unable to stop the assault by the usual means—pepper spray—they resorted to deploying a munitions device, which rolled under Plaintiff and exploded beneath his lower back.

Plaintiff sued the United States pursuant to the Federal Tort Claims Act, alleging that the correctional staff of the Federal Detention Center negligently failed to protect him from the

---

[1] Taylor was convicted of one count of assault with a deadly weapon, 18 U.S.C. § 113(a)(3), for the attack. *See* Trial Tr. [Doc. No. 201], at 40–41, *United States v. Taylor*, Crim. No. 07-0288 (E.D. Pa. Dec 3, 2010).

attack by Taylor.[2] The claim was tried to this Court, which now makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.   FINDINGS OF FACT

### A.  Events Preceding the Taylor Attack

1. Plaintiff Peter Bistrian was detained at the Federal Detention Center ("FDC") in Philadelphia from 2006 to 2008 pending trial on charges of wire fraud.[3] He eventually pled guilty to those charges.[4]

2. Plaintiff was placed in the Secure Housing Unit ("SHU") in January 2006 for violating telephone regulations.[5]

3. On June 30, 2006, Plaintiff was placed in a recreation area with inmates Steve Northington, Jelani Lee, and Terry Walker, among others. Northington, Lee, and Walker assaulted Plaintiff, badly beating him.[6]

4. As a result of the Northington assault, Plaintiff sustained a cracked or broken rib and several broken or chipped teeth; experienced hearing problems; and urinated blood for several days.[7]

---

[2] Plaintiff also brought failure-to-protect claims against a number of individual officers of the Federal Detention Center pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), based on a separate in-custody assault by different perpetrators. The *Bivens* and FTCA claims were bifurcated, Doc. No. 259, and the *Bivens* claims were tried to a jury, which found all the defendants not liable, Doc. No. 394. At the beginning of the bench trial on the FTCA claim, the parties stipulated to the "wholesale" admission of the record from the *Bivens* trial. Trial Tr. July 25, 2019, at 15–16. All of the testimony and evidence from the *Bivens* trial is therefore part of this trial record. To avoid confusion, Defendant's exhibits from the *Bivins* trial are marked 'D' and Government's exhibits from the FTCA trial are marked 'G.'

[3] Bistrian Test., Trial Tr. July 9, 2019, at 44–45; Bistrian Test., Trial Tr. July 10, 2019, at 171.

[4] Bistrian Test., Trial Tr. July 9, 2019, at 44.

[5] *Id.* at 45.

[6] Bistrian Test., Trial Tr. July 10, 2019, at 90–92; P-43. The Northington assault was the subject of Plaintiff's aforementioned *Bivens* claims.

[7] Bistrian Test., Trial Tr. July 10, 2019, at 8.

5.   Plaintiff also sustained a serious injury to his left shoulder, which may have been dislocated in the assault.[8]

   **B.   Razor Policy**

6.   The Bureau of Prisons ("BOP") directs its correctional and detention facilities to adopt post orders to give specific instructions and guidance to staff on a variety of issues.[9]

7.   Bureau of Prisons Program Statement 5500.11, dated October 10, 2003, provides high-level general guidance to BOP facilities on a number of subjects and instructs that "[w]ritten procedures outlining and directing staff response should be prepared and included in the appropriate post orders."[10]

8.   In 2006, the FDC had implemented certain policies and procedures governing the distribution and collection of razors in the SHU, among other subjects, which were set forth in written Program Statements, Post Orders, and Special Instructions. Program Statements, Post Orders, and Special Instructions implement BOP policy.[11]

9.   A SHU Post Order in effect in 2006 contained a written policy governing razors in the SHU. It required officers to keep careful track of which inmates received a razor, to collect razors within 10 minutes after distributing them, and to inspect razors upon collection to ensure they had not been tampered with:

   Officers are required to account for all razors utilized during the day. Razors will be inventoried via bin card to insure accountability.

---

[8] Bistrian Test., Trial Tr. July 9, 2019, at 91; P-43 at 9.

[9] P-28 at 19.

[10] *Id.* at 1, 19.

[11] Vanyur Test., Trial Tr. Aug. 13, 2019, at 82–83, 105–06.

> Officers will place a razor sign on the cell door of any inmate being issued a razor. Inmates will have 10 minutes to shave and return the razor. Officers will inspect the razor upon return to insure the blade is still intact.[12]

10.  Officers were to issue one razor per inmate.[13] Pursuant to the Post Order, the officer distributing razors was required to place a magnet labeled with either the number "1" or "2" on each cell door to indicate how many razors were distributed to that cell. (Two razors could be distributed to a single cell shared by two inmates who both requested to shave.)[14]

11.  SHU officers kept a logbook in which they recorded the name and cell number of each inmate who received a razor on a given day, the time the razor was distributed and collected, as well as the number of razors distributed and collected.[15]

12.  Inmates sometimes manage to obtain and conceal contraband, including razor blades, in creative ways.[16]

13.  For example, Officer Patrick Griffiths—one of the SHU officers in charge of distributing razors to inmates in 2006[17]—testified that inmates would remove a razor blade from its safety handle, cut out part of a foil packet of ramen noodles the shape and size of the blade, and replace the blade with the silver foil cutout, so that the correctional officer collecting the razor would not notice that the blade was missing from the handle.[18]

---

[12] P-305 at 7; *see* P-310 at 120–121 (explaining the requirements for distributing and collecting razors, including the ten-minute time frame).

[13] Griffiths Test., Trial Tr. Aug. 20, 2019, at 8–9; *see* P-305 at 7.

[14] Griffiths Test., Trial Tr. Aug. 20, 2019, at 9.

[15] P-112; P-303; P-304.

[16] Gravette Test., Trial Tr. July 26, 2019, at 49; Griffiths Test., Trial Tr. Aug. 20, 2019, at 7.

[17] Griffiths Test., Trial Tr. Aug. 20, 2019, at 8.

[18] *Id.* at 7.

14. The likely purpose of the ten-minute razor policy was to limit the opportunity of inmates to conceal a razor blade using this or other methods.

15. FDC officers routinely disregarded the policy requirements governing razors.

16. The razor log for the relevant period shows that officers frequently failed to collect razors within 10 minutes of distributing them.[19]

17. Additionally, other razor log entries implausibly record that dozens of razors were given out and/or collected in the same minute. For example, the entries for July 16, 2006, purport to show that a single SHU officer distributed thirty razors to thirty inmates in their cells at precisely 4:10 PM, and that the same officer collected all thirty razors exactly ten minutes later at 4:20 PM.[20]

18. This pattern suggests that SHU officers often made inaccurate records of their distribution and collection of razors, perhaps after the fact, so as to create the appearance that they had distributed and collected razors on that day in compliance with policy when, in fact, they had not.

19. The apparent falsification of some entries so as to create the appearance that razors were collected exactly ten minutes after distribution also suggests that SHU officers were aware of a requirement that razors be collected within ten minutes, even if they did not always comply with it.[21]

---

[19] *See, e.g.*, P-303 at 14–17.

[20] *Id.* at 11–12. The process of distributing razors involved going around to each cell, asking each inmate if they wanted a razor, and providing the razor if requested. The Court does not find it plausible that thirty razors could be handed out in one minute; rather, Officer Griffiths likely used an approximate time, which he filled in after handing out all of the razor blades. *See also, e.g., id.* at 12–13 (recording that Officer Griffiths purportedly distributed twenty-five razors at exactly 7:15 PM and collected all twenty-five at exactly 7:25 PM); *id.* at 16–17 (recording that Officer Griffiths purportedly distributed twenty-eight razors at exactly 4:45 PM and collected all twenty-eight at exactly 6:00 PM).

[21] *See, e.g., id.* at 10–12.

20.  A SHU Post Order in effect in 2006 contained a written policy governing searches of inmates' cells, or "shakedowns." It provided:

> Searches of housing areas are conducted primarily to uncover contraband, maintain sanitation standards and eliminate fire and safety hazards. Inmates will be removed from the area before starting a search. Particular attention should be paid to beds, bedding, chairs and other areas which could be used to conceal contraband. Searches will be logged in the shakedown log located at the Officer's station.[22]

21.  If an inmate refused to return a razor, a shakedown would be conducted in accordance with that procedure—removing the inmate from the cell, searching the inmate, and then searching the empty cell.[23]

### C.  Aaron Taylor Obtains and Conceals a Razor

22.  On July 1, 2006, FDC inmate Aaron Taylor assaulted two fellow inmates with a razor blade while housed in the general population.[24]

23.  As a result of that razor blade attack, Taylor was placed in the SHU from August to October of 2006.[25]

24.  Despite Taylor's recent history of violent misconduct with razors, he continued to receive razors in the SHU with no additional restrictions beyond those applied to all SHU inmates (and routinely disregarded).[26] He was not placed on "razor restriction," which would have either prevented him from receiving razors altogether or limited him

---

[22] P-305 at 11.

[23] Griffiths Test., Trial Tr. Aug. 20, 2019, at 10–11.

[24] P-51 at 5.

[25] Gravette Test., Trial Tr. July 26, 2019, at 12.

[26] Knox Test., Trial Tr. Aug. 12, 2019, at 185–94. Captain Knox rather implausibly testified that Taylor's access to razors was not restricted, even he attacked two inmates in general population with a razor and then refused to return a razor once he was placed in the SHU, because FDC personnel including himself were concerned about violating Taylor's rights as an inmate. *Id.*

to shaving in the presence of a correctional officer.[27] Placing an inmate with Taylor's profile on razor restriction would have been accepted, standard practice within the Bureau of Prisons.[28]

25. On August 22, 2006, the razor log reflects that Taylor received at least one razor and refused to return it.[29]

26. According to the razor log entry for August 22, 2006, Officer Griffiths distributed razors around 6:30 PM and collected them around 9:30 PM, meaning that inmates were left with the razors they received for approximately three hours—two hours and fifty minutes more than the maximum time permitted under SHU policy.[30]

27. That three-hour interval directly violated the razor policy that, if followed, would have drastically limited Taylor's opportunity to remove the razor from its safety handle and conceal it.

28. According to Officer Griffiths, when an inmate refused to return a razor, he would typically "step off the range of the [SHU]" in order to notify the Operations Lieutenant.[31]

---

[27] *Id.* at 194–97; *see also* Gravette Test., Trial Tr. July 26, 2019, at 21–23; Griffiths Test., Trial Tr. Aug. 20, 2019, at 55.

[28] *See* Gravette Test., Trial Tr. July 26, 2019, at 21–25 (opining that the failure to restrict Taylor's access to razors was a violation of "customs and practices, and sound correctional management"); *but see* Knox Test., Trial Tr. Aug. 12, 2019, at 194–97.

[29] P-303 at 38. The razor log entry for this day does not contain a column indicating the number of razors distributed and collected.

[30] *Id.*

[31] Griffiths Test., Trial Tr. Aug. 20, 2019, at 20 ("I don't specifically remember this incident, but in common practice, if this did happen, I would step off the range of the special housing unit to make contact with other staff members, including the lieutenant, to let them know what was going on.").

29.  FDC officers testified that it is common practice for inmates to flush weapons down the toilet if they believe their cell is going to be searched. No correctional officer remained by the cell to see if Taylor flushed the toilet.[32]

30.  The August 22, 2006 razor log entry notes that a "shakedown [was] conducted" with "neg[ative] results,"[33] meaning that Taylor's person and his cell were searched but the razor was not recovered.[34]

31.  Taylor was written up for two disciplinary infractions in connection with this incident, but was not written up for possessing a weapon, because "the razor was not present," as correctional officers assumed "he flushed the razor."[35]

32.  Taylor testified to a different sequence of events that led him to possess the razor he used to attack Plaintiff. He testified that he obtained that razor when a correctional officer accidentally distributed two razors to him, thinking he had distributed only one. When the officer came to collect one razor from Taylor, he testified, he returned one as requested and silently kept the other.[36]

33.  Although parts of Taylor's testimony were lucid, forthright, and credible, his account of how he came to possess the razor was muddled and appeared to confuse several different incidents Taylor recalled from his time in the SHU.

34.  For example, Taylor claimed to recall two separate incidents in which he and a correctional officer disputed how many razors he had been given. In one of those

---

[32] *Id.* at 20–22, 36–37.

[33] P-303 at 38.

[34] Griffiths Test., Trial Tr. Aug. 20, 2019, at 10–11.

[35] *Id.* at 22.

[36] Taylor Test., Trial Tr. Aug. 12, 2019, at 27–29.

incidents, Taylor testified that the officer mistakenly gave him two razors and collected only one, not realizing that Taylor had received and retained the other. In the other, the August 22, 2006 incident recorded in the razor log, Taylor testified that the officer gave him only one razor, but mistakenly believed he had given him two and wrote him up for refusing to return one of them.[37]

35.    Observing this portion of Taylor's testimony, the Court's impression was that Taylor was either confusing the supposed incident in which he received two razors and returned one with the August 22, 2006 incident, or making up the former incident entirely. This impression is bolstered by the razor log entry for August 22, 2006, which contains no suggestion that SHU officers believed Taylor was given two razors and returned only one. Instead, the entry merely reflects that Taylor refused to return the razor he was given.[38]

36.    The Court finds that Taylor most likely came to possess the razor he ultimately used to attack Plaintiff when he retained the razor he was given on August 22, 2006.

37.    Correctional officers conducted a cursory and careless search of Taylor's person and cell after he refused to return the razor on August 22, 2006, because they assumed—and, perhaps, hoped—that Taylor had flushed the razor down the toilet.

38.    Officer Griffiths testified that inmates "could easily flush a razor" and often did so to avoid being written up for refusing to return a razor.[39]

---

[37] *Id.* at 26–29.

[38] Taylor also testified that he only took razors on two occasions during this time period—once on August 22, and once on the day of the supposed double-razor incident. Taylor Test., Trial Tr. Aug. 12, 2019, at 30–31. But the razor log reflects that in late August 2006 alone, Taylor also received razors on August 24, August 29, and August 31. P-303 at 40, 44, 45.

[39] Griffiths Test., Trial Tr. Aug. 20, 2019, at 20.

39.  Officer Griffiths also testified that the reason Taylor was not written up for a razor infraction in this case, but rather for "refusing to obey an order from a staff member" and for "insolence toward a staff member," was that "the razor was not present" because "he flushed the razor."[40]

40.  Other than Officer Griffiths's testimony, the only evidence in the record substantiating that any search was made is a terse note on the razor log indicating that Taylor "did not return" a razor and that a "shakedown [was] conducted."[41] If a "shakedown"—that is, a search of Taylor's person and cell—had been conducted, policy required that the search be recorded in the search log.[42] No search of Taylor or his cell was recorded on the search log.[43]

41.  The search conducted, if any, was not memorable to Taylor, as he testified that he could not remember if a search was done at all while he had the razor.[44]

42.  Importantly, when asked how he managed to maintain possession of the razor weapon, Taylor explained, "I just kept it with me in the cell. That's how I was able to maintain it."[45] The Court finds this straightforward response credible.

---

[40] *Id.* at 22.

[41] P-112 at 15.

[42] P-305 at 4; Gravette Test., Trial Tr. July 26, 2019, at 15–16.

[43] Gravette Test., Trial Tr. July 26, 2019, at 15–16; *see also* P-120 at 189–90. Officer Griffiths testified that a "special" search like this one, not conducted in the regular course, would be documented in the razor log and incident report, not in the search log, but that testimony contradicts both the written policy and the testimony of Plaintiff's expert on BOP policy and practice, as well as Captain Knox's acknowledgement that a "shakedown" of an inmate's cell should have been recorded in the search log. *See* P-305 at 4; Gravette Test., Trial Tr. July 26, 2019, at 15–16; Knox Test., Trial Tr. Aug. 12, 2019, at 200–01.

[44] Taylor Test., Trial Tr. Aug. 12, 2019, at 19.

[45] *Id.* at 18.

43. Indeed, Taylor testified that there was no need to devise a clever scheme for concealing the razor from correctional officers.[46]

44. In view of all the evidence, the Court does not find persuasive the government's argument that this was a case of such great inmate ingenuity that even the most thorough search protocols could not have turned up the razor weapon.[47]

45. Instead, the correctional officers were hasty in their search, assuming the razor had been flushed, or did not conduct a search at all.

46. Alternatively, it is possible, though not likely, that Taylor came to possess the razor he ultimately used to attack Plaintiff when a correctional officer inadvertently gave him two razors and believed there was only one to collect.[48]

47. There is no question that the razor used to attack Plaintiff was issued to Taylor by the FDC.

---

[46] Taylor Test., Trial Tr. Aug. 12, 2019, at 18–19 ("How was I able to keep it? . . . You said, how was I able to keep it? . . . I just kept it with me in the cell. That's how I was able to maintain it."). Taylor did not mention any hole that he had dug out of a wall or any complicated manner of concealing the weapon in a body cavity. Although he was not specifically asked if he did these particular things, a description of such a hiding place, if it existed, would have been the obvious explanation for how he managed to maintain the weapon, and the Court finds the fact that he did not mention any is strong evidence that it was not concealed in a body cavity, in a hole he dug in the wall, or in any other manner described by the United States as an explanation for why they failed to find it.

[47] *See* United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] ¶ 11.

[48] Although the Court finds this scenario somewhat less plausible, the incident report written after Taylor refused to return a razor on August 22 does lend a measure of credence to the two inverse razor incidents Taylor claimed to return. The incident report notes that Officer Griffiths believed Taylor and his cellmate had each been issued a razor, and when he returned to collect them, Taylor handed back only one, insisting that Officer Griffiths had only given him one. *See* P-58. This could suggest that Taylor also correctly remembered that on another occasion, he was given two razors and only one was collected. Ultimately, regardless of how and when he obtained the razor, the fact remains that the FDC failed to collect a razor from Taylor, allowing him to fashion the weapon he used to attack Plaintiff.

### D. SHU Inmate Search Policy

48. SHU policies and procedures in effect in 2006 required that inmates be pat-searched and searched with a hand-held metal detector each time they left their cells to be escorted to the recreation area.[49]

49. BOP policy required officers conducting searches of inmates with a hand-held metal detector to thoroughly check body cavity areas where contraband could be hidden:

> When using the hand-held metal detector, staff must closely check body cavity areas, i.e., mouth, nose, ear, rectum, and vagina.[50]

50. At least some FDC officers appear to view these searches as essentially useless. In particular, Officer Griffiths and Captain Knox were skeptical that the wands had the sensitivity to detect razor blades through flesh—that is, if the razor blade were concealed in a body cavity or behind an inmate's genitals, they believed the wand would not detect the razor.[51] Taylor, too, volunteered his belief that the metal detecting wands "don't pick up razors."[52]

51. On the other hand, Officer Griffiths explained that the metal detecting wands used at the FDC were effective even through several layers of clothing, and that he would not expect clothing to have any "impact" on their effectiveness.[53]

---

[49] P-305 at 2 ("All inmates will be pat searched upon exiting their cell for any reason, no exceptions."); P-28 at 14 ("Upon departing to and returning from outside recreation, inmates will be screened with a hand-held metal detector."); Gravette Test., Trial Tr. July 26, 2019, at 25, 81–82; Knox Test., Trial Tr. Aug. 12, 2019, at 150–51; G-16 at 11; *see also* Griffiths Test., Trial Tr. Aug. 20, 2019, at 33 (testifying that conducting a pat-search and wand-search upon escorting an inmate out of his cell was not discretionary, but that the decision whether to conduct a strip search was discretionary).

[50] P-28 at 11.

[51] Griffiths Test., Trial Tr. Aug. 20, 2019, at 43; Knox Test., Trial Tr. Aug. 12, 2019, at 140–41.

[52] Taylor Test., Trial Tr. Aug. 12, 2019, at 20.

[53] Griffiths Test., Trial Tr. Aug. 20, 2019, at 44.

52.    BOP policy required officers conducting pat-searches of inmates to follow proper

procedure for maximum effectiveness:

> The pat search is used more often than other searches and must be performed
> properly to be effective. Before starting a pat search, the inmate will remove
> the contents from all pockets and any head gear. The head gear and personal
> effects removed will be inspected after removal.[54]

53.    Additionally, the general FDC Philadelphia Post Order in effect in 2006 prescribed a

specific sequence for all officers conducting pat-searches:

> Pat searches should be conducted by staff from behind the inmate in order to
> give staff an advantage in terms of protecting themselves. Before starting this
> type of search, the inmate should remove the contents of his pockets and
> remove his cap. The cap and personal effects removed from his pockets
> should be inspected, then the complete search should be conducted as
> follows:
>
>    A.  Have the inmate face away from you with arms extended and his feet
>        apart at least twelve inches.
>
>    B.  Use both hands and start at the back of the head, follow a direct course
>        across the back of the arms to the hands, then across the front of the
>        arms to the shoulders.
>
>    C.  Return your hands to the original starting position and cover the
>        shoulders, back and sides to the belt line. Search the belt line, metal tip,
>        pockets, and chest area.
>
>    D.  From the back at the waistline, proceed down the back and sides of the
>        legs to the shoe tops.
>
> Check the shoe tops, trouser cuffs, socks and inside of the legs well up to the
> groin.[55]

54.    In addition to the razor log, FDC policy required the maintenance of a separate "search

log" used to track when and where searches were conducted in a particular housing

---

[54] P-28 at 10.

[55] P-306 at 22; *see also* Griffiths Test., Trial Tr. Aug. 20, 2019, at 13–16 (explaining how he conducts a pat-search
and noting that even when an inmate was wearing a jumpsuit, which did not have a defined belt line, officers would
"still check" the inmate's belt line area "anyway").

unit.[56] The retention of a razor by an inmate would have triggered a search of the inmate's person and cell.[57] That search was required to be recorded in the search log.[58]

55.    In the SHU, inmates were rotated to a new cell approximately every three weeks to minimize the risk that an inmate might create a place to hide contraband.[59] Each time this rotation occurred, SHU policy dictated that both the empty cell and the inmate be searched to prevent the transportation of contraband to a new cell or the transfer of contraband to the cell's new occupant.[60]

56.    FDC officers routinely disregarded the policy requirements governing searches.

57.    Plaintiff testified that inmates "never really got pat searched" before being escorted to the recreation area.[61]

58.    While the government took the position in this case that the policies governing inmate searches were invariably followed,[62] Officer Jezior, who testified in the *Bivens* trial in this case, previously testified in another case that the required search procedures were

---

[56] Gravette Test., Trial Tr. July 26, 2019, at 15–17; *see also* P-305 at 4, 11.

[57] Gravette Test., Trial Tr. July 26, 2019, at 15–17.

[58] *Id.*

[59] Knox Testimony, Trial Tr. Aug. 12, 2019, at 144. Although one would expect, under this policy, that Taylor's cell would have been rotated at least twice between mid-August and mid-October, only one cell rotation is evident from the record. Taylor was moved from cell 821 to cell 823 sometime between September 26 and October 3. *See* G-24 at 5, 7 (logging searches of Taylor's cell).

[60] G-24 at 5, 7. The government points out that the razor log and search log document multiple searches of Taylor's cell during the relevant period—specifically, on August 22 (the day Taylor refused to return a razor), September 21, September 26, October 3, and October 11, the day before the assault. *See* United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] ¶ 27. Far from allaying concerns about how these searches were conducted, however, this series of searches—and especially the search on October 11—further calls into question the care and thoroughness of the SHU officers in following search policy. Regardless of how or when Taylor obtained the razor he used to attack Plaintiff, he almost certainly had it by October 11, the day before the assault. Indeed, he must have, because the razor log shows that razors were offered to SHU inmates on October 10 and again on October 13, but not on October 11 or 12. P-303 at 74. By October 11, therefore, Taylor must have already had the razor he used to attack Plaintiff the following day, yet the October 11 search did not locate it.

[61] Bistrian Test., Trial Tr. Aug. 7, 2019, at 49–50.

[62] *See, e.g.*, United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] ¶ 6.

14

not always followed because of "shortage of staff, carelessness of officers, people being in a rush."[63] Officer Jezior further testified that there were "certain staff who take shortcuts."[64]

59.   As a result of the routine failure to adhere to the written search policies, inmates were often able to bring items hidden on their person to the recreation area for trading with other inmates or for other illicit purposes.[65]

**E.   Taylor Fashions a Razor Weapon and Brings It to the Rec Pen**

60.   At some point after August 22, Taylor fashioned a weapon from the plastic safety razor by popping the blade out of the handle and then reattaching the exposed blade to the handle with a sticky label from a deodorant cannister.[66]

61.   The exact size of the razor weapon remains unknown because the United States destroyed it.[67] The only available photographs of the weapon have no scale comparison that could indicate size,[68] and although the materials Taylor used to fashion the weapon give some approximate sense of its dimensions, even Officer Griffiths—the SHU officer in charge of handing out razors to inmates, who was intimately familiar with the particular kind of razor in question—spontaneously noted that he could not gauge the weapon's size without any scale indicator.[69]

---

[63] P-310 at 117.

[64] *Id.* at 131.

[65] Bistrian Test., Trial Tr. Aug. 7, 2019, at 49–50.

[66] Taylor Test., Trial Tr. Aug. 12, 2019, at 17–18.

[67] Both the razor weapon and the stun munition deployed during the assault were preserved as evidence in anticipation of Taylor's criminal prosecution. Both were destroyed in 2015, many years after this litigation began and after a letter from Plaintiff requesting that all exhibits from Taylor's criminal trial be preserved and produced. Memorandum Opinion [Doc. No. 459] at 25–31.

[68] *See* P-167 at 10.

[69] Griffiths Test., Trial Tr. Aug. 20, 2019, at 41–42.

62. Based on the available photographs and the general agreement about the materials used to fashion the weapon, it might have been anywhere from about four inches long by one inch wide to about seven inches long by two inches wide.[70] The thickness of the weapon is unclear from photographs, but because it was fashioned from the handle of a plastic safety razor, it was not flat.[71]

63. In the weeks and months that followed the August 22 incident, other SHU personnel continued to be concerned that Taylor was holding onto a razor.

64. For example, on September 22, 2006, FDC physician Dr. Gary Reynolds, MD, made a notation in Taylor's file stating that "custody staff expressed ongoing concern that [Taylor] continues to possess a concealed weapon."[72]

65. On September 27, 2006, Dr. Reynolds added a notation that Taylor could not receive medical treatment until "any and all potential threats to staff are eliminated."[73]

---

[70] See P-167 at 10.

[71] See id.; Taylor Test., Trial Tr. Aug. 12, 2019, at 17–18. Taylor's testimony was that the weapon was fashioned from the blade and handle of a plastic safety razor; there was also speculation that the blade could have been attached to a toothbrush, which would likely have been even longer. See Knox Test., Trial Tr. Aug. 12, 2019, at 198–99.

[72] P-284 ¶ 5; see also Gravette Test., Trial Tr. July 26, 2019, at 20–21.

[73] P-284 ¶ 6. As a physician at the FDC, Dr. Reynolds "regularly entered information concerning an inmate for whom I was providing or was asked to provide medical services in the medical record for that inmate maintained by the Federal Detention Center." Id. ¶ 7.

The government asks the Court to find that any possibility that Taylor might still have had the razor he received on August 22 as of late September was eliminated when SHU officers searched Taylor's cell on September 26, see G-24 at 5, and the government points to Dr. Reynolds's final notation from later in the day on September 27, 2006, that he was "assured by custody [staff that] inmate no longer poses a threat," P-284 ¶ 6. See United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] ¶ 28. This does not accord with the evidence. For one thing, Dr. Reynolds's earlier notation on September 27—that Taylor could not be examined by medical staff until the threat was eliminated—was also made after the September 26 search, suggesting that the September 26 search did not eliminate the threat, at least in Dr. Reynolds's judgment. Moreover, both notations—the September 22 notation and the September 27 notation—were made after staff had already purportedly searched Taylor's cell on two prior occasions, first on August 22, the day he refused to return the razor, see P-303 at 38, and again on September 21, see G-24 at 4. See P-284 ¶¶ 5, 6. If the August 22 "shakedown" and the September 21 search were insufficient to assure custody staff and Dr. Reynolds that Taylor no longer had a weapon, it is unclear why the September 26 search would have provided that assurance, and the government does not explain what, if anything, was different about the September 26 search.

66. On September 28, 2006, Dr. Andrea Boardman, Ph.D., the chief psychologist for the FDC, spoke to Taylor regarding an accusation he had made against another FDC psychologist. Dr. Boardman noted Taylor's "history of unprovoked violence" as well as "staff perceptions that he may be mentally ill."[74]

67. On October 6, 2006, Dr. Boardman placed Taylor on "psych alert" status, based on Taylor's history of recent violence and indications of paranoia, racial preoccupation, and sexually inappropriate actions toward female staff.[75]

68. Correctional officers were given a list of all inmates on psych alert status.[76]

69. Plaintiff testified that sometime after he returned from the hospital, Officer Griffiths admitted to him that "the entire staff knew that Aaron Taylor had a razor and nothing was done about it. He shouldn't have been out there with you."[77]

70. The Court finds that testimony particularly credible, as it accords with the above-noted FDC records showing that two FDC medical professionals on two separate occasions within weeks before to the razor attack had expressed their concern that Taylor was dangerous and/or potentially armed with a razor.

71. The Court cannot conclude that it was impossible to find the razor weapon in this case, given its approximate size and the length of time—nearly two months—that it would have been in Taylor's possession before the assault. A proper search in compliance with FDC and SHU policy at the time would have uncovered the razor, but no policy-compliant search was made.

---

[74] P-49 at 8.

[75] *Id.* at 3.

[76] Knox Test., Trial Tr. Aug. 13, 2019, at 36.

[77] Bistrian Test., Trial Tr. Aug. 7, 2019, at 52–53. Officer Griffiths denied making this statement. Griffiths Test., Trial Tr. Aug. 20, 2019, at 30–31.

72. After conducting a cursory "shakedown," SHU officers compounded their carelessness by missing a second opportunity to find and confiscate the razor weapon—the required pat- and wand-search before escorting Taylor to recreation.

73. On October 12, 2006, Plaintiff and Taylor were placed in the same "rec pen" in the SHU recreation area.[78]

74. No direct evidence was presented that suggested that correctional officers made a proper search of Taylor before escorting him to the rec pen in compliance with the policy that all SHU inmates be pat-searched and metal-detected before taking recreation. Instead, the government relied on the testimony of FDC witnesses that the search policy was invariably followed at the FDC and argued that there was no reason to believe it had not been followed in this instance.[79]

75. On the contrary, however, the only available direct evidence—Taylor's testimony—suggested that he was not properly searched in compliance with the applicable policy.

76. The weapon would not have laid flat under Taylor's clothing; the plastic handle of the safety razor would have made a detectable bulge.

77. Taylor testified that he recalled being pat-searched, but that the pat-search was insufficient to detect the razor weapon through his several layers of prison-issued clothing.[80]

---

[78] Bistrian Test., Trial Tr. Aug. 7, 2019, at 23–24. The "recreation area" or "recreation yard" contained several smaller enclosed spaces where one or more SHU inmates were permitted to take their daily hour of recreation. Bistrian Test., Trial Tr. July 10, 2019, at 223.

[79] *See* Knox Test., Trial Tr. Aug. 12, 2019, at 151–52 (testifying that, in his regular review of video surveillance of officers escorting SHU inmates to recreation, Captain Knox had never observed an officer failing to follow the search policy and that he "hope[d]" that the policy was followed on every such occasion); Griffiths Test., Trial Tr. Aug. 20, 2019, at 34 (testifying that it was Officer Griffiths's "practice" to pat-search and wand-search every inmate before taking them to recreation, but that he could not speak to the practices of other officers).

[80] *See* Taylor Test., Trial Tr. Aug. 12, 2019, at 19–20.

78.    When Taylor was asked whether he was wand-searched, he initially responded, "no,"

     and later added that although he could not definitely recall, he did not think he had

     been.[81]

79.    On the subject of how Taylor got the razor weapon from his cell to the rec pen, Taylor

     testified:

> Q: Okay. And on the day of the attack, how were you able to get this razor
> weapon from your cell to the rec pen?
> A: I put it inside my drawers.
> Q: And so was that then sort of like on top of your buttocks and under your –
> under what, your jumpsuit?
> A: Yeah, in the front though.[82]

80.    Taylor expanded on this testimony in another exchange:

> Q: So the razor weapon, as I understand it, was in your front under your boxer
> shorts?
> A: Yeah.
> Q: And this was below your waist, at your waist?
> A: Below my waist.[83]

81.    There was no evidence beyond pure speculation that Taylor concealed the weapon

     behind his genitals or in any body cavity.[84]

82.    Taylor's agreement with counsel's characterization that the weapon was "on top of" his

     buttocks and underneath his clothing, but "in the front," suggests that the weapon was

     toward the top of his boxer shorts.[85] Additionally, because Taylor was wearing prison-

     issued boxer shorts rather than a tighter kind of undergarment, the weapon was most

---

[81] *Id.*; *see also id.* at 24.

[82] *Id.* at 19. The Court asked a clarifying question to determine that by "drawers" Taylor meant "underwear," and specifically "boxer shorts." *Id.* at 21.

[83] *Id.* at 21.

[84] *See, e.g.*, Knox Test., Trial Tr. Aug. 12, 2019, at 199.

[85] Taylor Test., Trial Tr. Aug. 12, 2019, at 19.

likely placed in the waistband; otherwise it would have fallen through to his pant leg, where it would certainly have been detected, as Officer Griffiths observed.[86]

83. Taylor testified that the reason the razor weapon was not detected was that he "had a lot of clothes on," including a "bigger jumpsuit and drawers" and a "t-shirt."[87] According to Taylor, then, it was his clothing—not any clever system of hiding the razor behind his genitals or in a body cavity—that concealed the weapon from detection.

84. Although the Court would have preferred that Taylor had been asked exactly where in his "drawers" he concealed the razor weapon, the Court finds that it was not placed under or behind his genitals, an area officers were forbidden to pat-search. Rather, Taylor most likely stuck the weapon in the waistband of his boxer shorts, with the waistband securing the weapon in place and the length of the weapon hanging down inside the boxer shorts.

85. The Court finds that Taylor was not wand-searched. A proper wand-search would most likely have detected the razor weapon in that spot.

86. The Court finds that Taylor was not properly pat-searched. A proper pat-search would most likely have detected the razor weapon in that spot.

87. FDC policy required correctional officers to "[s]earch the belt line" of an inmate in the course of a pat-search.[88]

---

[86] Griffiths Test., Trial Tr. Aug. 20, 2019, at 40.

[87] Taylor Test., Trial Tr. Aug. 12, 2019, at 20.

[88] P-306 at 22.

88. Officer Griffiths testified that correctional officers were supposed to, and generally did, search the "belt line"—that is, the waist area—of an inmate even if he was wearing a jumpsuit, which lacks a defined belt line.[89]

89. Officer Griffiths demonstrated what a policy-compliant pat-search should look like. He explained that a pat-search is "very systematic. We start from top to bottom. We're going to try to look – any seams in their clothing, anything we think could be some place to conceal something."[90] After demonstrating the search of the collar, shoulder, and arms, Officer Griffiths explained that an officer would "go to the front of the [pants] or the front of the uniform . . . go down his chest, around his belt line, checking anywhere, pockets, anything you could see on the belt line . . . down the front of his buttons, across the top of his belt line, side of his body."[91] An officer would also search his "upper thigh, down his legs, kind of inside of his upper thigh."[92]

90. Had the officer escorting Taylor to the rec pen conducted a search remotely resembling the search described by Officer Griffiths and required by the FDC post order, the razor weapon would likely have been discovered.

91. Moreover, a correctional officer conducting a thorough, careful, policy-compliant pat-search would have detected the bulge of the razor weapon even through the three layers of clothing Taylor was wearing.[93]

---

[89] Griffiths Test., Trial Tr. Aug. 20, 2019, at 14–15.

[90] *Id.* at 14.

[91] *Id.* at 14–15.

[92] *Id.* at 15.

[93] *See id.* at 27–28 (testifying that the inmates' thermal shirts were "actually fairly thin, so it was actually very easy to conduct the pat search on their person"). Captain Knox's evasive and peculiar testimony on this point was neither credible nor helpful. *See* Knox Test., Trial Tr. Aug. 13, 2019, at 49–52.

21

92. The Court previously ruled that the spoliation of the razor weapon did not warrant "clos[ing] off all proof" on the issue of the weapon itself, and of whether Taylor was properly searched, by conclusively determining that the weapon was too large to be concealed from any proper pat-search. Instead, the Court ruled that the spoliation of the razor weapon should be considered as "one factor among many" in determining whether a proper search was made.[94]

93. Even apart from the spoliation of the razor weapon, the Court easily finds that correctional officers failed to comply with the search policies when they escorted Taylor to the recreation area.

94. The spoliation of the razor weapon further underlines that finding. As the Court previously explained, "[t]he bigger and bulkier the razor weapon was, the less likely it would be that an officer doing a thorough pat search would not feel it."[95]

95. The government's actions deprived Plaintiff of the ability to introduce the actual razor weapon into evidence. This is further support for the Court's finding that a thorough, policy-compliant pat-search would certainly have detected it, as the government is not entitled to any benefit of the doubt that the razor weapon was closer to four than seven inches.

96. Unfortunately, there was still more critical evidence—evidence that would have definitively showed whether Taylor was properly searched—that was unavailable at trial because it was not preserved.

---

[94] Memorandum Opinion [Doc. No. 459] at 31.

[95] *Id.* at 30.

97.   Video surveillance cameras in the SHU hallways record any activity at the doorway of or just outside each SHU cell. Those cameras would have captured footage of correctional officers removing Taylor from his cell and escorting him to recreation on October 12, 2006, as well as any search—or lack thereof—the officers conducted, which would have taken place just outside Taylor's cell.[96]

98.   The government failed to preserve this video. The Court previously ruled that, while that failure did not amount to bad faith, the loss of the video did prejudice Plaintiff.[97] The Court therefore determined pursuant to Federal Rule of Civil Procedure 37(e)(1) that it was appropriate for the Court to "consider the video's destruction as one factor among many in making its ultimate determination, as the finder of fact, as to whether SHU staff properly searched Taylor."

99.   Again, even without considering the multiple layers of spoliation, the Court easily finds that SHU officers did not properly search Taylor before escorting him to recreation.

100.  The loss of the hallway video, like the destruction of the razor weapon, further underlines this finding. As the Court previously determined, the government was under a duty to preserve the video and allowed it to be overwritten anyway, causing the loss of the only evidence that could definitively show how thoroughly (if at all) officers searched Taylor.[98]

---

[96] Griffiths Test., Trial Tr. Aug. 20, 2019, at 28–29; Knox Test., Trial Tr. Aug. 12, 2019, at 167–68; Taylor Test., Trial Tr. Aug. 12, 2019, at 24–25.

[97] Memorandum Opinion [Doc. No. 459] at 20–25; Griffiths Test., Trial Tr. Aug. 20, 2019, at 28–29.

[98] Memorandum Opinion [Doc. No. 459] at 8–25.

101. As explained above, the careless search made by officers is particularly puzzling and alarming in light of evidence that some FDC personnel continued to believe, between August and October, that Taylor was holding onto a razor.

102. Although search policies requiring a pat- and wand-search of inmates on their way to recreation should have been followed in every instance, the record in this case suggests that there was a particular need for careful adherence to policy in this situation, where Taylor had refused to return a razor and several SHU officials were concerned that he still had it.

103. The Court finds, in sum, that there was widespread knowledge among SHU officers that Taylor was an acute danger to others and was likely in possession of a razor before the attack on Bistrian, and that the officers in charge of searching Taylor before escorting him to the rec pen nevertheless made no wand-search and made a hasty, sloppy pat-search where a proper search would almost certainly have uncovered the weapon and prevented the assault. That search was unacceptably careless, particularly under the circumstances.

### F.  Taylor Attacks Bistrian with the Razor Weapon

104. On October 12, 2006, Plaintiff was placed into a locked rec pen with Taylor and several other inmates.[99]

105. The rec pens, like the rest of the SHU, were surveilled by video cameras.[100] Video footage of the Taylor assault was captured, preserved, and used at trial, unlike the lost hallway footage.

---

[99] Bistrian Test., Trial Tr. Aug. 7, 2019, at 23–28; P-4.

[100] *See* Gravette Test., Trial Tr. July 26, 2019, at 42–43; *see also* Griffiths Test., Trial Tr. Aug. 20, 2019, at 29.

106. At the end of the recreation period, per FDC policy, each inmate placed his hands behind his back at the wicket in the rec pen door to be handcuffed.[101]

107. All inmates were required to be cuffed before the rec pen could be opened and the inmates escorted back to their cells.[102]

108. Bistrian was handcuffed before Taylor. According to Taylor, he "intentionally stayed back," as was his practice, since he believed "it's always best to . . . get your cuffs put on last when it's time to go in."[103]

109. As Bistrian stepped away from the wicket in the recreation pen door after he had been put into hand restraints, Taylor lunged at Bistrian with the razor weapon and began slashing at Bistrian's head and body.[104]

110. Without the use of his arms to defend himself, Bistrian threw himself to the ground, attempting to fight Taylor off with his legs.[105]

111. The assault lasted for about two and a half minutes.[106]

112. Plaintiff sustained extensive lacerations to his face, arms, and legs.[107]

113. Correctional officers first deployed pepper spray in an attempt to break up the assault so that they could safely enter and restrain Taylor.[108]

---

[101] Knox Test., Trial Tr. Aug. 12, 2019, at 163–64.

[102] P-305 at 8.

[103] Taylor Test., Trial Tr. Aug. 12, 2019 at 32–33.

[104] P-4; Bistrian Test., Trial Tr Aug. 7, 2019, at 25.

[105] P-4; Bistrian Test., Trial Tr. Aug. 7, 2019, at 25–26.

[106] P-4.

[107] P-114 at 1–3.

[108] Knox Test., Trial Tr. Aug. 12, 2019, at 159–60.

114. Taylor was not deterred by the pepper spray; he continued to stab and slash at Plaintiff with the razor weapon.[109]

115. When multiple cans of pepper spray proved ineffective, correctional officers deployed a device called a "Tactical Blast Stun Munition" into the rec pen in the hope that it would temporarily stun and disable Taylor.[110]

116. A stun munition produces a bright flash of light and a very loud noise, as well as a pressure wave measuring five pounds per square inch at a distance of seven feet.[111]

117. The munitions device rolled underneath Plaintiff, who was still lying supine on the ground, and exploded beneath his back.[112]

118. The kind of munitions device used to break up the Taylor assault is extremely dangerous if deployed in the direction of a person. Its instructions warn that it should never be aimed at a person or group of people and that it can cause contusions, abrasions, broken ribs, concussions, loss of eyes, superficial organ damage, serious skin lacerations, massive skull fractures, rupture of the heart or kidney, fragmentation of the liver, hemorrhage, or death.[113]

119. The explosion of the stun munition threw Plaintiff's body into the air and knocked Taylor to the ground.[114]

---

[109] *Id.* at 160.

[110] *Id.* at 160–62.

[111] P-125; Gravette Test., Trial Tr. July 26, 2019, at 40.

[112] P-4; Bistrian Test., Trial Tr. Aug. 7, 2019, at 26.

[113] P-125.

[114] P-4; Bistrian Test., Trial Tr. Aug. 7, 2019, at 26, 28.

120. Correctional officers were then able to enter the rec pen, subdue Taylor, and begin attending to Plaintiff's injuries.[115]

### G. Damages

121. As a direct result of the Taylor assault, Plaintiff suffered scarring on his face, arms, and legs; permanent nerve damage to his leg and foot causing numbness and loss of balance, among other things; and chronic back injuries, including pain and spasms.

122. Immediately after the assault, Plaintiff received medical attention at the FDC, where his injuries were assessed and photographed.[116]

123. Because his injuries were assessed to be severe, Plaintiff was transported to the emergency room of a nearby hospital for treatment. He was treated and returned to the FDC the same day.[117]

### i. Razor Wounds

124. Plaintiff sustained multiple lacerations to the left side of his face, his left lower leg, his right ear, and his right leg.[118]

125. The razor lacerations were long and deep, cutting through skin and fascia and into muscle.[119]

126. The laceration to Plaintiff's left leg alone required twenty stitches.[120] The laceration to his face required twelve stitches.[121]

---

[115] Knox Test., Trial Tr. Aug. 12, 2019, at 162-163.

[116] Bistrian Test., Trial Tr. Aug. 7, 2019, at 43–47; P-114 at 1, 2; P-167 at 3, 5, 9.

[117] P-151 at 4; P-291 (Reynolds Dep.) at 44–45. Deposition designations of Plaintiff and counter-designations of Defendant were admitted into evidence. Trial Tr. July 25, 2019, at 50–51.

[118] P-151 at 2; P-291 (Reynolds Dep.) at 74–75.

[119] P-291 (Reynolds Dep.) at 74–75.

[120] *Id.* at 51.

[121] *Id.* at 48.

127. Plaintiff has permanent scarring as a result of the razor attack, including scarring to his face.

128. The Taylor assault was a substantial factor—indeed, the only factor—in causing the razor lacerations and subsequent scarring Plaintiff suffered.

129. Plaintiff presented some evidence to suggest that the razor attack caused a condition called "drop foot" or "slap foot" that affected Plaintiff's gait.

130. In a number of contemporaneous letters to family members, Plaintiff complained of numbness and "limited feeling" and expressed that his balance was "off" because he could not feel his foot hit the ground.[122]

131. Dr. Reynolds, a physician at the FDC, confirmed that Plaintiff had complained of numbness in his lower extremity to FDC medical staff.[123]

132. No objective clinical evidence prior to 2018 substantiated any loss of sensation or function to Plaintiff's lower extremities.[124]

133. No expert witness opined regarding "drop foot" or any other numbness or loss of sensation or function in Plaintiff's lower extremities prior to 2018, when Plaintiff apparently began to suffer from peripheral neuropathy. To the extent that drop foot is a separate condition that Plaintiff asserts he suffered from in the immediate wake of the Taylor assault, there was insufficient evidence to support such a condition.

134. Plaintiff cannot meet the burden of showing medical causation without expert testimony.

---

[122] *See, e.g.*, P-204 at 3-4; P-275 at 4; P-276 at 3.

[123] P-291 (Reynolds Dep.) at 61, 67–68, 90–91.

[124] *See* Schwartz Test., Trial Tr. July 15, 2019, at 82.

135.  The Court is unable to find that Plaintiff suffered from "drop foot" or another similar condition. The Court will separately analyze Plaintiff's claims of peripheral neuropathy as part of the cascade of complications resulting from the back injury in the Taylor assault.

    *ii.*    *Back Injury*

136.  Before his incarceration, Plaintiff had no notable trouble with his back.[125]

137.  In order to stop Taylor from attacking Plaintiff, guards at the FDC threw a munition device into the rec pen. This device blew up underneath Plaintiff's back, causing his body to be thrown slightly into the air, ultimately flipping him over onto his side.[126]

138.  Immediately after the Taylor assault, Plaintiff began to complain of back issues.[127]

139.  In the months following the Taylor assault, Plaintiff was repeatedly treated by FDC medical staff for low back pain and spasms.[128]

---

[125] Karsch Test., Trial Tr. Aug. 7, 2019, at 9; *see also* P-111 at 105. There is no evidence that Plaintiff suffered any back pain or injuries before his incarceration. The government asks the Court to find that Plaintiff's college football career was a risk factor for future back pain, but the government does not suggest that Plaintiff ever suffered from back pain before the two assaults. *See* United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] at ¶¶ 199–200. Dr. Gene Salkind, MD, noted that Plaintiff "did not have any complaints of back or leg pain when he was playing football." Salkind Test., Trial Tr. July 11, 2019, at 28–29.

[126] P-4.

[127] Bistrian Test., Trial Tr. Aug. 7, 2019, at 79–88; P-291 (Reynolds Dep.) at 48 (explaining that a medical note made on October 19, 2006 recorded that Plaintiff was complaining of "low back pain"); *id.* at 51 (explaining that a medical note made on November 3, 2006 recorded that Plaintiff was complaining of "low back pain"); *id.* at 57 (explaining that a medical note made on November 9, 2006 recorded that the Assistant Health Services Administrator had requested that Plaintiff be evaluated for "persistent back pain" and that Plaintiff was assessed as having spinal pain "at the left lumbosacral angle"); *id.* at 70 (explaining that medical note dated January 12, 2007 recorded that Plaintiff was complaining of "low back pain"); *id.* at 90–91 (explaining that Plaintiff submitted a request on October 29, 2006 asking to be evaluated for lower extremity numbness and "back problems such as spasms")

[128] *See supra* note 127~~126~~.

140. Dr. Reynolds, the FDC physician who evaluated Plaintiff on November 9, assessed his back pain and the numbness in his lower extremities as being "from the assault on 10/12/06."[129]

141. Plaintiff did not have access to physical therapy or other rehabilitative services in the SHU, where he remained after the Taylor assault.[130]

142. Dr. Reynolds advised Plaintiff to increase his physical activity to assist his recovery from the Taylor assault.[131] In particular, Dr. Reynolds counseled Plaintiff that core strengthening is an important aspect of recovery from back injuries, and that stretching would also be helpful.[132]

143. Plaintiff followed Dr. Reynolds's advice, exercising frequently during the remainder of his incarceration and after his release in 2009.[133]

144. Plaintiff's exercise routine included some physically demanding strength exercises.[134]

145. Plaintiff's ability to perform demanding upper-body strength exercises like "handstand pushups" is not inconsistent with back and lower-body pain.

146. Plaintiff's physician-recommended exercise regimen, both at the FDC and after his release, in no way calls into question whether Plaintiff was experiencing back pain.[135]

---

[129] P-291 (Reynolds Dep.) at 57–61, 66–68.

[130] Id. at 62–64; Bistrian Test., Trial Tr. Aug. 7, 2019, at 81–82.

[131] P-291 (Reynolds Dep.) at 64–69.

[132] Id.

[133] G-122 at 5–6; Bistrian Test., Trial Tr. July 10, 2019, at 96–97, 217–18; Bistrian Test., Trial Tr. Aug. 12, 2019, at 57.

[134] Bistrian Test., Trial Tr. Aug. 8, 2019, at 101-04, 111.

[135] The government asks the Court to find that any harm Plaintiff sustained in the Taylor attack was fully resolved by February 2007, when Plaintiff reported that he was able to perform a demanding exercise regimen. See United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] ¶¶ 77–85. This is emblematic of the impossible standard the government seeks to hold Plaintiff to, as it also asks the Court to find that Plaintiff failed to mitigate damages by foregoing potentially beneficial treatment options after his release. See id. ¶¶ 401–29.

147.   Plaintiff's exercise regimen is consistent with a genuine attempt, as an injured former
       athlete,[136] to rehabilitate as instructed by physicians and to mitigate damages.

148.   Further, Plaintiff's continued exercising in order to maintain his strength in the prison
       setting, where he had been the victim of two violent assaults and feared another,[137] is
       not evidence that he was not in pain as a result of the Taylor assault.

149.   In an October 31, 2006 letter to his mother, Plaintiff complained that his "lower back
       [was] screwed up totally," and that he was suffering "back spasms in [his] lower back
       on a regular basis."[138]

150.   Plaintiff complained of significant and worsening back pain in numerous letters to
       family members during the weeks and months following the Taylor assault.[139]

151.   Plaintiff's daughter testified that when she visited him following the Taylor assault he
       complained of being in pain and she observed that he appeared to be in pain, sitting in
       odd positions and shifting around.[140]

152.   The defense's medical expert, Dr. Scott Rushton, MD, was qualified as an expert in
       orthopedic surgery and spinal surgery.[141]

---

[136] *See* Karsch Test., Trial Tr. Aug. 7, 2019, at 8–9.

[137] *See id.* at 12.

[138] P-275 at 4. Plaintiff wrote that he had still "not seen a real doctor yet regarding my injuries," suggesting that his complaints stemmed from the October 12 Taylor assault, for which Plaintiff did not receive medical attention between the day of the assault and November 9. *Id.*; *see also* P-291 (Reynolds Dep.) at 44, 57, 64 (explaining that a physician's assistant treated Plaintiff after the assault on October 12 while Dr. Reynolds did not personally evaluate him until November 9).

[139] P-276 at 2; P-277 at 2; P-204 at 3; P-278 at 3; P-205 at 3; P-207 at 1; P-206 at 3; P-279 at 2; P-208 at 3; P-209 at 2.

[140] Karsch Test., Trial Tr. Aug. 7, 2019, at 13.

[141] Rushton Test., Trial Tr. July 19, 2019, at 36.

153. Dr. Rushton was not provided with video or images of the Taylor assault, nor was he informed that a visual record of the assault existed.[142] Dr. Rushton acknowledged that having a visual of the trauma "would have assisted" him in reaching his conclusions.[143]

154. Plaintiff's medical experts, Dr. Gene Salkind, MD, and Dr. Harry Schwartz, MD, were qualified as experts in "medicine and neurosurgery, general neurological surgery" and "physical medicine and rehabilitation, as well as spinal cord injuries," respectively.[144]

155. Dr. Salkind and Dr. Schwartz were provided with still images from the video of the Taylor assault, which graphically illustrated the trauma to Bistrian, including the force of the stun munition explosion.[145]

156. The experts generally agreed that Plaintiff had degenerative disc disease or arthritic change in the spine, which had already existed for some time prior to both the Northington and Taylor assaults.[146]

157. Dr. Salkind and Dr. Schwartz each reviewed extensive medical documentation and examined Plaintiff personally.[147]

158. Dr. Salkind concluded that Plaintiff's degenerative disc disease, which he described as part of the normal "wear and tear" on the human spine, was asymptomatic prior to the Northington and Taylor assaults.[148]

---

[142] *Id.* at 65–66.

[143] *Id.*

[144] Salkind Test., Trial Tr. July 11, 2019, at 11; Schwartz Test., Trial Tr. July 15, 2019, at 11.

[145] Salkind Test., Trial Tr. July 11, 2019, at 15–16; Schwartz Test., Trial Tr. Aug. 12, 2019, at 100–01.

[146] Salkind Test., Trial Tr. July 11, 2019, at 16–17; Rushton Test. Trial Tr. July 19, 2019, at 51–53.

[147] Salkind Test., Trial Tr. July 11, 2019, at 12–14; Schwartz Test., Trial Tr. July 15, 2019, at 14–16, 41–44; D-159 at 1–2.

[148] Salkind Test., Trial Tr. July 11, 2019, at 16–18.

159. Dr. Salkind further concluded that Plaintiff's back pain was the result of the traumas, which activated Plaintiff's underlying, previously asymptomatic arthritic condition.[149]

160. Dr. Schwartz similarly concluded that, although Plaintiff already suffered from an underlying asymptomatic degenerative disc disease, the "initial cause" of Plaintiff's back pain was the assaults, and that Plaintiff's back pain had progressively worsened over time in a kind of downward spiral of complications.[150]

161. The opinions of Dr. Salkind and Dr. Schwartz were informed in part by their assessment of the extent of the trauma to Plaintiff in the Taylor assault based on the images they viewed.

162. Dr. Rushton also reviewed medical records and examined Plaintiff.[151]

163. Dr. Rushton opined that Plaintiff's back pain was caused by his underlying degenerative condition, not by any trauma.[152]

164. That conclusion is inconsistent with the contemporaneous evidence of new significant back pain in Plaintiff's medical records at the FDC and in Plaintiff's letters to family members in the immediate aftermath of the Taylor assault. Dr. Rushton did not offer any explanation of those immediate-onset symptoms.

165. The Court credits the expert opinions of Dr. Salkind and Dr. Schwartz, who observed the original trauma to Plaintiff and whose opinions account for the voluminous contemporaneous evidence of new significant back pain immediately after the Taylor assault.

---

[149] *Id.*

[150] Schwartz Test., Trial Tr. July 15, 2019, at 16.

[151] Rushton Test., Trial Tr. July 19, 2019, at 38–39.

[152] *Id.* at 55–58, 62–63, 67.

166.   Dr. Salkind opined that no competent, responsible physician would have prescribed the amounts and dosages of narcotic pain medications Plaintiff received and took unless the physician believed Plaintiff was genuinely in severe pain.[153]

167.   Dr. Schwartz opined that Plaintiff's self-reported pain levels were consistent with objective clinical findings.[154]

168.   No expert was able to opine, within a reasonable degree of medical certainty, regarding the exact proportion of Plaintiff's pain that was attributable to each of the two assaults Plaintiff suffered at the FDC.[155]

169.   Plaintiff's expert on the Bureau of Prisons system, Timothy Gravette, explained that there was no indication of any back injury in the documentation of Plaintiff's injuries from the Northington assault.[156]

170.   Plaintiff testified that while he had some back pain after the Northington assault, the stun munition explosion beneath his back during the Taylor assault escalated that pain "to a whole other level."[157]

171.   It is credible that the explosion of a munitions device directly beneath one's body would cause more extensive trauma and more significant pain than being kicked in the back, even repeatedly. Indeed, the Court doubts whether expert medical testimony is necessary to substantiate this common-sense proposition.[158]

---

[153] Salkind Test., Trial Tr. July 11, 2019, at 73–76.

[154] Schwartz Test., Trial Tr. Aug. 12, 2019, at 125.

[155] *See* Schwartz Test., Trial Tr. Aug. 12, 2019, at 128; Schwartz Test., Trial Tr. July 15, 2019, at 95–96; Salkind Test., Trial Tr. July 11, 2019, at 26 (opining that Plaintiff's pain was the combined result of the two attacks which aggravated his previously asymptomatic lumbar degenerative disc disease).

[156] *See* Gravette Test., Trial Tr. July 11, 2019, at 194–95.

[157] Bistrian Test., Trial Tr. Aug. 8, 2019, at 93.

[158] "[I]t is generally acknowledged that the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson. For a plaintiff to make out his cause of action in such a case,

172. In any event, moreover, the testimony of multiple experts did substantiate that proposition.

173. Dr. Schwartz explained that he concluded in his expert report that Plaintiff "suffered significant injures in the razor attack an[d] concussion grenade blast of October 12, 2006," and that "[a]ll subsequent attempts at treating his back pain . . . are as a direct consequence of the injuries suffered in that assault, . . . as there was no significant low back premorbid[ity]."[159]

174. Dr. Schwartz further explained that he concluded in his expert report that Plaintiff's back condition was "a direct consequence of the clinical cascade that ensued follow[ing] the second assault on Mr. Bistrian."[160]

175. Dr. Schwartz further explained that he determined in his expert report that:

> The detonation of the concussion device beneath his back, when [he] lay supine in the recreation pen, was of sufficient force to cause damage to the lumbar spine. His position at detonation ensure[d] that the blast effects were concentrated where they could do the most damage. The sudden elevation upward [and] the fall downward was almost as dangerous. . . . The complications of the interventional pain management procedures were consequent to the original injury.[161]

176. Dr. Schwartz clarified during his testimony that in his opinion, both the Northington assault and the Taylor assault contributed to Plaintiff's deteriorating back condition.[162]

---

therefore, the law requires that expert medical testimony be employed." *Hamil v. Bashline*, 392 A.2d 1280, 1285 (Pa. 1968) (citations omitted). Even medical causation that appears intuitively obvious may require expert testimony. *See Kravinsky v. Glover*, 396 A.2d 1349, 1354–55 (Pa. Super. Ct. 1979) (holding that the causation of the plaintiff's driving phobia, which began immediately after the car crash that was the subject of the suit, was not "such an obvious, natural, or probable result of the car collision that a trier of fact could determine causation without the aid of expert testimony"). Although it is not necessary to decide, as there is ample expert testimony in this case, the causal link between back pain and a stun munition explosion directly under one's back might be so obvious as not to require experts at all.

[159] Schwartz Test., Trial Tr. July 15, 2019, at 84.

[160] *Id.* at 85.

[161] *Id.* at 85–86.

[162] *Id.* at 86, 93, 95–99, 100–01.

Dr. Schwartz did not, however, disavow or disagree with any of the assessments in his expert report, which determined that the particular features of the stun munition explosion in the Taylor assault were apt to cause traumatic pathology like that experienced by Plaintiff and were likely an important cause of Plaintiff's ongoing condition.

177. After the initial recovery phase from the acute injuries Plaintiff sustained in the Taylor assault, Plaintiff's condition was relatively manageable for some time, slowly deteriorating over a period of years. Eventually, Plaintiff's physicians appropriately recommended more aggressive and invasive treatment options, one of which triggered a number of complications that produced further deterioration in Plaintiff's condition.

178. After Plaintiff was released from prison in 2009, his condition was relatively stable for several years, with chronic back pain that moderately interfered with his activities of daily living.

179. Plaintiff first sought care for his back outside prison in November 2010, when he saw Dr. Meciko Muharemovic, MD, at Hampton Medical Care.[163]

180. Dr. Muharemovic explained that during the period from 2010 to 2013, Plaintiff's condition did not change much. He had "chronic back pain" that was "basically lingering" and "needed pain management."[164]

181. Plaintiff was able to sustain a moderate level of physical activity during approximately that same period. For example, he exercised daily, including going for long walks each morning, and he occasionally played tennis and golf.

---

[163] P-298 (Muharemovic Dep.) at 13.

[164] *Id.* at 83.

182. Also during that period, Plaintiff began taking prescription pain medication, Percocet, for back pain.[165]

183. The Court finds Plaintiff's level of physical activity consistent with the kind and degree of back pain he self-reported and was treated for during that period, especially considering that Plaintiff was already taking prescription painkillers.

184. During that same time period, from approximately 2010-2013, Plaintiff also sought chiropractic treatment and acupuncture for back pain.[166]

185. Around January 2014, after Plaintiff had been off prescription pain medications for approximately 18 months,[167] Plaintiff sought new treatment for back pain, as his pain was no longer manageable in the absence of prescription pain medication.

186. Plaintiff was referred to Dr. Sathish Subbaiah, MD, for a surgical consult regarding his back pain.[168]

187. Dr. Subbaiah determined, based on his examination of Plaintiff and the results of a CT scan he ordered, that Plaintiff should undergo a course of epidural injections for back pain prior to any surgery.[169] Dr. Subbaiah referred Plaintiff to Dr. Juan Gargiulo, MD, of the East End Pain Center to pursue that course of treatment.[170]

188. Dr. Gargiulo is a physician who is board certified in pain management.[171]

---

[165] P-298 (Muharemovic Dep.) at 22; Bistrian Test, Trial Tr. July 10, 2019, at 24–25.

[166] P-169 at 1, 33, 39; G-328; G-339; Schwartz Test., Trial Tr. July 15, 2019, at 90; Bistrian Test., Trial Tr. Aug. 12, 2019, at 49–50

[167] *See infra* ¶¶ 219–32 (discussing Plaintiff's bouts of opioid dependence).

[168] Bistrian Test., Trial Tr. Aug. 7, 2019, at 95.

[169] *Id*. at 96.

[170] *Id.* at 95–96; P-297 (Gargiulo Dep.) at 33–34.

[171] P-297 (Gargiulo Dep.) at 22–25.

189. By the time of Plaintiff's first appointment with Dr. Gargiulo, Plaintiff was reporting that his level of physical activity had decreased as his pain continued to worsen.[172]

190. Dr. Gargiulo treated Plaintiff with a course of transforaminal epidural steroid injections intended to reduce nerve inflammation.[173]

191. Plaintiff experienced only mild improvement after the course of epidural injections.[174]

192. Because the epidural injections were mostly unsuccessful, Dr. Gargiulo recommended that Plaintiff undergo a discogram, a diagnostic procedure in which dye is injected into a disc between vertebrae in the spine to indicate whether the disc is intact or ruptured and to measure pressure inside the disc.[175]

193. The results of the discogram Dr. Gargiulo performed were consistent with the type and degree of pain Plaintiff was reporting.[176]

194. Based on the results of the discogram, Dr. Gargiulo recommended that Plaintiff undergo a manual disc decompression procedure.[177] Plaintiff underwent the disc decompression on May 30, 2014.[178]

195. In the days and weeks following the decompression procedure, Plaintiff developed worsening back pain and spasms with intermittent fevers, chills, and rigors.[179]

---

[172] P-223 at 1.

[173] P-297 (Gargiulo Dep.) at 34–36.

[174] P-223 at 2; *see* Bistrian Test., Trial Tr. July 10, 2019, at 28.

[175] P-297 (Gargiulo Dep.) at 64–65; Salkind Test., Trial Tr. July 11, 2019, at 23.

[176] *See* P-297 (Gargiulo Dep.) at 69–73.

[177] *Id.* at 79; P-223 at 2.

[178] P-223 at 2.

[179] P-183 at 1; *see* P-223 at 2–3.

196. Plaintiff returned to Dr. Gargiulo frequently over the eight weeks following the disc decompression procedure with worsening pain and spasms. Dr. Gargiulo performed trigger point injections for the severe acute pain and also prescribed narcotic pain medications including oxycodone, Valium, Percocet, and Soma.[180]

197. In July 2014, Plaintiff was admitted to Southampton Hospital with a high fever, symptoms of sepsis, and severe respiratory distress.[181]

198. CT scans taken in September 2014 showed destruction of bone and narrowing of the disc space in Plaintiff's spine and generally revealed changes since a January 2014 CT scan that were consistent with osteomyelitis.[182]

199. Blood work from September 2014 indicated an inflammatory process in Plaintiff's body.[183]

200. In October 2014, Plaintiff was evaluated for worsening back pain and recurrent chills and fever by Dr. Michael Henry, MD, an infectious disease physician at the Hospital for Special Surgery in New York.[184]

201. At Dr. Henry's recommendation, Plaintiff underwent a biopsy of the L2-L3 disc, the suspected location of an infection resulting from the discogram procedure. The biopsy was positive for a bacterial infection of the bone.[185] Plaintiff was diagnosed with discitis and osteomyelitis.[186]

---

[180] P-223 at 2–3.

[181] P-186 at 18.

[182] P-229 at 5–6; P-254A; Ingerman Test., Trial Tr. July 12, 2019, at 15–16; Schwartz Test., Trial Tr. July 15, 2019, at 19–23.

[183] P-253A; Schwartz Test., Trial Tr. July 15, 2019, at 17–19.

[184] P-302 (Henry Dep.) at 12–13, 17–19; P-93 at 1–4.

[185] P-93 at 4; P-302 (Henry Dep.) at 33–34; Ingerman Test., Trial Tr. July 12, 2019, at 20–21.

[186] P-93 at 4; *see also* Ingerman Test., Trial Tr. July 12, 2019, at 24–25.

202. Osteomyelitis is an infection of the bone. It is "excruciatingly painful," producing a "dramatic" increase in pain over a patient's baseline pain level.[187] Discitis is an infection of the disc space.[188] Plaintiff's experts, including Plaintiff's infectious disease expert, Dr. Mark Ingerman, MD, concurred in these diagnoses.

203. Plaintiff's discitis and osteomyelitis were most likely caused by the decompression procedure performed by Dr. Gargiulo.[189]

204. Dr. Henry treated Plaintiff with a six-week course of intravenous antibiotics administered through a percutaneous line implanted during an ultrasound-guided procedure.[190]

205. Plaintiff experienced some improvement after that course of treatment, but the severe pain recurred about six months later.[191] Dr. Henry determined that Plaintiff had likely experienced a relapse of osteomyelitis.[192]

206. In July 2015, Plaintiff underwent another six-week course of intravenous antibiotics to treat the osteomyelitis recurrence, including the antibiotic daptomycin.[193]

207. This triggered a further complication: In the months following the second course of antibiotics, Plaintiff was readmitted to Southampton Hospital on several occasions for

---

[187] Salkind Test., Trial Tr. July 11, 2019, at 24–26.

[188] Ingerman Test., Trial Tr. July 12, 2019, at 24–25.

[189] P-93 at 10–11; Salkind Test., Trial Tr. July 11, 2019, at 23–26.

[190] P-245A at 17–18; P-302 (Henry Dep.) at 41–42; Schwartz Test., Trial Tr. July 15, 2019, at 27–28.

[191] P-93 at 15.

[192] Id. at 15–16.

[193] Id. at 15–16, 19; P-302 (Henry Dep.) at 86–92.

high fevers.[194] The presumed diagnosis was daptomycin-induced pneumonitis, with which Plaintiff's experts concurred.[195]

208. Dr. Schwartz opined that Plaintiff suffers from peripheral neuropathy, which was likely caused by the daptomycin administered to treat his osteomyelitis infection.[196] Peripheral neuropathy is a disease of the smaller nerves of the arms and legs causing diffuse loss of sensation to the extremities.[197]

209. The Court credits Dr. Schwartz's opinion, which was based on his objective findings after a second examination of Plaintiff in early 2019.[198]

210. Peripheral neuropathy caused by daptomycin is a permanent clinical finding; Plaintiff will not recover from these symptoms.[199]

211. About a year after the 2015 daptomycin treatment, Plaintiff underwent a spinal surgery "to debride the area and . . . relieve the nerve entrapment inflammation."[200]

212. The surgery confirmed the diagnosis of discitis/osteomyelitis because the surgeon, Dr. Andrew White, MD, noted the presence of an abscess and necrotic bone.[201]

213. Chronic osteomyelitis can only be cured by amputation. Amputation is impossible when the infection is located in the spine.[202]

---

[194] P-186 at 18.

[195] P-180 at 1; D-159 at 3–7; Schwartz Test., Trial Tr. July 15, 2019, at 81.

[196] Schwartz Test., Trial Tr. July 15, 2019 at 48–49.

[197] *Id.* at 43–44.

[198] *Id.* at 41–45.

[199] *Id.* at 58.

[200] Ingerman Test., Trial Tr. July 12, 2019, at 27.

[201] *Id.* at 27–31; P-237 at 285–86.

[202] Ingerman Test., Trial Tr. July 12, 2019, at 31–32.

214. Instead, Plaintiff's condition will require lifetime suppressive antibiotic therapy to control his infections and fevers.[203]

215. These cascading complications—the infection itself, which necessitated antibiotic treatment, which in turn caused the peripheral neuropathy—were the result of the decompression procedure, which was medically reasonable and necessary to relieve Plaintiff's underlying back pain.[204] The underlying back pain was the direct result of the traumas Plaintiff suffered in both the Northington and Taylor assaults.

216. The Taylor assault was a substantial factor in causing not only the acute back pain Plaintiff suffered in the weeks and months after the assault, but also the "cascade" of complications that resulted when he attempted to have it treated after his release.

217. Plaintiff has required extensive medical care in the past to treat and manage his chronic pain and its follow-on complications caused by the Taylor assault, including chiropractic care; pharmaceutical pain management; orthopedics; non-invasive and invasive pain management procedures; emergency room visits; hospital admissions; diagnostic testing and imaging; recurrent intravenous antibiotic therapy; infectious disease care; neurological care; and surgery.[205]

218. In the future, Plaintiff will require further medical care to treat and manage his chronic pain and its follow-on complications caused by the Taylor assault, including medical care provided by pain management specialists, orthopedists, neurosurgeons, infectious disease specialists, and physiatrists, among other specialists; therapeutic modalities,

---

[203] P-253 at 419; Ingerman Test., Trial Tr. July 12, 2019, at 36–37; Salkind Test., Trial Tr. July 11, 2019, at 24; Schwartz Test., Trial Tr. July 15, 2019, at 58.

[204] *See* Salkind Test., Trial Tr. July 11, 2019, at 27.

[205] *See supra* ¶¶ 179–214; *see also* Masterson Test., Trial Tr. July 16, 2019, at 148; P-134 at 4–9, 11–33.

including physical therapy; appropriate adaptive equipment, including adaptive

transportation equipment; diagnostic testing and laboratory studies; emergency room

visits; hospital admissions; part-time assistance by a personal care attendant; and

potential assisted living residential placement.[206]

### iii.    Opioid Dependence

219.  Sometime after Dr. Muharemovic first prescribed Percocet, Plaintiff developed opioid

dependency.[207]

220.  For a period of time, Plaintiff was treated by a dentist and prescribed Percocet.[208]

221.  Dr. Muharemovic referred Plaintiff to Dr. Shawn Cannon, MD, an internal medicine

physician whose practice focuses on treating patients with opioid dependence.[209]

222.  Dr. Cannon treated Plaintiff's opioid dependence with a suboxone regimen.[210]

223.  As part of his treatment with Dr. Cannon, Plaintiff saw Dr. James Sherwood, Ph.D., for

mental health treatment related to his opioid dependence.[211]

224.  During and after treatment with Dr. Cannon and Dr. Sherwood, it appears Plaintiff did

not use narcotic pain medications for a period of twelve to eighteen months.[212]

---

[206] Masterson Test., Trial Tr. July 16, 2019, at 149–63; P-134 at 10, 39–52.

[207] Bistrian Test., Trial Tr. Aug. 7, 2019, at 161-163.

[208] *Id.* at 95.

[209] *Id.* at 148; *see also* P-298 (Muharemovic Dep.) at 51.

[210] Bistrian Test., Trial Tr. Aug. 7, 2019, at 95, 97–98; *see also* P-296 (Sherwood Dep.) at 17–18; *see generally* G-305(records related to Plaintiff's controlled substance prescriptions and suboxone treatment), G-306 (same).

[211] P-296 (Sherwood Dep.) at 13, 17–18.

[212] Bistrian Test., Trial Tr. Aug. 12, 2019, at 85; *see also* P-296 (Sherwood Dep.) at 65–66; P-223 at 1 (recounting a timeline that indicates that Plaintiff was not on narcotic pain medications when he first came to Dr. Gargiulo).

225. Dr. Gargiulo wrote Plaintiff multiple prescriptions for a variety of narcotic pain medications after the disc decompression procedure,[213] which had dramatically increased Plaintiff's level of back pain.

226. By early 2015, Plaintiff was again taking large amounts of a number of narcotic pain medications daily.[214] He returned to Dr. Cannon for another round of suboxone treatment.[215]

227. By March 2016, Plaintiff was again taking large amounts of narcotics, this time prescribed by Dr. Ralph Gibson, MD.[216]

228. At several points throughout Plaintiff's treatment for back pain, Plaintiff has been addicted to narcotic pain medications.

229. It is unclear to the Court, on this record, whether Plaintiff may have been filling prescriptions for narcotic pain medications during periods where he was purportedly being treated for addiction with suboxone.[217]

230. The only possible relevance of that finding, if such a finding could be made, would be as a reflection on Plaintiff's credibility as a historian of his own health.[218]

231. Even if it is true that Plaintiff is not a perfectly reliable historian of his own health, however, the Court relies hardly at all on Plaintiff's own testimony in finding that he

---

[213] P-223 at 2.

[214] P-223 at 116.

[215] G-306-J; *see also* P-223 at 116.

[216] Bistrian Test., Trial Tr. Aug. 7, 2019, at 98–99; P-299 (Gibson Dep.) at 15–18, 33–34.

[217] *See* United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] ¶¶ 289–98.

[218] *See also id.* ¶¶ 274–88, 299–322. The government asks the Court to find that Plaintiff has "significant credibility deficits" because, among other things, he allegedly asked one physician to add to or change medical records for litigation purposes; because some symptoms Plaintiff claimed to have reported to certain physicians are missing from those physicians' records; because of inconsistencies in his account of his shoulder pain; because Plaintiff once admittedly omitted information from a BOP form to avoid being sent to a different facility; and because Plaintiff previously pled guilty to two counts of wire fraud. *See id.*

did indeed experience a "cascade" of complications, directly resulting from the negligence of the officers at the FDC, that caused him excruciating back pain.[219]

232. Plaintiff is not malingering. Rather, the overwhelming weight of the credible, reliable evidence shows that Plaintiff's reported pain levels are consistent with clinical observations.[220]

     *iv.*    *Shoulder Injury*

233. Plaintiff testified that he suffered a dislocated left shoulder in the Taylor assault.[221]

234. Plaintiff attributes some or all of his chronic shoulder pain to the Taylor assault.[222]

235. Plaintiff injured his shoulder playing college football, requiring surgery.[223]

236. In 2005, before the Northington and Taylor assaults, Plaintiff had complained to his family that his shoulder was bothering him.[224]

237. Plaintiff's shoulder was also injured in the Northington assault.[225] Plaintiff popped his shoulder back in by running up against a cement wall.[226]

---

[219] Similarly, any probative value in Plaintiff's criminal conviction for wire fraud, *see Bistrian v. Levi*, No. 08-3010, 2019 WL 8888190, at *2 (E.D. Pa. June 28, 2019) (ruling for purposes of the *Bivens* trial), is diminished by the substantial corroboration of Plaintiff's testimony in the opinions of the experts and in the objective evidence. While the issue of Plaintiff's credibility was hotly contested by the parties, the Court has found it almost entirely unnecessary to simply take Plaintiff at his word.

[220] Schwartz Testimony, Trial Tr. Aug. 12, 2019, at 125; Salkind Test., Trial Tr. July 11, 2019, at 37 ("[I]n [Plaintiff's] particular case, there was a clear cut correlation between the complaints, the objective findings, the diagnostic studies, all correlated in Mr. Bistrian's case.").

[221] Bistrian Test., Trial Tr. Aug. 7, 2019, at 53; *see also* Plaintiff's Proposed Findings of Fact and Conclusions of Law [Doc. No. 478] ¶ 137.

[222] Plaintiff's Proposed Findings of Fact and Conclusions of Law [Doc. No. 478] ¶ 132–64.

[223] Bistrian Test., Trial Tr. Aug. 8, 2019, at 84.

[224] *Id.* at 85–86.

[225] *Id.* at 86.

[226] *Id.*

238. There are no records of Plaintiff complaining of shoulder pain after the Taylor assault; instead, his contemporaneous medical requests concerned his lacerations and back pain and, perhaps, his psychological state.

239. Unlike the Northington assault, in which Plaintiff's attackers repeatedly kicked him in the shoulder, there was little evidence of any specific trauma to the shoulder in the Taylor assault.

240. Dr. Schwartz opined that the Taylor assault exacerbated Plaintiff's shoulder injury, but allowed that in rendering his opinion he was primarily focused on Plaintiff's back and legs and "not so much" on Plaintiff's shoulder.[227]

241. Dr. Schwartz was unaware of Plaintiff's significant history of shoulder injury. Because Dr. Schwartz's opinion as to the shoulder injury in particular was not based on complete information, the Court does not credit it.

242. Plaintiff has not met his burden of showing that the Taylor assault was a substantial factor in causing or exacerbating his shoulder injury.

     *v.   Hearing Damage*

243. Plaintiff testified that he suffered a substantial or total loss of hearing in the Taylor assault.[228]

244. During the *Bivens* trial, Plaintiff testified that his hearing loss began when he was kicked in the head during the Northington assault.[229]

245. No expert witness has opined as to the cause of Plaintiff's hearing loss.

---

[227] Schwartz Test., Trial Tr. Aug. 12, 2019, at 112–13.

[228] Bistrian Test., Trial Tr. Aug. 7, 2019, at 53.

[229] Bistrian Test., Trial Tr. July 10, 2019, at 60.

246. Plaintiff has the burden to show that it was more likely than not that his hearing loss was caused by the Taylor assault.

247. Plaintiff cannot meet the burden of showing medical causation without expert testimony.

248. This is particularly so when Plaintiff himself has offered earlier, contradictory explanations of causation.

249. No expert has testified that Plaintiff's hearing was damaged in the Taylor assault.

250. So far as the record reflects, the damage to Plaintiff's hearing is consistent with multiple possible causes, including aging and family history.

251. Plaintiff has failed to meet his burden of showing that the Taylor assault was a substantial factor in causing or exacerbating his hearing loss.

    vi.   *Emotional and Psychological Harm*

252. After the Northington assault, Plaintiff's mental health was compromised. The Northington attack and the stress of confinement in the SHU "weakened Mr. Bistrian's resilience to further stress" and "predisposed him" to an intensified psychological response to additional trauma.[230]

253. The Court finds that the Taylor assault, which lasted for over two and a half minutes and was halted only when a stun munition exploded underneath Plaintiff, is a trauma sufficient to cause post-traumatic stress disorder ("PTSD").[231]

254. As a direct result of the Taylor assault, Plaintiff suffered serious emotional and psychological injuries, including PTSD.

---

[230] Weiss Test., Trial Tr. Aug. 8, 2019, at 187–90.

[231] *Id.* at 184–85 (testifying that video of the Taylor attack showed it to be "quite congruent with the degree of stress that would constitute a psychic trauma under [psychiatric] criteria")

255.   Plaintiff's daughter testified that when she visited him after the Taylor assault, she found that he was "so frightened" and "didn't feel protected."[232]

256.   In early 2008, Dr. Edulfo Gonzalez, MD, a staff psychiatrist at the FDC,[233] assessed Plaintiff while he was still incarcerated as having depression, anxiety, and PTSD. Specifically, Dr. Gonzalez made a note that Plaintiff's PTSD was associated with having been "attacked by another [inmate]."[234]

257.   Dr. Sherwood, whom Plaintiff saw for mental health treatment in conjunction with his addiction treatment, diagnosed Plaintiff as having PTSD.[235]

258.   The Court finds the testimony of Dr. Kenneth Weiss, MD, Plaintiff's expert in psychiatry and forensic psychiatry, credible. Dr. Weiss's opinions were fully informed after thoroughly reviewing the relevant information.[236]

259.   Dr. Weiss opined that Plaintiff met the criteria for a diagnosis of PTSD.[237]

---

[232] Karsch Test., Trial Tr. Aug. 7, 2019, at 12.

[233] G-70 at 3.

[234] P-52 at 4 ("A[ssessment]—depression/anxiety/PTSD (attacked by another I/M)[.]"); *see* P-291 (Reynolds Dep.) at 27–28. The Court understands this note as referring to the Taylor assault, which had one perpetrator, rather than the Northington assault, which had three perpetrators. As the government has repeatedly emphasized, references in medical documentation to an assault by multiple inmates or a group of inmates likely refer to the Northington assault, while references to a single inmate likely refer to the Taylor assault. *See, e.g.*, United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] ¶¶ 223, 225–26.

[235] P-296 (Sherwood Dep.) at 34–39.

[236] Weiss Test., Trial Tr. Aug. 8, 2019 at 121–22, 180–81.

[237] Weiss Test., Trial Tr. July 16, 2019, at 10, 13–14, 20–27. The government asks the Court to conduct its own independent review of the diagnostic criteria for PTSD and to find that they are not met in Plaintiff's case. *See* United States' Proposed Findings of Fact [Doc. No. 484] at ¶¶ 323–56. Given that qualified experts retained by both parties opined on this exact issue—whether Plaintiff meets the diagnostic criteria for PTSD—the Court finds it more appropriate to evaluate the reliability of those experts' opinions than to attempt to conduct its own diagnostic analysis. *See supra* note 158157; *see also Borman v. Raymark Industries*, 960 F. 2d 327, 333 (3d Cir. 1992) (quoting *Martin v. Owens-Corning Fiberglass Corp*., 528 A.2d 947, 950 (Pa. 1987)) (stating that a lay person's "common sense and common experience . . . do not serve as substitutes for expert guidance," and it is therefore improper to disregard such expert testimony when deciding the facts of a case).

260.   Dr. Weiss opined that the traumatic assaults Plaintiff experienced at the FDC were the cause of his PTSD.[238]

261.   Dr. Weiss specifically opined that Plaintiff's PTSD was "made worse by the Taylor attack."[239]

262.   Dr. Weiss noted that five physicians other than himself had evaluated Plaintiff and had also reached the conclusion that he suffered from depression and PTSD as a result of the traumatic assaults.[240]

263.   Dr. Weiss testified that he and other physicians had witnessed Plaintiff becoming "emotional, mostly in the direction of sad mood."[241]

264.   The Court rejects Dr. Barbara Ziv, MD's testimony in this case as not credible and thus unreliable.[242]

265.   According to Dr. Ziv, the majority of the population experiences trauma, depression, and anxiety.[243] Yet most of these people do not have PTSD, which requires, not just one traumatic experience, but repeated trauma "over a longer period of time."[244] In

---

[238] Weiss Test., Trial Tr. July 16, 2019, at 14.

[239] Weiss Test., Trial Tr. Aug. 8, 2019, at 173.

[240] Weiss Test., Trial Tr. July 16, 2019, at 15–17.

[241] Weiss Test., Trial Tr. Aug. 8, 2019, at 128–29.

[242] Before trial, the Court issued an *in limine* ruling precluding parts of Dr. Ziv's testimony. *Bistrian v. Levi*, 443 F. Supp. 3d 576 (E.D. Pa. 2019). That ruling precluded Dr. Ziv from testifying that she believed Plaintiff was a malingerer for a number of reasons, including that "[a] doctor cannot pass judgment on the [examinee's] truthfulness in the guise of a medical opinion, because it is the jury's function to decide credibility." *Id.* at 579 (quoting *Coney v. NPR, Inc.*, 312 F. App'x 469, 474 (3d Cir. 2009)). The Court permitted Dr. Ziv to testify as to her assessment that Plaintiff does not have PTSD. *Id.* 579–80. The Court noted that Plaintiff "object[ed] to her testimony relating to PTSD as being overly dependent on her opinion that [Plaintiff] is a malingerer," but ruled that "*to the extent* that Dr. Ziv's opinion as to PTSD is based on her assessment that Plaintiff does not display certain symptoms or respond to memories of the events in question in a manner consistent with someone with PTSD, it is proper expert testimony." *Id.* at 580.

[243] Ziv Test., Trial Tr. July 22, 2019, at 84–85.

[244] *Id.* at 86.

sum, "PTSD is not just having something bad happen. It is a change in your brain chemistry."[245]

266. In concluding that Plaintiff does not have PTSD, Dr. Ziv inaccurately minimized Plaintiff's traumatic experiences at the FDC. Dr. Ziv's conclusion that these experiences are comparable to the general stress, anxiety, and depression experienced by 90% of the population is not credible.[246]

267. Dr. Ziv's testimony appeared to suggest that she disagreed with the official diagnostic criteria for PTSD in the DSM-V, the most current version of the DSM, as well as that she is generally skeptical of PTSD as a diagnosis.[247] As a result, it was not always clear whether Dr. Ziv was opining that Plaintiff did not meet the official diagnostic criteria for PTSD or whether she was opining that Plaintiff did not meet her personal, heightened criteria for PTSD.

268. Parts of Dr. Ziv's testimony with respect to PTSD crossed the line into an area the Court had specifically precluded, to wit, whether Plaintiff is a malingerer. For example, while Dr. Ziv was permitted to testify that in her opinion Plaintiff did not experience negative thoughts, which was inconsistent with a diagnosis of PTSD, she was not permitted to testify that the purported absence of negative thoughts was attributable to Plaintiff being a generally "grandiose" person who was "over-the-top in his self-appraisal."[248] Because her testimony sometimes shaded into these specifically precluded areas, the Court must take her opinions with a grain of salt.

---

[245] *Id.* at 87.

[246] *See id.* at 83–85, 112.

[247] *See id.* at 83–85, 92–93.

[248] *Id.* at 109–10.

269. Dr. Ziv's account of the interview she conducted with Plaintiff particularly calls into question the credibility of her opinions.

270. Dr. Ziv testified that she did not observe any signs of emotional distress on Plaintiff's part during the interview.[249]

271. Yet a paralegal from Plaintiff's counsel's law firm, who was present at this meeting, had a much more specific recollection of Plaintiff's demeanor. According to her, she "witnessed Peter cry on, I'd say over a dozen times. Sometimes so emotionally that he couldn't go on." He was in physical discomfort during these meetings, often having to "stand up, shift in his chair, ask if he could move around a little bit."[250]

272. Dr. Ziv's testimony also indicated that she placed particular reliance on the reports of Dr. Andrea Boardman, Ph.D., the FDC's chief psychologist, and on her belief that Plaintiff never reported any distress or symptoms consistent with PTSD to Dr. Boardman while at the FDC.[251]

273. The Court finds, however, that Dr. Boardman's interactions with Plaintiff were too negligible to be relied upon and that it is highly questionable that Plaintiff never alerted Dr. Boardman that he was in distress.

274. As chief psychologist at the FDC, Dr. Boardman's main "area of clinical responsibility was the Special Housing Unit."[252]

---

[249] *Id.* at 97.

[250] Blair Test., Trial Tr. July 22, 2019, at 163–64.

[251] Ziv Test., Trial Tr. July 22, 2019, at 103.

[252] Boardman Test., Trial Tr. Aug. 8, 2019, at 24.

275. According to Dr. Boardman, FDC policy required that she make regular rounds of the SHU and "engage every inmate" to find out whether "they had an interest" in having a private meeting with her.[253]

276. Dr. Boardman's rounds consisted of approaching each cell and asking the inmate through the "grill" in the door whether they would like to speak with her.[254] During these rounds, Dr. Boardman was frequently accompanied by ten to twelve other FDC staff who could all hear any conversation she might have with an inmate.[255]

277. Defense counsel questioned Dr. Boardman about Plaintiff's deposition testimony asserting that Dr. Boardman's rounds were "like a joke" because she would ask inmates only a single question: "Are you okay?"[256] In her testimony, Dr. Boardman appeared to agree that, unless an inmate specifically requested psychological follow-up, she would merely ask, "Are you okay?" and move on.[257]

278. In fact, however, the governing regulations required BOP staff to "conduct a psychiatric or psychological assessment, *including a personal interview*, when administrative detention continues beyond 30 days."[258]

---

[253] *Id.* at 25.

[254] *Id.* at 25–26.

[255] *Id.* at 35–36.

[256] *Id.* at 27–30.

[257] *Id.* at 30–31.

[258] 28 C.F.R. § 541.22(c) (2006) (emphasis added); *see also Dixon v. Zenk*, No. 05-3127, 2008 WL 2437841, at *6 (E.D.N.Y. June 16, 2008) (referring to the government's interpretation of the "personal interview" requirement as being satisfied by assessments conducted through the cell door as a "strained reading of the regulation," but concluding that the personal interview requirement of the regulation, unlike the periodic review of administrative segregation status, was not part of the protected due process liberty interest).

279.  Dr. Boardman testified that she believed the "personal interview" requirement was fully satisfied by her weekly rounds consisting of a single question.[259]

280.  The Court does not find credible Dr. Boardman's hairsplitting distinction between a "clinical interview," which could not be satisfied by asking a single question through a cell door, and a "personal interview," which supposedly could be satisfied in that cursory manner.[260]

281.  Dr. Boardman's rounds, as she described them, were wholly inadequate to identify inmates in distress, and to the extent that Dr. Ziv relied on the absence of self-reported distress in these single-question "interviews," Dr. Ziv's conclusions are themselves questionable at best.

282.  Dr. Boardman also testified that she did not recall any occasion during Plaintiff's time in the SHU when he needed or requested psychological services.[261] That directly contradicts both Plaintiff's own recollection—that he stated he was not okay on "more than ten" occasions[262]—and the evaluations of FDC psychiatrists *and* independent psychiatrists who evaluated Plaintiff during his time in the SHU.[263]

283.  Moreover, even if Plaintiff never responded to Dr. Boardman's inquiry of "Are you okay?" with a request for further psychological services, that is not an indication that Plaintiff was not in distress—instead, it is entirely credible that he may have felt requesting mental health treatment under these circumstances was futile.[264]

---

[259] Boardman Test., Trial Tr. Aug. 8, 2019, at 39–42.

[260] *See id.* at 39–40.

[261] *Id.* at 27–30.

[262] *Id.* at 28–29.

[263] Weiss Test., Trial Tr. July 16, 2019, at 15–17.

[264] Weiss Test., Trial Tr. Aug. 8, 2019, at 193–94.

284. Further, Dr. Boardman initially testified that she was not present at the Taylor assault, but a contemporaneous memorandum she wrote showed that she responded to the assault while it was in progress and witnessed the pepper spray and stun munition being deployed.[265]

285. These contradictions regarding whether Dr. Boardman was present at the Taylor assault and whether Plaintiff ever indicated that he needed mental health services cast further doubt on the reliability of Dr. Boardman's reports and testimony and, to the extent that Dr. Ziv relied on Dr. Boardman's reports and impressions, on the reliability of Dr. Ziv's opinions.

286. Moreover, in relying on Dr. Boardman's conclusions, Dr. Ziv appeared to embellish Dr. Boardman's own accounts of her "interviews" of Plaintiff. For example, when asked whether Dr. Boardman's cursory and infrequent interviews were an adequate basis to evaluate Plaintiff's condition, Dr. Ziv speculated that Dr. Boardman "could have" also interacted with Plaintiff beyond the limited interactions in the SHU that Dr. Boardman had recorded, even though Dr. Boardman specifically testified that she did not recall ever interacting with Plaintiff beyond her single-question "interviews" and "exchang[ing] pleasantries."[266] To the extent that Dr. Ziv rested her conclusions on speculation about how much Plaintiff and Dr. Boardman could theoretically have interacted, that casts further doubt on the reliability of Dr. Ziv's opinions.

287. The Taylor assault was a substantial factor in causing Plaintiff's PTSD. The Northington assault was also a substantial factor in causing Plaintiff's PTSD.

---

[265] Boardman Test., Trial Tr. Aug. 8, 2019, at 31–34.

[266] Ziv Test., Trial Tr. July 22, 2019, at 136; Boardman Test., Trial Tr. Aug. 8, 2019, at 43.

288.   Plaintiff has required psychological and counseling services in the past to treat and manage his PTSD caused by the Taylor assault.

289.   In the future, Plaintiff will require further psychological and counseling services to treat and manage his PTSD caused by the Taylor assault.[267]

### vii.    Plaintiff's Professional and Personal Life After Prison

290.   During the period from 2009-2013, Plaintiff maintained a good relationship with his parents.[268]

291.   During this time period, Plaintiff rebuilt his relationships with his children.[269]

292.   During this time period, Plaintiff met and married his wife, Michelle.[270]

293.   During this time period, Plaintiff was briefly employed at Health Management Concepts, a company owned by a family friend.[271]

294.   Plaintiff's efforts to resume a normal life and repair his family connections are not evidence that he was not in pain or suffering from mental illness.

295.   Plaintiff's periodic lapses in treatment are not evidence that he is malingering.[272] The Court finds that these lapses were often due to factors beyond Plaintiff's control, including financial limitations and concerns about the perceived or actual skill of his physicians.[273] Moreover, any inability on Plaintiff's part to manage the logistics of maintaining continuous care for multiple complex medical conditions strikes the Court

---

[267] Masterson Test., Trial Tr. July 16, 2019, at 150.

[268] Bistrian Test., Trial Tr. July 10, 2019, at 51; Ziv Test., Trial Tr. July 22, 2019, at 102; Bistrian Test., Trial Tr. Aug. 12, 2019, at 48.

[269] Weiss Test., Trial Tr. Aug. 8, 2019, at 135.

[270] Bistrian Test., Trial Tr. Aug. 7, 2019, at 91; Weiss Test., Trial Tr. Aug. 8, 2019, at 135.

[271] Bistrian Test., Trial Tr. Aug. 12, 2019, at 66, 70, 130–31.

[272] Weiss Test., Trial Tr. Aug. 8, 2019, at 163–164, 190–193.

[273] Id. at 195–96.

as entirely consistent with depression, PTSD, and limited functioning due to chronic pain.

296.   Plaintiff's attempts to obtain a book deal are not evidence that he does not have PTSD.[274]

    *viii.*    *Reasonable Value of Past and Future Costs of Care*

297.   Plaintiff has incurred $251,340.81 in reasonable and necessary past costs of care caused by the Taylor assault.

298.   Plaintiff will incur $1,000,000.00 in reasonable and necessary future costs of care caused by the Taylor assault.

299.   Plaintiff has endured past pain and suffering and will suffer from pain and loss of life's pleasures in the future.

## II.   CONCLUSIONS OF LAW

### A.  The Federal Tort Claims Act

The Federal Tort Claims Act ("FTCA") waives the sovereign immunity of the United States where negligent or wrongful acts or omissions of government employees, acting within the scope of their employment, cause injury to others.[275] The FTCA "provides a mechanism for bringing a state law tort action against the federal government in federal court."[276] "[T]he extent of the United States' liability under the FTCA is generally determined by reference to state

---

[274] *Id.* at 130–32, 196–97.

[275] 28 U.S.C. § 1346(b)(1). This Court has jurisdiction over Plaintiff's FTCA claims based on a federal question under 28 U.S.C. § 1331 and pursuant to 28 U.S.C. § 1346(b) because the claims arise from personal injuries allegedly caused by the negligence of federal employees while acting within the scope of their employment. *Imbrenda v. United States*, No. 07-3663, 2008 WL 879857, at *5 (E.D. Pa. Mar. 8, 2008). Venue is proper pursuant to 28 U.S.C. § 1402(b). *Seidman v. United States*, No. 95-6995, 1996 WL 421905, at *2 (E.D. Pa. July 24, 1996).

[276] *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 264 F.3d 344, 362 (3d Cir. 2001).

law."[277] As a result, the Pennsylvania law of torts controls this action, and the liability of the United States is to be determined under Pennsylvania law as though the government were a private party.[278]

"To prevail under Pennsylvania negligence law, a plaintiff must show a duty, breach of duty, actual loss or harm, and a causal connection between the breach and the harm."[279] The government's duty of care in cases involving federal prisoners is one of ordinary diligence.[280] More specifically, the correctional institution's duty to a federal inmate is "to exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by [the government]."[281]

### B. The Government was Negligent and the Discretionary Function Exception Does Not Shield It from Liability

#### i. The Discretionary Function Exception

The FTCA waives sovereign immunity for claims related to injuries "caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment."[282] This waiver, however, does not apply to claims based upon the performance of, or failure to perform, a discretionary function.[283] The government has

---

[277] *Id.* (quoting *Molzof v. United States*, 502 U.S. 301, 305 (1992)).

[278] *See* 28 U.S.C. § 1346(b)(1); *Alston v. United States*, No. 02-1259, 2004 WL 764784, at *4 (E.D. Pa. Mar. 31, 2004).

[279] *Alston*, 2004 WL 674684, at *4 (citing *Redland Soccer Club, Inc. v. Dep't of the Army*, 55 F.3d 827, 851 n.15 (3d Cir. 1995)).

[280] *Harris v. Federal Bureau of Prisons*, 779 F. App'x 72, 74 (3d Cir. 2019); *Millbrook v. United States*, 8 F. Supp. 3d 601, 616 (M.D. Pa. 2014).

[281] *Turner v. Miller*, 679 F. Supp. 441, 443 (M.D. Pa. 1987) (quoting *Hossic v. United States*, 682 F. Supp. 23, 25 (M.D. Pa. 1987)) (emphasis omitted).

[282] 28 U.S.C. § 1346(b)(1).

[283] 28 U.S.C. § 2680(a).

the burden of proving the applicability of the discretionary function exception.[284] In determining whether the discretionary function exception applies, the Third Circuit has instructed courts to use the two-step *Mitchell* analysis.[285]

At step one, a court must determine whether the act giving rise to the alleged injury involved "an element of judgment or choice."[286] If a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," and the employee did not follow it, the discretionary function exception does not apply because the employee had no choice but to follow the directive.[287] If this is the case, the government is not immune from liability, and the inquiry is complete.

Where a specific course of action is not prescribed, the court at step two considers whether the action at issue "is of the kind that the discretionary function exception was designed to shield,"[288] which, in general, are actions and decisions based on public policy considerations.[289] The "focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis."[290] In other words, the discretionary function exception does not apply every time there is a choice between courses of action, but it immunizes from second-guessing decisions grounded in social, economic, and political

---

[284] *Cestonaro v. United States*, 211 F.3d 749, 756 n.5 (3d Cir. 2000) (quoting *Nat'l Union Fire Ins. v. United States*, 115 F.3d 1415, 1417 (9th Cir. 1997)).

[285] *Mitchell v. United State*s, 225 F.3d 361, 363-364 (3d Cir. 2000) (citing *United States v. Gaubert*, 499 U.S. 315, 322–323 (1991)).

[286] *Id*. at 363.

[287] *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)).

[288] *Id.* at 322–323 (quoting *Berkovitz*, 346 U.S. at 534).

[289] *Gray v. United States*, 486 F. App'x 975, 977 (3d Cir. 2012) (citing *S.R.P v. United States*, 676 F.3d 329, 333 (3d Cir. 2012)).

[290] *Gaubert*, 499 U.S. at 325.

policy.[291] Thus, at issue in step two is whether the purportedly negligent act was a product of a choice motivated by considerations of public policy. The Third Circuit has held that this analysis is "not a toothless standard that the government can satisfy merely by associating a decision with a regulatory concern."[292] Rather, the government must establish that the challenged conduct is "grounded in the policy of the regulatory regime," and "based on the purposes that the . . . regime seeks to accomplish."[293]

The Third Circuit has also noted that "if the discretionary function exception is given an overly broad construction, it could easily swallow the FTCA's general waiver of sovereign immunity and frustrate the purpose of the statute."[294] Therefore, "where the Government is aware of a specific risk and responding to that risk would only require the Government to take garden-variety remedial steps, the discretionary function exception does not apply."[295]

The Third Circuit has consistently ruled, however, that the discretionary function exception is especially expansive for prison officials and has rarely found that an officer's action was not grounded in public policy concerns or covered by what the exception was intended to protect. Correctional officers have broad discretion in the management of prisons, and as such, courts have given wide-ranging deference to prison officials' decisions when a policy does not prescribe a specific course of action because such "discretion is needed to preserve internal discipline and maintain institutional security."[296] Prison officials must constantly assess risks and

---

[291] *Gray*, 486 F. App'x at 977.

[292] *S.R.P.*, 676 F.3d at 336 (quoting *Cestonaro*, 211 F.3d at 755).

[293] *Id*. (quoting *Gaubert*, 499 U.S. at 325).

[294] *Id.* at 338.

[295] *Id.* at 340.

[296] *Donaldson v. United States*, 281 F. App'x 75, 77 (3d Cir. 2008) (citing *Bell v. Wolfish*, 441 U.S. 520, 547–548 (1979)).

prioritize them, tasks that "implicate social and public-policy considerations."[297] Moreover, assessing and resolving risks and protecting inmates must also always be balanced with inmates' rights, a crucial public policy consideration.[298] Even unwise and foolish correctional decisions may be matters of prison security which the discretionary function exception was meant to shield and immunize.[299]

> ii.     *Failure to Collect the Razor*

The policy governing the distribution and collection of razors in the SHU is set forth in a Post Order, an institution-specific document that institutes and implements BOP policy. The razor policy provides that:

> Officers are required to account for all razors utilized during the day. Razors will be inventoried via bin card to insure accountability.
>
> Officers will place a razor sign on the cell door of any inmate being issued a razor. Inmates will have 10 minutes to shave and return the razor. Officers will inspect the razor upon return to ensure the blade is still intact.[300]

In *Gray v. United States*, the Third Circuit held that the failure to retrieve a razor from an inmate at a prison was not a discretionary function.[301] In support, the Court pointed to the BOP "Program Statement 5217.01," which provides that each institution with a "Special Management Unit," as the facility at issue had, "will develop an Institution Supplement that addresses local

---

[297] *Alfrey v. United States*, 276 F.3d 557, 565 (9th Cir. 2002) (cited in *Donaldson*, 281 F. App'x at 78).

[298] *Graham v. United States*, No. 97-1590, 2002 WL 188573 at *4 (E.D. Pa. Feb. 5, 2002) (citing *Calderon v. United States*, 123 F.3d 947, 951 (7th Cir. 1997)).

[299] *See id.* (finding that the discretionary function exception applied to officers' "foolish" decision to allow inmates access to razor blades and violent films); *see also Rivera v. United State*s, No. 12-1339, 2013 WL 5492483 at *9–10 (M.D. Pa. Oct. 2, 2013) (arguing that officers' decision to not separate inmates in a rec pen and not to intervene immediately in the ensuing assault was covered by the discretionary function exception); *Green v. United States*, No. 94-5706, 1995 WL 574495 at *3–4 (E.D. Pa. Sept. 22, 1995) (finding that officers' decision to house an inmate accused of sexual assault together with another inmate was protected by the discretionary function exception); *see also Donaldson*, 281 F. App'x at 76–77.

[300] P-305 at 7; *see also* P-310 at 120–121.

[301] 486 F. App'x 975, 977–78 (3d Cir. 2012).

operations and procedures."[302] Such a Supplement was issued pursuant to this Program Statement, and it provided that "razors will be controlled by staff and that specific rules outlining procedures for showers are addressed in the SMU Handbook."[303] This Handbook, in turn, stated that an inmate will be issued a razor while showering if he wishes to shave, and "[a]ll razors will be accounted for and disposed of at the end of the shower."[304] The Third Circuit held that the language used prescribed a specific course of action that did not leave any room for the officers to utilize "any element of judgment or choice" when retrieving razors.[305]

The language of the razor policy here is even more specific than the language in *Gray*. The FDC's razor policy expands on the requirement that officers account for all razors by specifically prescribing the manner in which that accounting is to take place. Officers must indicate who has received a razor by placing a magnet on the cell door; they must inspect the razor upon collecting it to ensure it is intact; and, crucially, this must all take place within a ten-minute time frame that limits inmates' opportunity to tamper with or conceal razors. The mandatory language and specific instructions leave no room for discretion. It cannot be disputed that the razor policy is mandatory.

The government offers two arguments, as far as the Court can tell, in support of its contention that the ten-minute instruction was not a mandatory policy. First, it has appeared to argue that the language of the ten-minute rule is directed to inmates, not to correctional officers.[306] Second, it argues that the language of the rule sets a minimum allotment of time in

---

[302] *Id.* at 977.

[303] *Id.*

[304] *Id.* at 977–978.

[305] *Id.* at 978.

[306] *See* United States' Mem. Opp. Mot. for Adverse Inference [Doc. No. 424] at 30.

which inmates may shave, not a maximum that would require correctional officers to cut inmates off at precisely ten minutes.[307] Neither of these is a plausible construction of the plain text of the rule.

Regarding the first argument, the Third Circuit in *Gray* specifically rejected the argument that the Handbook only acted as a guide to the inmates at the institution.[308] That holding applies with even more force here, as the ten-minute rule appears in a post order—a document that sets out rules for correctional officers as they carry out their job duties—not in an inmate guide. Moreover, a defining feature of life as an inmate is a lack of control over one's environment and daily schedule; by definition, SHU inmates can only return a razor when a correctional officer comes around to their cell door and offers to collect it.

As to the second argument, the government's reading disregards the latter part of the sentence, which reads in full: "Inmates will have ten minutes to shave *and return the razor*." If the post order simply said, "Inmates will have ten minutes to shave," one might argue that the rule is ambiguous, setting either a floor or a ceiling—either the inmates will be guaranteed *no less than* ten minutes to shave, or the inmates will be required to complete their shaving *within* ten minutes. Instead, however, the rule's ten-minute time limit plainly covers both shaving and returning the razor—otherwise, the phrase "and return the razor" is left dangling, with no grammatical place in the sentence structure. In sum, the razor policy imposed a mandatory requirement that officers account for all razors issued by, among other things, collecting razors no more than ten minutes after distributing them.

---

[307] United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] at ¶¶ 9–11.

[308] 486 F. App'x at 978.

The officers' failure to adhere to the policy amounts to negligence. Through sheer carelessness, FDC officers breached their duty to collect the razor promptly at the end of the ten-minute limit on August 22, 2006, dramatically increasing Aaron Taylor's opportunity to conceal a razor.[309] Nor did they comply with the mandatory requirement to "account for all razors used during the day." When Taylor refused to return the razor, the record shows, the officers assumed he had flushed it and accordingly conducted a cursory "shakedown" that failed to find the razor that, according to Taylor himself, could readily have been discovered. The government is liable for that negligence, which proximately caused the assault on Plaintiff.[310]

> iii.    *Failure to Search Taylor Outside His Cell*

The policy governing searches of inmates is set forth in several BOP policy documents. FDC SHU policies mandated that "all inmates will be pat searched upon exiting their cell for any reason, *no exceptions*,"[311] and that "upon departing to and returning from outside recreation, inmates will be screened with a hand-held metal detector."[312] Moreover, BOP policies required officers to perform pat- and wand-searches in specific ways. BOP policy provided that "when using the hand-held metal detector, staff must closely check body cavity areas, i.e., mouth, nose, ear, rectum, and vagina."[313]  An FDC Philadelphia Post Order in effect at the time of the attack also instructed:

---

[309] P-303 at 38.

[310] Moreover, even if the Court were to credit Taylor's account—that he obtained the razor he used to attack Plaintiff when a correctional officer mistakenly gave him two razors and collected only one—the Court would still conclude that this was a violation of the mandatory policy that all razors be accounted for and a failure to exercise reasonable care, and would hold the United States liable.

[311] P-305 at 2; *see also* Griffiths Test., Trial Tr. Aug. 20, 2019, at 32-33 (stating that wand- and pat-searching inmates as they came out of their cells were not discretionary practices, but the decision to perform a *strip search* was discretionary and based on reasonable cause).

[312] P-28 at 14.

[313] *Id*. at 11.

Pat searches should be conducted by staff from behind the inmate in order to give staff an advantage in terms of protecting themselves. Before starting this type of search, the inmate should remove the contents of his pockets and remove his cap. The cap and personal effects removed from his pockets should be inspected, then the complete search should be conducted as follows:

A. Have the inmate face away from you with arms extended and his feet apart at least twelve inches.

B. Use both hands and start at the back of the head, follow a direct course across the back of the arms to the hands, then across the front of the arms to the shoulders.

C. Return your hands to the original starting position and cover the shoulders, back and sides to the belt line. Search the belt line, metal tip, pockets, and chest area.

D. From the back at the waistline, proceed down the back and sides of the legs to the shoe tops.

Check the shoe tops, trouser cuffs, socks and inside of the legs well up to the groin.[314]

Taken together, these policies implement a mandatory requirement that FDC officers pat-search all SHU inmates each time they are removed from their cells according to the particular procedure laid out by BOP, and that they wand-search all inmates going to and returning from recreation according to the particular procedure laid out by BOP. These policies are similar to search policies at other facilities that have been found to be mandatory. For example, a USP Lewisburg Special Post Order provided that "[a]ll inmates who are removed from the cell . . . are pat searched and have a hand-held metal detector ran [sic] over their bodies."[315] A district court considering that policy determined that the discretionary function exception did not apply and

---

[314] P-306 at 22; *see also* Griffiths Test., Trial Tr. Aug. 20, 2019, at 12–16 (explaining that the program statement was consistent with officers' practices and that officers would still check the belt line area of an inmate wearing a jumpsuit).

[315] *Schingler v. United States*, No. 13-1388, 2014 WL 980757, at *5 (M.D. Pa. Mar. 13, 2014) (alterations in original); *see also Rivera*, 2013 WL 5492483 at *6.

64

the government was not immune from liability for failure to adhere to those requirements.[316] Once again, the language here is even stronger and more specific than in that case. Just as the USP Lewisburg Special Post Order removed any element of judgment or choice, so do the SHU and BOP policies in question. The discretionary function exception therefore does not apply, and the government is not immune from liability stemming from the failure to search Taylor.

Based on the evidence in the record, and bolstered by the loss of other critical evidence that could have shown whether Taylor was properly searched,[317] the Court has determined that Taylor was not properly pat- and wand-searched in accordance with applicable mandatory BOP policy before being taken to the rec pen where he attacked Plaintiff. In other words, FDC officers breached their duty to make thorough searches of all inmates on their way to recreation as mandated by BOP and FDC policy.[318] This negligence proximately caused the assault on Plaintiff and is not protected by the discretionary function exception.

> iv. *Failure to Maintain an Accurate Razor Log*

The correctional officers' negligence in failing to accurately maintain a log of the razors they were distributing to each inmate in the SHU is protected by the discretionary function exception. There was no mandatory policy that required officers to keep an accurate log account of when razors were given out to inmates and collected.

Moreover, this negligent action is the type of behavior that the discretionary function exception was intended to shield.[319] The Court believes that the likely purpose of the ten-minute

---

[316] *Schingler*, 2014 WL 980757, at *5.

[317] Mem. Opinion [Doc. No. 459] at 25. Griffiths Test., Trial Tr. Aug. 20, 2019, at 28–29; Knox Test., Trial Tr. Aug. 12, 2019, at 167–68; Taylor Test., Trial Tr. Aug. 12, 2019, at 24–25.

[318] *See also Rich v. United States*, 811 F.3d 140, 146–47 (4th Cir. 2015) (holding that officers' failure to properly pat- and wand-search inmate who attacked fellow inmate in rec cage with makeshift knife would not be covered by the discretionary function exception and would, if proven, amount to negligence).

[319] *Gray*, 486 F. App'x at 977 (quoting *S.R.P.*, 676 F.3d at 333).

razor policy and log entry was to limit the opportunity for inmates to conceal and keep razor blades.[320] As such, the keeping of the log was rooted in institutional security and inmate safety concerns. Courts give broad deference to discretionary decisions, even admittedly "foolish" ones, that implicate prison security as these decisions are without a doubt grounded in policy considerations and must be immunized from second guessing.[321] Therefore, the discretionary function exception applies to the failure to accurately maintain a razor log, and the government is not liable on this issue.

> ### v.    Failure to Restrict Taylor's Access to Razors

Although it may have been "sound correctional management" to impose some sort of razor restriction status on Taylor, Plaintiff was unable to point to a mandatory policy that required officers to restrict razor access for inmates with a profile like Taylor's.[322] As there was apparently no prescribed course of action for officers to follow when determining if violent inmates with a history of razor attacks should be placed on razor restriction, the decision to give razors to Taylor passes the first prong of the *Mitchell* test.[323]

Moreover, the decision to place an inmate on razor restriction status—or not—is the kind of policy consideration courts have consistently held to be squarely within the discretionary function exception.[324] Restricting an inmate's access to razors implicates complex policy considerations of prison safety and inmates' rights.[325] Even if in the Court's judgment it would

---

[320] *See supra* ¶ 14.

[321] *Donaldson*, 281 F. App'x at 77, 78 (citing *Bell*, 441 U.S. at 547-548); *see also Graham*, 2002 WL 188573 at *4.

[322] *See* Gravette Test., Trial Tr. July 26, 2019, at 24–26.

[323] *Mitchell*, 225 F.3d at 363 (citing *Gaubert*, 499 U.S. at 322-323).

[324] *Donaldson*, 281 F. App'x at 77, 78; *see also Graham*, 2002 WL 188573 at *4.

[325] Knox Test., Trial Tr. Aug. 12, 2019, at 187 (stating that placing Taylor on razor restriction was not necessary because "inmates have rights . . . as well").

have been wise to restrict Taylor's access to razors given his recent history of razor assaults and other razor-related misconduct, the discretionary function exception immunizes that decision from liability.[326]

      vi.    *Decision to Place Taylor in Rec Pen with Plaintiff and to Restrain Taylor Last*

Like the decision to continue allowing Taylor access to razors, these decisions are covered by the discretionary function exception. There is no mandatory policy in this record prescribing a specific course of action concerning who could be placed in the rec pen together.[327] Nor was there, apparently, any customary practice or policy of cuffing inmates by order of assessed propensity for violence.[328] Moreover, decisions about which inmates to allow in the rec pen together and in what order to handcuff them are core discretionary decisions, requiring a weighing of institutional security and inmate safety concerns against inmates' rights to out-of-cell recreation and the potential benefits of social contact for isolated SHU inmates.[329] The discretionary function exception immunizes these kinds of judgments from liability and shields them from second-guessing, regardless of how seemingly unwise the decision may have been.[330] Courts have consistently ruled that the discretionary function exception applies to officers' decisions to place inmates in recreation together even if the two inmates were known to be in

---

[326] *Graham*, 2002 WL 188573 at *4 (finding that the discretionary function exception applied to officers' decisions to give inmates access to razors).

[327] *Cf. Mitchell*, 225 F.3d at 363 (citing *Gaubert*, 499 U.S. at 322-323).

[328] Griffiths Test., Trial Tr. Aug. 20, 2019, at 65.

[329] *See Rich*, 811 F.3d at 145–46 (noting that "other federal appellate courts have held that prisoner placement and the handling of threats posed by inmates against one another are 'part and parcel of the inherently policy-laden endeavor of maintaining order and preserving security within our nation's prisons,'" and concluding that the discretionary function exception applies to the decision to place two inmates in a recreation cage together).

[330] *Donaldson*, 281 F. App'x at 77, 78; *see also Graham*, 2002 WL 188573 at *4.

rival gangs or had threatened each other.[331] Thus, this decision is covered by the discretionary function exception.

### C.  Causation and Damages

Because the Court determines that the United States is not shielded from liability for the negligent failure to adhere to the razor and search policies, the remaining question of law is whether the Taylor assault was the legal cause of Plaintiff's damages and, thus, whether the United States may be liable for those damages that the Court has found Plaintiff suffered.

It is a fundamental principle of tort law that "an admittedly negligent act does not necessarily entail liability; rather even when it is established that the defendant breached some duty of care owed the plaintiff, it is incumbent on a plaintiff to establish a causal connection between defendant's conduct and the plaintiff's injury."[332] In other words, "the defendant's conduct must be shown to have been the proximate cause of plaintiff's injury."[333] Proximate cause "may be established by evidence that the defendant's negligent act or failure to act was a substantial factor in bringing about the plaintiff's harm."[334] "It is the plaintiff's burden to prove that the harm suffered was due to the conduct of the defendant. As in many other areas of the law, that burden must be sustained by a preponderance of the evidence."[335]

Because of the unusual context of this tort action—that Plaintiff suffered not one but two assaults while detained at the FDC—the parties dispute the applicable legal framework for the

---

[331] *See Rivera*, 2013 WL 5492483 at *9 (finding that the discretionary function exception applied to the decision to place two well-known rival gang members together in recreation); *see also Alfrey*, 276 F.3d at 565 (ruling that the discretionary function exception applied to the decision not to relocate an inmate who had received death threats from his cellmate).

[332] *Hamil v. Bashline*, 392 A.2d 1280, 1284 (Pa. 1978).

[333] *Id.*

[334] *Id.*

[335] *Id.*

causation analysis. Plaintiff seeks to apply the familiar concept that a defendant takes a plaintiff as he or she finds him, and accordingly may be liable for unusually dramatic injuries that a plaintiff in ordinary good health would not have suffered (the "eggshell plaintiff" doctrine),[336] as well as for "any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or negligent manner."[337] Under Plaintiff's analysis, the government is liable for the full impact of the Taylor assault even if Plaintiff was unusually sensitive and susceptible to injury after the Northington assault, or if the Taylor assault aggravated preexisting injuries initially caused by the Northington assault.

The government does not dispute that if it is proven that the Taylor assault was a substantial factor in aggravating Plaintiff's injuries, it would be liable for the extent of the aggravation.[338] But the government argues that this is not the "correct legal construct" in this case; instead, it argues, Plaintiff is trying to recover damages that were actually caused in the Northington assault, that is, damages caused by an earlier tortfeasor.[339] Although two tortfeasors may be liable for joint damages, and a second tortfeasor may be liable for aggravation of damages caused by an earlier tortfeasor, a second tortfeasor may not be liable for damages caused by an earlier tortfeasor.[340]

The Court has found, as a factual matter, that the Taylor assault not only caused the acute damages Plaintiff suffered from his razor wounds in the weeks and months after the incident, but

---

[336] Restatement (Second) of Torts § 461, cmt. a; *Fritz v. Consol. Rail Corp.*, No. 90-7530, 1992 WL 96285, at *4 (E.D. Pa. Apr. 23, 1992), *aff'd*, 983 F.2d 1050 (3d Cir. 1992).

[337] Restatement (Second) of Torts § 457; *see also Shaffer v. Commonwealth*, 842 A.2d 989, 993 (Pa. 2004).

[338] United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] ¶¶ 447, 449, 455.

[339] *Id.* ¶¶ 451–63.

[340] Restatement (Second) of Torts § 879, cmt. b.

was also a substantial factor in the deteriorating back pain that resulted in a cascade of

complications, as well as a substantial factor in Plaintiff's PTSD. Plaintiff has proven by a

preponderance of the evidence that the Taylor assault, in which he was repeatedly slashed with a

razor weapon for several minutes before a stun munition blew up underneath his body, was a

proximate cause of the back pain and PTSD because that assault produced symptoms beyond

what Plaintiff would have experienced had he only been assaulted by Northington and his

associates.

Because all parties, and the Court, agree that at least some injuries were sustained in the

Northington assault, however, a further question comes into play—the question whether the

government is liable for the entire extent of Plaintiff's damages or whether Plaintiff's damages

should instead be apportioned between the two assaults, leaving the government liable only for

harms specifically attributable to the Taylor assault.

The Third Circuit has recognized that under Pennsylvania law, "[c]ertain types of harm

'are normally incapable of any logical, reasonable, or practical division.'"[341] Indivisible harms

include "death, a broken limb and any single wound."[342] "By far the greater number of personal

injuries . . . are . . . normally single and indivisible."[343] Before the question of what portion of

damages the government may be liable for can be answered, it must first be determined whether

the harm can be divided into portions at all. "[T]he burden of proving apportionment rests on the

party seeking it."[344]

---

[341] *Borman v. Raymark Indus., Inc.*, 960 F.2d 327, 331 (3d Cir. 1992) (quoting Restatement (Second) of Torts § 433A, cmt. i).

[342] *Id.*

[343] *Id.* (quoting Restatement (Second) of Torts § 433A, cmt. i).

[344] *Id.* at 332 (quoting *Martin v. Owens-Corning Fiberglas Corp.*, 528 A.2d 947, 949 (Pa. 1987)).

In *Borman v. Raymark Industries*, the Third Circuit considered the case of a smoker and insulation installer who was diagnosed with asbestosis and lung cancer.[345] Expert testimony established that both the plaintiff's smoking and his exposure to asbestos dust were substantial factors in the development of his disabling health conditions.[346] The expert was unable, however, to opine as to the proportional responsibility each of the two causes bore in causing the plaintiff's asbestosis and lung cancer—although the plaintiff's expert agreed that each was more than 0% and less than 100% responsible, he could not apportion the contribution of each factor any more specifically than that.[347]

The Third Circuit held that under Pennsylvania law, apportionment could not be made in such a case, where even the "medical experts, relying on the same evidence [as the factfinder], could not draw" a conclusion on apportionment.[348] The proper analysis, the court explained, began with determining whether "(a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm."[349] As in *Borman*, the concept of "distinct harms" can be dispensed with in Plaintiff's case. While there are a number of separate injuries and conditions alleged in this case—PTSD and back pain are separate harms, for example—the concept of distinct harms comes into play where each harm is separately attributable to a distinct cause. Here, by contrast, *both* Plaintiff's PTSD *and* his back pain were caused in part by the Northington assault and in part by the Taylor assault. The relevant question,

---

[345] 960 F.2d at 328.

[346] *Id.* at 330–31.

[347] *Id.*

[348] *Id.* at 333, 334.

[349] *Id.* at 332 (quoting Restatement (Second) of Torts § 433A).

then, as in *Borman*, is whether "the particular contribution of multiple causes can be determined on a factual basis."[350] Here, it cannot.

Just as in *Borman*, Plaintiff's experts opined that while both the Northington assault and the Taylor assault were substantial factors in causing Plaintiff's harms, they were unable to divide or apportion the harms between the two causes. On the issue of Plaintiff's back pain and its many complications, Dr. Salkind opined that Plaintiff had pre-existing lumbar degenerative disc disease, which was asymptomatic before the two assaults in May and October of 2006.[351] Dr. Salkind concluded that "these attacks made his degenerative arthritis clinically symptomatic."[352] In other words, the combined trauma of the Northington and Taylor assaults caused Plaintiff's back pain. Similarly, Dr. Schwartz opined that Plaintiff's back pain was caused by the trauma Plaintiff sustained in "both attacks."[353] Regarding the Taylor assault in particular, Dr. Schwartz concluded in his expert report that Plaintiff "suffered significant injuries in the razor attack an[d] concussion grenade blast of October 12, 2006."[354] Dr. Schwartz also testified that at the time he examined Plaintiff, he could not "tell the difference how much injury occurred with the first versus the second [assault]."[355] Even the government's expert, whose opinions the

---

[350] *Id.* at 331.

[351] Salkind Test., Trial Tr. July 11, 2019, at 16–18.

[352] *Id.* at 17.

[353] Schwartz Test., Trial Tr. July 15, 2019, at 95–99.

[354] *Id.* at 84. Dr. Schwartz's expert report further concluded that Plaintiff's "pain and abnormal neurological exam on May 16, 2016 were as a direct consequence of the clinical cascade that ensued follow[ing] the second assault on Mr. Bistrian." *Id.* at 85. In his testimony, Dr. Schwartz clarified that in his opinion, Plaintiff's "cascade" of worsening back injuries was the combined result of the sequence of two attacks. *Id.* at 86, 93–99. The government criticizes Dr. Schwartz's testimony on the basis that he changed the opinion presented in his expert report—whereas the report appeared to attribute Plaintiff's back injuries only to the Taylor assault, and to the stun munition explosion in particular, Dr. Schwartz clarified in his testimony that he believed both attacks contributed. *See* United States' Proposed Findings of Fact [Doc. No. 484] ¶ 153. Even if the Court were to hold Dr. Schwartz to his report, however, it would not help the government, as the report specifically attributed all of Plaintiff's damages to the Taylor assault.

[355] Schwartz Test., Trial Tr. July 15, 2019, at 95. Dr. Schwartz did allow that perhaps if he had "been able to examine [Plaintiff] between attack one and attack two," he might have been able to "differentiate." *Id.* This testimony does not suggest that the harm in question—Plaintiff's back pain—was capable of apportionment if only

Court in any event has not credited, opined that the cause of Plaintiff's back condition was the underlying degenerative disc disease itself, not either (or both) of the assaults.[356] As a result, there is no evidence in the record based on which a factfinder could make an apportionment of damages as to the constellation of symptoms and complications the Court has referred to simply as "back pain."[357]

Likewise, Dr. Weiss, Plaintiff's psychological expert, opined that he could not distinguish with any certainty the portion of Plaintiff's psychological condition that was attributable to each assault.[358] Here too, moreover, the government's expert, whom the Court in any event has not credited, offered no basis to apportion damages either—rather, she concluded that Plaintiff did not have PTSD at all. Like Plaintiff's back pain, therefore, Plaintiff's PTSD is a harm that cannot be apportioned.

The other category of injury the Court found by a preponderance of the evidence to have been caused by the Taylor assault does not require an apportionment analysis. The government has not disputed that if it is found liable in the Taylor assault, damages should be awarded for the

---

it had been assessed in time. Instead, it merely suggests that Plaintiff likely suffered from the injuries inflicted in the Northington assault in the interim between that first incident and the Taylor assault, and a physician who examined Plaintiff during that period would be able to speak to the extent of damages attributable solely to the Northington assault. By contrast, Dr. Schwartz was able to speak only to the extent of damages attributable *collectively* to the combined effect of the Northington and Taylor assaults. Of course, the United States could not be liable for any harms that can be attributed solely to the Northington assault, i.e., those that predated the Taylor assault. But credible expert testimony established that the harms Plaintiff has suffered since the Taylor assault were, to a reasonable degree of medical certainty, the *combined* result of *both* assaults.

[356] Rushton Test., Trial Tr. July 19, 2019, at 55–58, 62–63, 67; *see Borman*, 960 F.2d at 329 & n.3 (noting that the trial judge found no reasonable basis for apportionment because while the plaintiff's expert opined that no apportionment of damages was possible between the two causes, the defendant's expert opined that the damages were entirely attributable to one cause and not at all to the other).

[357] *Borman*, 960 F.2d at 333.

[358] Weiss Test., Trial Tr. Aug. 8, 2019, at 172–73. Plaintiff disagreed with this in his testimony. Bistrian Test., Trial Tr. Aug. 7, 2019, at 114. Following the approach in *Borman*, however, as well as the general principle that expert testimony is required on all issues of medical causation, the Court follows the opinion of the experts it has credited in determining whether apportionment of damages is possible.

acute recovery period in the weeks and months after the Taylor assault. Those harms were not jointly caused by the Northington assault, so apportionment is not at issue.

The government argues that it cannot be entirely responsible for any harm in which both assaults were a substantial factor, because the principle that a tortfeasor may be liable for the entire harm where a harm cannot be apportioned does not apply "when one person causes a harm that is aggravated by another."[359] In that case, each tortfeasor is liable for the harm it caused, but "the joint liability is limited to the aggravation," so that "the second tortfeasor is not liable for the original harm."[360]

Of course, the government is correct that it cannot be held liable for harms attributable *solely* to causes other than the Taylor assault, including those attributable to the Northington assault. The Court has found that the Taylor assault was not a substantial factor in causing Plaintiff's shoulder injury or his hearing loss. The government accordingly owes no damages on those issues. But the harms to which both the Taylor and Northington assaults contributed— Plaintiff's back pain and its attendant complications, and Plaintiff's PTSD—are not apportionable. The burden of proving apportionment is on the party seeking it.[361] The government has not shown that Plaintiff's damages can be segregated into a Northington category, a Taylor category, and an "aggravation" category, and indeed all the expert testimony in the record indicates that no such apportionment can be made. Accordingly, the government has not carried its burden to avoid liability for the full extent of Plaintiff's back injury and PTSD.

---

[359] United States' Proposed Findings of Fact and Conclusions of Law [Doc. No. 484] ¶ 454 (quoting Restatement (Second) of Torts § 879, cmt. b).

[360] *Id.* ¶ 455 (quoting Restatement (Second) of Torts § 879, cmt. b).

[361] *Borman*, 960 F.2d at 332.

The purpose of awarding damages under the FTCA is to compensate the plaintiff for his losses.[362] Plaintiff is entitled to receive damages in an amount that will fairly compensate him for his injury and for the reasonable and necessary costs of past and future care.[363] As for noneconomic damages, a trier of fact may award damages "based on the plaintiff's pain and suffering, embarrassment and humiliation, loss of ability to enjoy the pleasures of life, and disfigurement."[364] A plaintiff is entitled to be fairly compensated for physical pain, mental anguish, discomfort, inconvenience, and distress, past and future, caused by his or her injuries.[365] The United States is liable and shall pay to Plaintiff the sum of $251,340.81 for past costs of care and $1,000,000.00 for future costs of care, as well as $500,000.00 for pain and suffering.

## III.    CONCLUSION

This case is about the brutal assault Aaron Taylor perpetrated, and the physical and emotional damage it has caused Plaintiff over many years. But this case is also about the extraordinary responsibility entrusted to correctional officers at the FDC, and about the tragic and horrific consequences that can result when officers are negligent in their duties. From August to October of 2006, Aaron Taylor was able to obtain a razor, fashion it into a weapon,

---

[362] *Barnes v. United States*, 685 F.2d 66, 69 (3d Cir. 1982). Attorneys' fees under the Equal Access to Justice Act are not available in tort cases. 28 U.S.C. § 2412(d). The appellate courts to have addressed the issue have held that the FTCA does not provide statutory authority for an award of attorneys' fees. *See Anderson v. United States*, 127 F.3d 1190, 1191–92 (9th Cir.1997) ("Congress has not waived the government's sovereign immunity for attorneys' fees and expenses under the FTCA"); *Joe v. United States*, 772 F.2d 1535, 1537 (11th Cir.1985) ("The FTCA does not contain the express waiver of sovereign immunity necessary to permit a court to award attorneys' fees against the United States directly under that act."). Courts have awarded attorneys' fees where the government engaged in substantial discovery abuses in bad faith during the litigation of an FTCA action. *See, e.g.*, *Limone v. United States*, 815 F. Supp. 2d 393 (D. Mass. 2011). In his proposed findings of fact and conclusions of law, Plaintiff once again asserted bad faith by the government during the conduct of discovery. Plaintiff's Proposed Findings of Fact and Conclusions of Law [Doc. No. 478] ¶¶ 47–52, 81–89. The Court previously determined what sanctions were appropriate to address the government's actions in discovery, *see* Memorandum Opinion [Doc. No. 459], and no award of attorneys' fees is warranted.

[363] *Nudelman v. Gilbride*, 647 A.2d 233, 237 (Pa. 1994).

[364] *Late v. United States*, No. 13-0756, 2017 WL 1405282, at *6 (M.D. Pa. Apr. 20, 2017) (citing *Catlin v. Hamburg*, 56 A.3d 914, 924–25 (Pa. Super. Ct. 2012)).

[365] *See* Pa. Civ. Jury Instruction 7.130.

hold it in his cell, carry it with him to a rec pen, and use it to violently assault a fellow inmate. Although there were numerous opportunities for the weapon to be discovered and retrieved, and despite the mandatory policies that razors be retrieved and thorough searches conducted to recover contraband and prevent its entry to the recreation areas, those opportunities were squandered by FDC personnel acting hastily and carelessly.

The Court is well aware of the many challenges in the job of a correctional officer. This was not, however, as the United States has suggested, a case where officers faced a complicated plot and ingenious techniques whereby an inmate obtained and concealed dangerous contraband in a manner that no correctional officer could feasibly have discovered. On the contrary—the record betrays little ingenuity or even planning on Taylor's part. The overwhelming weight of the evidence suggests this was a case of pure carelessness. An extraordinary series of negligent blunders led directly to the assault on Plaintiff and to the injuries and medical complications that followed. The United States is liable for those damages.

## VERDICT

The Court hereby finds in favor of Plaintiff Peter Bistrian and against the United States in the amounts of $251,340.81 for past costs of care, $1,000,000.00 for future costs of care, and $500,000.00 for pain and suffering. Accordingly, the Court will enter judgment for Plaintiff in the amount of $1,751,340.81. An appropriate Order follows.

**/s/ Cynthia M. Rufe**

_____

**CYNTHIA M. RUFE, J.**